# UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF FLORIDA

| | | |
|---|---|---|
| A.L., et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No.:  6:14-cv-1544-ACC-GJK |
| | ) | |
| WALT DISNEY PARKS AND | ) | |
| RESORTS U.S., INC., | ) | |
| | ) | |
| Defendant. | ) | |

## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT
## AND INCORPORATED MEMORANDUM OF LAW

/s/ Kerry Alan Scanlon
Kerry Alan Scanlon (admitted *pro hac vice*)
Jeremy M. White (admitted *pro hac vice*)
Kaye Scholer LLP
901 15th Street, NW
Washington, DC 20005
(202) 682-3500 telephone
(202) 682-3580 facsimile
kscanlon@kayescholer.com
jeremy.white@kayescholer.com

Manuel Kushner
mkushner@kayescholer.com
Florida Bar Number: 330957
KAYE SCHOLER LLP
Phillips Point, West Tower
777 South Flagler Drive, Suite 900
West Palm Beach, FL 33401-6163
(561) 802-3230 telephone

October 7, 2015

*Attorneys for Defendant Walt Disney Parks and Resorts U.S., Inc.*

## PRELIMINARY STATEMENT

Discovery has confirmed a fatal and glaring defect in plaintiffs' complaint:  plaintiffs sued under a statute whose purpose is to ensure access to public accommodations for persons with disabilities -- but plaintiffs were never excluded from or denied access to anything during their visit to the Walt Disney World Resort ("WDW").  In fact, under Disney's Disability Access Service ("DAS"), which allows guests with autism and other cognitive disabilities to hold a place in line for rides without standing in the actual line -- thereby giving them time to go to other attractions while they wait virtually -- plaintiff A.L. and his family had the opportunity to experience all the same or even more rides and attractions than the majority of other guests and with much less wait time.

Even though their claim is couched in the language of equal access under the Americans with Disabilities Act ("ADA"), it is clear that what plaintiffs really want is for Disney to accommodate A.L.'s specific, immediate, and unpredictable personal preference for instant and unrestricted access to the rides of his choice -- regardless of how popular the rides are or how long other guests (including others with disabilities) have to wait in line.  The ADA requires no such thing, either to favor a particular person or to disadvantage other patrons.

There is no evidence that A.L. was prevented from accessing the rides at WDW or that the relief sought is necessary to afford access to A.L., the required elements of a claim under the reasonable modification provision of Title III of the ADA.  To the contrary, with his DAS card and other ride passes given to A.L. on the day of his visit, he could have experienced his preferred rides at the Magic Kingdom, in whatever order he chose and with little or no waiting.[1]  Instead, his mother, plaintiff D.L., rejected the DAS system out of hand and took her son on only

---

[1]  A.L. provided to Disney a list of 19 rides he preferred to experience in a particular order at Magic Kingdom.  *See* Ex. 1, Pls.' Resp. to Def.'s Interrog. No. 7.

one ride before "redirecting" him to a show, a parade, and other attractions. Turning the facts on their head, this lawsuit alleges that plaintiffs were discriminatorily denied access to the very rides they *chose* not to go on.

What plaintiffs are actually seeking to achieve is not "access" -- which they already had -- but rather fulfillment of their subjective desire to follow a particularized routine of experiencing all their favorite rides in a precise order of their choosing, without having to wait anywhere at any time. Their very subjective and personal routine, which may reflect nothing more than what they did in the past, is not based on a medical need or inherent attribute of autism, as plaintiffs assert. Courts have consistently ruled that plaintiffs are not entitled to the precise and self-defined accommodation of their choice. Disney is not obligated to operate its parks so as to guarantee that each of A.L.'s preferences is fulfilled and at the expense of equal treatment of everyone else.

Even if plaintiffs could make a persuasive showing that Disney has to throw out DAS to afford access to A.L., plaintiffs would still have to show their request is "reasonable." They demand that Disney adopt a version of the prior Guest Assistance Card ("GAC") system -- a system never required under the ADA -- which fraud and abuse was making impossible to sustain. Plaintiffs cannot prove that reverting to the disruptive and unworkable GAC is a "reasonable" accommodation.

Because there is simply no evidence to show that the current DAS system prevented A.L. from accessing the rides and attractions at Magic Kingdom or that it is in any way a violation of the ADA, Disney is entitled to summary judgment in its favor.

## FACTUAL BACKGROUND

**A.    The Guest Experience at Magic Kingdom**

Magic Kingdom is one of four theme parks at WDW.  It is organized into six "lands," comprising 41 rides and other attractions.  *See* https://disneyworld.disney.go.com/ destinations /magic-kingdom/.  Throughout the day, guests can experience shows, parades, and concerts, without having to wait in any line.  *See* Def.'s Statement of Undisputed Material Facts ("DSOF") ¶ 2.  There are also numerous shops, restaurants and special events located in close proximity to the rides and other attractions.  *Id.*  At Magic Kingdom, the intention is that every guest feel immersed throughout their visit in a constantly changing fantasy world played out on an enormous three-dimensional stage where there is always something for guests to do.

Each year, millions of guests from around the world visit the theme parks at WDW.  To experience the attractions, guests generally stand in a line, called the stand-by line, and wait until they move to the front of the line to enter the attraction.  Ex. 2, WDW Guide for Guests with Cognitive Disabilities ("WDW Guide") at Disney-AL0000182.  The majority of attractions also have a separate line -- the so-called "FastPass" line -- which typically has a very short wait.  *Id.* This line is available to guests who take advantage of the FastPass system, whereby guests receive a designated return time from a ride location, essentially saving their place in line without having to stand in an actual line.  Ex. 3, Laval Rep. ¶¶ 9-10; Ex. 4, Hale Dep. 67:19-68:1; Ex. 5 Laval Dep. 18:14-20:4.  At the return time, guests can enter the FastPass line.

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████  Ex. 3, Laval Rep. ¶¶ 10-11.

**B.**     **The GAC System Led to Widespread Fraud and Abuse**

Until October 9, 2013, the former GAC system generally provided guests with disabilities and their families unlimited, repeated and prompt access to rides and attractions through alternative "backdoor" entrances or shorter FastPass lines without requiring them to wait in the regular attraction lines. Ex. 6, Armor Dep. 30:10-13, 46:13-17.[2]  GAC had six different tiers of assistance. *Id.* at 46:23-47:1.  However, through social media and other sources, guests increasingly learned about the top tier and demanded it even though they did not need it. *Id.* at 47:1-12.  Because Disney is not allowed to ask about a guest's disability -- thus making it difficult for the employees to effectively filter guests into the various tiers or to deny them GAC cards altogether -- GAC became an unlimited front-of-the-line pass for anyone asserting a need for it, which resulted in widespread abuse. *Id.* at 46:13-15, 46:23-47:5, 55:17-22, 56:9-11.

Among the abuses:  Most commonly, some guests fabricated their need for a pass at all.[3] *See* DSOF ¶ 12.  More egregiously, some guests created counterfeit GACs, posted Craigslist ads offering the use of GACs -- at the cost of thousands of dollars -- for unauthorized "tours" of WDW, and used the internet to sell unexpired GACs.[4]  *Id.*  This misuse became notorious; in May 2013, the New York Post, NBC News, Fox News and other media outlets ran stories documenting accounts of wealthy mothers from New York City paying disabled tour guides to

---

[2] ████████████████████████████████████████████████ *Id.* at 100:6-8.

[3] For example, on at least one occasion, Guest Relations employees at Magic Kingdom witnessed a teenage boy celebrating with his friends after leaving City Hall with a GAC. Ex. 7, Riggs Dep. 24:9-18.

[4] This exaggeration or fabrication of need for GAC reached a point where a ride sometimes had more guests in the GAC line than in the stand-by line. Ex. 7, Riggs Dep. 28:14-24.

lead them through WDW so they could skip lines. *See* Ex. 11, Disney-AL1044366; Ex. 12, Disney-AL1015875-77; Ex. 13, AL,DL001701-3.



[5] Ex. 6, Armor Dep. 58:20-59:9.

Ex. 3, Laval Rep. ¶ 38.

## C.   <u>DAS and Other Services Provided to Guests with Cognitive Disabilities</u>

### 1.   **Development and Implementation of DAS**

In Spring 2012, Disney began considering changes to the GAC system.  An Attractions Access working group was assembled.  *See* Ex. 6, Armor Dep. 15:22-16:16; Ex. 16, Disney-AL1011162-3.  This group comprised leaders from various departments, including Services for Guests with Disabilities, Park Operations, Guest Relations, Public Affairs, and Legal, among others.  DSOF ¶ 1.  The objective was to reduce the fraud and abuse under the GAC system, while providing a sustainable, optimal level of service to guests with disabilities who are unable to wait in a line.  *Id.*  The team spent many months analyzing the abuses of GAC (including the



[5]

*See* DSOF ¶ 13.

Ex. 15, Disney-AL1010280.

*Id.*; Ex. 6, Armor Dep. 58:24-59:9.

Ex. 15, Disney-AL1010280; Ex. 6, Armor Dep. 100:9-16.

results of the IE Easter Study) and carefully considering how to develop a program that would provide a complete accommodation to guests with disabilities who could not stand and wait in a line. *Id.* The team also consulted various autism organizations and considered their suggestions. *Id.*

This extensive work led to replacing GAC with the DAS system on October 9, 2013. *Id.*[6] As with FastPass, instead of physically standing in line, DAS cardholders may wait for their entry virtually. *Id.* at ¶ 2. Unlike with FastPass, however, DAS return times never run out for the day and can always be requested. Ex. 3, Laval Rep. ¶ 17.[7] DAS return times, which are the posted ride wait times minus ten minutes, are issued at each ride or attraction, although the first one may be issued at Guest Relations when the DAS card is received. Ex. 20, DAS guide and FAQs at Disney-AL0000004; Ex. 4, Hale Dep. 72:14-73:5; Ex. 7, Riggs Dep. 107:2-6. Once the return time arrives and the DAS return time is redeemed, a guest may then obtain another return time for the same attraction or for any other attraction. Ex. 20, DAS guide and FAQs at Disney-AL0000002.[8] While guests are waiting virtually for their return time to arrive, they can avail of the many other attractions throughout the park -- the concerts, characters, and stores. *See* DSOF ¶ 2.

---

[6]  Since its implementation, Disney has not made any changes to the substance of DAS, though it has changed the DAS technology at WDW to allow employees to authorize DAS for guests and provide attraction return times by loading the information into their electronic tickets. Ex. 19, Def.'s Am. Resp. to Pl.'s Interrog. No. 5.

[7]  While FastPass provides guests with return times that expire, DAS return times are valid until redeemed prior to park closing. *See* Ex. 20, DAS Guide and FAQs at Disney-AL0000002; Ex. 21, DAS Fact Sheet at Disney-AL0000102; Ex. 2, WDW Guide at Disney-AL0000182; Ex. 4, Hale Dep. 69:1-4.

[8]  At the return time, DAS cardholders enter the ride through the FastPass line or through an alternative entrance. *See* Ex. 6, Armor Dep. 79:4-14.

Another benefit of DAS is that it actually provides near-immediate access to rides with short wait times. *Id.* at ¶ 3. If the wait time posted at the attraction is less than 15 minutes, DAS cardholders are typically given access right away. *Id.*[9] Combined with the FastPass system, this gives DAS guests the opportunity to experience a very high number of attractions in a single day -- far more than most guests could without DAS. Ex. 4, Hale Dep. 78:3-79:12; *infra* Section I.B.2. ███████████████████████████████████████████████████
███████████████████████████████████████ Ex. 3, Laval Rep. ¶ 23, Exhibit 1.

### 2.    Other Guest Services

In addition to DAS, other services are available to assist guests with disabilities. Ex. 7, Riggs Dep. 61:22-62:10, 68:10-69:8; *see also*, Ex. 2, WDW Guide. For example, Guest Relations employees offer guidance to guests with anxiety, such as warning about large crowds or advising attending nighttime parades, which attract smaller crowds than daytime parades. Ex. 7, Riggs Dep. 52:13-53:6. They also help guests with itinerary planning based on guests' interests, providing advice about the best route to follow. *Id.* at 59:15-62:10. Sometimes DAS guests and each member of their party also may receive re-admission passes ("re-ads"), which allow them to immediately enter the shorter FastPass line at any attraction on any given day without requiring them to stand and wait in a line or even to wait virtually. Ex. 4, Hale Dep. 79:1-12; Ex. 17, Jones Dep. 79:14-80:9.

Around the same time that DAS was implemented, Disney developed in collaboration with Autism Speaks a guide titled *Planning a Trip to the Walt Disney World Resort: A Resource*

---

[9] *See, e.g.*, Ex. 4, Hale Dep. 85:1-3 ("[For DAS card holders] ten minutes is deducted from the time. So, typically, if the wait is less than 15 minutes, they are allowed right in."); *see also*, Ex. 7, Riggs Dep. 109:13-23.

*for Guests with Cognitive Disabilities including Autism Spectrum Disorder (ASD).* Ex. 2, WDW

Guide; *see also* Ex. 4, Hale Dep. 33:11-21. This guide provides strategies for parents to use

when visiting WDW with a child with a cognitive disability. *See* Ex. 2, WDW Guide.[10] As

Disney's autism expert explained, the strategies identified in the WDW guide are consistent with

evidence-based techniques in the autism literature. Ex. 22, Kelderman Rep. at 4.

**D.    Plaintiffs' Visit to Magic Kingdom**

This lawsuit involves a single visit to Magic Kingdom on the evening of December 19,

2013, when plaintiffs were given a DAS card and ████████████ for the six people in

their party. *See* DSOF ¶ 4. During that visit, plaintiffs only went on one ride, Jungle Cruise,

using re-admission passes, and then watched a show and a holiday parade. *See* DSOF ¶ 5. At no

time did they use the DAS card, and they did not use ████████████████ *Id.* Less

than four months later, plaintiff A.L., by and through his mother, D.L., filed this lawsuit, alleging

that because GAC was replaced by DAS, A.L. was discriminated against in violation of Title

III of the ADA. *See* Doc. 98, Am. Compl. ¶¶ 64-83.

<b>STATEMENT OF UNDISPUTED MATERIAL FACTS</b>

The following are the material facts as to which there is no genuine issue for trial:

1.    Disney's Attractions Access working group, which included leaders from various

departments, spent many months analyzing ways to reduce the fraud and abuse under the GAC

system and carefully considering how to develop a new program that would provide a complete

accommodation to guests with disabilities who could not stand and wait in a line. Ex. 6, Armor

---

[10] For example, it suggests planning ahead, utilizing a visual schedule, and bringing along a device or activity to use as a distraction while waiting. Ex. 2, WDW Guide at Disney-AL0000168. The guide also identifies quiet areas, and includes descriptions of each step of arrival and a detailed chart highlighting features of rides that may affect a guest with cognitive disabilities. *Id.* at Disney-AL0000170; Disney-AL0000173-81, Disney-AL0000183.

Dep. 17:24-19:23, 23:7-16, 131:14-132:4, 133:8-134:7, 135:21-136:2. The group consulted

various autism organizations and considered their suggestions. *Id.* at 50:6–55:23; Ex. 17, Jones

Dep. 48:15-53:6. This extensive work led to replacing GAC with DAS on October 9, 2013. Ex.

18, Disney-AL0000001; Ex. 6, Armor Dep. at 24:4-6, 29:18-23, 45:1-46:12.

2.      DAS allows guests with autism and other cognitive disabilities to hold a place in

line for rides without standing in the actual line -- thereby giving them time to go to other

attractions while they wait virtually. There are many different shows, parades, concerts, shops,

restaurants and special events located throughout Magic Kingdom that guests can experience

during their virtual wait. Ex. 20, DAS guide and FAQs, Disney-AL0000002-0000006; Ex. 7,

Riggs Dep. 107:2-108:13; Ex. 17, Jones Dep. 47:2-48:11, 68:14-23; Ex. 4, Hale Dep. at 69:5-10.

3.      If the wait time posted at a ride or attraction is 15 minutes or less, DAS

cardholders and their parties are typically given access right away. Ex. 4, Hale Dep. at 72:14-

73:5; Ex. 7, Riggs Dep. 107:2-6.

4.      Plaintiffs A.L. and D.L. visited Magic Kingdom on the evening of December 19,

2013, and were given a DAS card and ███████████ for the six people in their party.

Ex. 23, D.L. Dep. at 85:6-18, 110:5-7, 110:8-12; Ex. 1, Pls.' Resp. to Def.'s Interrog. No. 7.

5.      During plaintiffs' December 2013 visit to Magic Kingdom, plaintiffs only went

on one ride, Jungle Cruise, using re-admission passes, and then watched a show and a holiday

parade. At no time did they use the DAS card, and they did not use at least ███████

███████████ Ex. 23, D.L. Dep. at 103:5-20, 106:3-16, 116:20-118:23, 124:15-125:10; Ex.

30, Disney-AL0000144-5.

6.      There is no evidence or allegation that A.L. had a meltdown during his December 2013 visit to Magic Kingdom.  In fact, A.L.'s mother testified that he was doing well that day. Ex. 23, D.L. Dep. at 131:11-12; Ex. 24, James Dep. at 146:4-9.

7.      A.L. is not incapable of deviating from his supposed consistent routine of going on specific rides in an exact order, as shown by him changing the order on his list of preferred rides at Magic Kingdom, going "off his route" to experience a show, a parade and other attractions during his December 2013 visit, and not following the same routine during two separate visits to Epcot in July 2014 and July 2015.  Ex. 23, D.L. Dep. 103:11-105:4, 124:15-125:1; Ex. 26, Disney-AL0005190; Ex. 22, Kelderman Rep. at 2, 6; Ex. 28, Spector Rep. ¶ 13.

8.      A.L. has been on several trips and vacations within the past five years that required him to travel by car or plane, including a drive from Florida to North Carolina and a flight to Cancun, Mexico.  Ex. 1, Pls. Resp. to Def.'s Interrog. No. 8.

9.      The inability to wait or the need for immediate gratification is not a diagnostic criteria or requirement of autism spectrum disorder ("ASD").  Ex. 24, James Dep. at 210:18-211:3; Ex. 25, Kelderman Dep. at 71:7-8; Ex. 28, Spector Rep. ¶ 8.

10.     A.L. has shown that he can wait in lines for up to 15 minutes.  Ex. 23, D.L. Dep. at 95:5-15; Ex. 24, James Dep. at 98:25-99:5; Ex. 27, James Rep. at 11.

11.     On December 19, 2013, approximately ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ for A.L.'s preferred rides at Magic Kingdom ▓▓▓▓▓▓▓▓▓▓▓  Ex. 28, Wait Time Report. With his DAS card and remaining re-admission passes, A.L. could have gone on the rides on his preferred list with little to no waiting.  *Id.*

12.     There were various forms of documented abuse of the GAC system, including that some guests fabricated their need for a pass, created counterfeit GACs, posted Craigslist ads

offering the use of GACs -- at the cost of thousands of dollars -- for unauthorized "tours" of WDW, and used the internet to sell unexpired GACs. Ex. 6, Armor Dep. at 9:1-15; 9:21-10:15, 55:13-14, 17-22; Ex. 8, Disney-AL1017248; Ex. 9, Disney-AL1040009-11; Ex. 10, Disney-AL1014901-04.

13.     Disney's IE team conducted a two-week study in April 2013, 

Ex. 6, Armor Dep. at 58:18-59:17; Ex. 14, Disney-AL1010281-2.

14.

Ex. 3, Laval Rep. ¶¶ 40-41, Exhibits 5 & 6; *see also* Ex. 5, Laval Dep. 78:13-82:23, 87:5-88:14.

15.

Ex. 3, Laval Rep. ¶ 11; Ex. 5, Laval Dep. 17:8-18:13.

16.

Laval Rep. ¶¶ 30-32, 43.

17.     Plaintiffs do not intend to visit Magic Kingdom in the future.  Doc. 98, Pls.' Am. Compl. ¶ 83; Ex. 23, D.L. Dep. 102:21-103:1.

## ARGUMENT

Summary judgment is appropriate where, as here, "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of

11

law." Fed. R. Civ. P. 56(a).  A disputed fact is "material" only if its resolution could affect the

outcome of the suit, and it is "genuine" if the evidence is such that a reasonable jury could return

a verdict for either party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  The party

seeking summary judgment bears the initial burden of demonstrating the absence of a genuine

issue of material fact through affirmative evidence or by showing that there is an absence of

evidence to support the nonmoving party's case. *Celotex v. Catrett*, 477 U.S. 317, 323 (1986);

*Porter v. Ray*, 461 F.3d 1315, 1320 (11th Cir. 2006).  However, when the non-moving party

bears the burden of proof on an issue, the moving party need not support its motion with

affidavits or other material negating the opponent's claim but instead may simply point out the

lack of evidence supporting their case. *Denney v. City of Albany*, 247 F.3d 1172, 1181 (11th Cir.

2001).  If the "evidence is merely colorable, or is not significantly probative, summary judgment

may be granted." *Earley v. Champion Intern. Corp.*, 907 F.2d 1077, 1080-81 (11th Cir. 1990).

When the burden shifts to the non-moving party to designate specific facts showing that

there is a genuine issue for trial, the non-moving party cannot rely on "a mere scintilla of

evidence" supporting its position. *Walker v. Darby*, 911 F. 2d 1573, 1577 (11th Cir.

1990).  Rather, for a court to find a genuine issue for trial, the non-moving party must establish,

through the record presented to the court, that it is able to prove evidence sufficient for a

reasonable jury to return a verdict in its favor. *Cohen v. United Am. Bank*, 83 F. 3d 1347, 1349

(11th Cir. 1996).  No such circumstances exist here.  As set forth below, Disney is entitled to

summary judgment because plaintiffs cannot show that their requested modification is both

"reasonable" and "necessary" to afford access to WDW, and even if they could meet their

burden, Disney has a complete defense because the requested modification would increase the

wait times for ▓▓▓▓▓ of all guests and fundamentally alter their ride experience.

## I.      PLAINTIFFS CANNOT SATISFY TITLE III'S "NECESSARY" REQUIREMENT

### A.      Numerous Courts Have Applied the Supreme Court's Rule in Title III Cases and Denied Requested Modifications As Not "Necessary"

To prevail on their claim under Title III, plaintiffs must show that a reasonable modification of Disney's policy is *necessary to afford access* to WDW, unless doing so would fundamentally alter the nature of the goods, services, facilities, privileges, advantages, or accommodations offered at WDW. 42 U.S.C. § 12182(2)(A)(ii); *PGA Tour, Inc. v. Martin*, 532 U.S. 661, 688 (2001). In order to show that changing DAS is "necessary," plaintiffs must prove that it is "beyond [A.L.'s] capacity" to access the rides at Magic Kingdom with the DAS system in place. 532 U.S. at 682. It is not sufficient under *Martin* for plaintiffs to demonstrate that using DAS would be "uncomfortable or difficult" for A.L. *Id.* Because the undisputed facts and record evidence show that A.L. can access the rides at Magic Kingdom with the DAS system, plaintiffs cannot prevail as a matter of law.

Numerous federal courts applying *Martin* have held that a requested modification is not "necessary to afford access" to defendant's facilities under Title III if there are other available means of ensuring access. Judge Presnell followed the rule in *Martin* in another case involving the same legal issue, *Ault v. Walt Disney World Co.*, 2009 U.S. Dist. LEXIS 92911, at *27 (M.D. Fla. Oct. 6, 2009), concluding "[a]lthough some individuals may, with good reason, not want to use [mobility devices available at WDW] and instead prefer to use a Segway, *that preference -- standing alone -- is not essential to accessing Disney's Parks*." *Id.* at *27 (emphasis added) (*rev'd on other grounds*); *see also Ault v. Walt Disney World Co.*, 2011 U.S. Dist. LEXIS 45268, at *8 (M.D. Fla. Apr. 4, 2011).[11]

---

[11] *See also Coleman v. Phoenix Art Museum*, 2009 U.S. Dist. LEXIS 38905 (D. Ariz. Apr. 21, 2009) (citing *Martin* and holding that the plaintiff failed to meet his burden of showing that his

Similarly, in *Logan v. Am. Contract Bridge League*, 2006 U.S. App. LEXIS 5914, at *2 (3d Cir. Mar. 9, 2006), a person with a vision impairment sought to modify a bridge league's policy of prohibiting him from using a special deck of playing cards. The Third Circuit affirmed the district court's decision, finding that the plaintiff's contention that "he can't play to the maximum of [his] potential" without the requested modification failed to set forth a meritorious claim under Title III. *Id.* at *8-9. Applying *Martin*, the court reasoned that although the special cards enhanced plaintiff's ability to play bridge, the requested modification was not necessary to afford access to the bridge games and tournaments in light of the alternative accommodations. *Id.*; *see also Murphy v. Bowl*, 2005 U.S. App. LEXIS 21788, at *5-6 (9th Cir. Oct. 5, 2005) (citing *Martin*, the Ninth Circuit held that the requested modification of allowing a companion to accompany an individual with a cognitive disability on a ski bike was not necessary to improve her skills because there were alternative methods available).[12]

**B.      GAC Is Not Necessary to Afford A.L. Access to Disney's Parks**

**1.      A.L. Is Capable of Waiting and Deviating from His Routine**

Like the requested modifications in *Ault, Coleman, Dryer, Larsen, Logan* and *Murphy*, plaintiffs' request for unrestricted access that GAC provided is not necessary because an alternative accommodation -- the DAS system -- provides A.L. access to WDW. Specifically, it

---

own hip chair device was necessary to accommodate his disability when the museum offered to provide two different kinds of wheelchairs), *aff'd* 372 Fed. Appx. 793 (9th Cir. 2010); *Dryer v. Flower Hosp.*, 383 F. Supp. 2d 934, 941 (N.D. Ohio 2005) (plaintiff's requested modification of the hospital's policy prohibiting visitors from using its oxygen ports was not "necessary" under *Martin* because she was allowed to bring her own oxygen tank into the hospital); *Larsen v. Carnival Corp.*, 242 F. Supp. 2d 1333, 1344 (S.D. Fla. 2003) (finding that plaintiff's Title III claim failed because he could not establish that "it was necessary for Plaintiffs to carry on, rather than check in, the Bi-Pap [which is a breathing machine used while sleeping] in order to fully participate in the cruise").

[12]  The Ninth Circuit later ignored the Supreme Court's decision in *Martin* and the overwhelming weight of legal authority on this issue when construing Title III's "necessary" requirement in *Baughman v. Walt Disney World Co.*, 685 F.3d 1131, 1134-35 (9th Cir. 2012).

is undisputed that plaintiff A.L. was issued a DAS card, and that instead of being stuck standing in line, he was provided the opportunity during a virtual wait to experience other rides and attractions, such as watching a parade, meeting Disney characters, shopping, eating lunch, and going on rides with little or no wait times. Ex. 23, D.L. Dep. 124:15-125:10; *see also* DSOF ¶ 2. There is also no evidence that A.L. is incapable of waiting or that he could not access the park under DAS and, in fact, plaintiffs' own expert admitted that "they had access" during their visit. Ex. 24, James Dep. 179:21-180:2.

Plaintiffs allege that DAS is inadequate to accommodate A.L.'s individualized needs because he "is incapable of deviating from consistency, order and routine," and "[u]pon entering the [Disney] Parks, A.L. can travel in only one direction, stopping at only the same places, in the same order, every time." Doc. 98, Am. Compl. ¶ 70. The routine from which they claim an inability to depart is one of their own making based on highly subjective and personal experiences and there is no reasonable expectation, let alone any legal requirement, that the routine could be repeated in exactly the same way each time they visit the park. Even more important, this routine is born of preference or choice, not of medical necessity. Plaintiffs mistakenly insist that their idealized vision of a visit to WDW, based on visits in the past, is now a "need" that must be accommodated.

Plaintiffs' own experiences at WDW show that A.L.'s supposed consistent routine is neither consistent nor even required by his autism.[13] *See* DSOF ¶ 7. First, when A.L. visited Magic Kingdom, he did not follow the same order identified on his list of preferred rides and instead started the second ride -- Jungle Cruise -- which he was able to go on without any wait

---

[13] In fact, Dr. Kelderman testified that plaintiffs' allegations that "people with autism cannot browse; they cannot impulsively enjoy substitute experiences; they cannot 'kill time'" (*id.* ¶ 75) are neither factually correct nor supported by medical literature. Ex. 25, Kelderman Dep. 122:17-123:24; Ex. 22, Kelderman Rep. at 5-6.

because Disney provided him and everyone else in his party ███████████████████

████ *Id.* at ¶ 5. Second, while plaintiffs initially asserted that after going on that ride, they had

"no option" but to leave the park to avoid a meltdown by A.L. (Doc. 98, Am. Compl. ¶ 79), D.L.

conceded during her deposition that they did *not* leave the park but, rather, she redirected A.L.

"off of his route" and "chose" to go to other attractions, including a show, a parade and other

attractions. *See* DSOF ¶ 7. Third, during plaintiffs' subsequent visits to Epcot in July 2014 and

in July 2015 -- not in issue here -- A.L. deviated from *any* routine by going on different rides in

different order, thereby further showing that, with or without pre-planning, A.L. does not have to

follow a particular order to experience the parks.[14] *Id.* All of this led Dr. Kelderman to conclude

that A.L. is much less rigid than is alleged in the complaint and that A.L.'s mother could employ

behavioral interventions and strategies -- many of which have worked with A.L. in the past -- to

go on the rides at Magic Kingdom using DAS.  Ex. 25, Kelderman Dep. 130:2-132:21; Ex. 22,

Kelderman Rep. at 6.

It is also now undisputed that A.L. has some ability to wait, as D.L. conceded that A.L.

can wait in lines for short periods of time of 10 to 15 minutes; plaintiffs' expert testified that

D.L. told her A.L. could wait in lines for up to 15 minutes.  *See* DSOF ¶ 10.  In fact, D.L.'s

sworn interrogatory responses -- which identify numerous family vacations, including a lengthy

drive to North Carolina and a flight to Cancun -- demonstrate that A.L. is capable of waiting or

being distracted for long periods of time.  *Id.* at ¶ 8.[15]  Moreover, as both parties' experts have

---

[14] Plaintiffs' amended complaint -- which was filed almost four months after their July 2014
visit to Epcot -- does not include any allegations that A.L. was denied access when he visited
Epcot.

[15] Because waiting is "an inherent, unavoidable aspect of our culture" (Ex. 22, Kelderman Rep.
at 5), A.L. would have waited at school, at the doctor's office and throughout many other aspects
of his life.

stated, the inability to wait or the need for immediate gratification is not a diagnostic criteria or requirement of ASD. *Id.* at ¶ 9; *see also* Ex. 22, Kelderman Rep. at 3 ("an individual's desire for immediate gratification is not a requirement of [A.L.'s] disability" and, as a result, A.L.'s "preference for GAC over DAS . . . should not have to be accommodated by Disney"); Ex. 28, Spector Rep. ¶ 8 ("the inability to wait or to delay gratification is neither a necessary nor sufficient condition for the diagnosis of ASD").[16] Indeed, "there is no evidence presented that children with ASD as a group, much less A.L. as an individual, manifest a complete inability to delay or defer gratification, are incapable of waiting in lines, [or] require repeated turns on the same ride or group of rides in particular sequence . . ." Ex. 28, Spector Rep. ¶ 13; Ex. 25, Kelderman Dep. 77:15-21.  Dr. Kelderman -- who has seen hundreds of patients with autism -- has "yet to meet an individual with ASD who is 'incapable' of deviating from consistency, order, and routine" (Ex. 22, Kelderman Rep. at 6), and A.L. is no different.

### 2.   A.L. Had More Than Equal Access at Magic Kingdom

Because A.L. is capable of waiting at least up to 15 minutes, the evidence shows that A.L. could have gone on all of the 17 rides and attractions on his preferred list[17] during his December 19, 2013 visit to the Magic Kingdom, which is fatal to any claim that he was denied "access." Indeed, the wait time report for that day shows that ██████████████████ ███████████████████████████████████████████ (*see* DSOF ¶ 11), and

---

[16]  Any characteristic of rigidity or insistence on sameness can be managed through behavioral strategies and interventions. Ex. 22, Kelderman Rep. at 2. For example, preparing in advance and utilizing visual schedules, social stories and other visual supports have been shown to be effective in helping individuals with autism understand the order of events and to make the abstract concept of time more concrete. *Id.* at 3; *see also,* Ex. 25, Kelderman Dep. 81:2-82:9.

[17]  One of A.L.'s preferred rides, the Snow White ride, was not in operation during his December 2013 visit, and it is unclear from plaintiffs' interrogatory responses what character meet and greet was on his list. *See* Ex. 1, Pls.' Resp. to Def.'s Interrog. No. 7.

the few rides on A.L.'s list with longer wait times that day could have been accessed with a DAS return time or by using the ███████████ given to A.L.'s party, a few of which they used to access Jungle Cruise. After reviewing this report, Dr. Kelderman concluded that A.L. "easily could have accessed his entire preferred list of rides that day in his preferred order with the accommodations that were available to him without having to wait more than 15 minutes." Ex. 25, Kelderman Dep. 122:11-15; *see also* DSOF ¶ 11.

A.L.'s experience at Magic Kingdom is consistent with other evidence showing that guests with DAS can experience significantly more rides in a day than guests without DAS. Ex. 3, Laval Rep. ¶ 28. This point was recently confirmed by a study Disney conducted in which testers used the ride passes available to them (*i.e.*, DAS, Fastpasses, or re-ads) to experience as many attractions as possible during three days. *See* DSOF ¶ 16. ████████████

████████████████████████████████████████████

████████████████████████████████████

████████████████████████████████████████████

███████████████ *Id.* As Disney's industrial engineering expert, Bruce Laval, concluded, "DAS not only reasonably accommodates and provides equal access to guests with disabilities, for whom it may be difficult to wait in a traditional queue," but it provides more than equal access to such guests overall "because they can experience the most popular attractions faster and, if they desire, in greater number than what ███████ of guests [*i.e.*, non-DAS guests] at Walt Disney World can do without DAS." *Id.*

The undisputed evidence, along with uncontroverted expert opinion, shows that not only did A.L. have the same access as any guest without DAS to WDW, but he had significantly *more*

access with DAS.  Therefore, plaintiffs cannot prove that GAC is necessary to afford A.L. access to Disney's parks.

### C.     Plaintiffs Are Not Entitled to Their Choice of Accommodation

Not only do plaintiffs seek an accommodation to experience a set of attractions in a certain order, but they also want to experience those rides without having to wait at all between them.  Plaintiffs' claim that A.L. should be able to go on any ride he wants, when he wants, and as many times as he wants goes well beyond what is required by law.[18]  Under well-established legal precedent, plaintiffs' preference to have immediate, repeated access does not meet plaintiffs' burden under Title III of the ADA.  *See, e.g., Martin*, 532 U.S. at 682; Ault v. Walt Disney World Co., 254 F.R.D. 680, 688 (M.D. Fla. 2009) (explaining that a preference to use a Segway over other types of mobility devices need not be accommodated under the ADA as a matter of law); *Dobard v. San Francisco Bay Area Rapid Transit Dist.*, 1993 U.S. Dist. LEXIS 13677, at *9-10 (N.D. Cal. Sept. 7, 1993) (finding that plaintiff failed to state a claim for an ADA violation because defendant was not required to provide the most advanced technology to those who are hearing-impaired as long as it allows for some means of ensuring effective communication).

Indeed, as Judge Presnell explained with regard to the mobility device case noted earlier, when a plaintiff has access to a public facility through alternative means, the plaintiff's preference, "as a matter of law, need not be accommodated under the ADA." *Ault v. Walt*

---

[18]  Plaintiffs' own expert testified that "[A.L.'s] mom described to [her] that he has *this preference* of going on rides in a very particular order . . . ." *See* Ex. 24, James Dep. 111:10-13; *see also*, *Id.* at 178:2-5 ("I am certain about *his desire* and need to complete the rides in a particular way and that being a primary part of his experience of Disney.") (emphasis added).  When plaintiffs' expert realized that what she had said supports Disney's position, she backed away from her original testimony and said that it is more than a preference. *Id.* at 111:13-16.

*Disney World Co.*, 2011 U.S. Dist. LEXIS 45268, at *8 (M.D. Fla. Apr. 4, 2011). "Stated plainly, under the ADA a qualified individual with a disability is not entitled to the accommodation of her choice, but only to a reasonable accommodation." *Stewart v. Happy Herman's Cheshire Bridge*, 117 F.3d 1278, 1286 (11th Cir. 1997) (internal citation and quotations omitted). In *Stewart*, the plaintiff alleged that the defendant violated the ADA because it "could have easily accommodated her with the thirty minute paid lunch break she requested" in place of the company's twenty-minute policy. *Id.* at 1284. The Eleventh Circuit held that the defendant accommodated the plaintiff's disability because it offered several alternative work options and was "not required to accommodate an employee in any manner in which that employee desires." *Id.* at 1285; *see also Moore v. Accenture, LLP*, 2007 U.S. App. LEXIS 26275, at *11 (11th Cir. Nov. 9, 2007) (dismissing plaintiff's ADA claim under Rule 12(b)(6) because defendant had "no duty under the ADA to provide Plaintiff with his choice of a different accommodation").[19] Likewise, plaintiffs here do not have any right to near-immediate, repeated and rigidly executed access to all rides at WDW.

Of course nearly every family visiting WDW would probably prefer to go on any ride they want, as soon as they want, for as many times as they want, and in any order they want. That inclination is what led to the unworkability of the GAC system. But neither Disney nor any other public accommodation is required to accommodate these types of preferences or desires that go well beyond fundamental access to a facility.

---

[19] Although *Stewart* and *Moore* involved Title I claims, the Eleventh Circuit's analysis applies here because "there appears to be little, if any, substantive difference between the 'reasonable accommodation' which title I requires and the 'reasonable modification' which title III mandates." *Dahlberg v. Avis Rent a Car Sys., Inc.*, 92 F. Supp. 2d 1091, 1105 (D. Colo. 2000).

II.     **PLAINTIFFS' REQUESTED ACCOMMODATION IS NOT REASONABLE AND WOULD ADVERSELY IMPACT WAIT TIMES FOR OTHER GUESTS AND, THEREBY, FUNDAMENTALLY ALTER THE SERVICES PROVIDED**

Under Title III, plaintiffs must also prove that their requested modification is "reasonable." The "reasonable" requirement goes beyond whether the modification is necessary to afford access and focuses on the totality of the circumstances, including the practicality, cost, effectiveness or feasibility of the proposed modification, among other factors, in determining reasonableness. *Larsen*, 242 F. Supp. 2d at 1343. Plaintiffs have the burden of proving reasonableness, *Dudley v. Hannaford Bros. Co.*, 333 F.3d 299, 309 (1st Cir. 2003), and they cannot do so here. Even if the Court were to determine that plaintiffs have met their burden in proving that their requested modification is both "necessary" and "reasonable," plaintiffs' claim still fails. Indeed, the ADA does not require that an entity "employ any and all means" to make services accessible to persons with disabilities, but rather only requires "reasonable modifications" that would not "fundamentally alter the nature of the service or activity" provided. *Bircoll v. Miami-Dade Cty.*, 480 F.3d 1072, 1082 (11th Cir. 2007). As shown below, there is ample evidence demonstrating that reverting to the system plaintiffs prefer would adversely impact the ride opportunities for the vast majority of guests and thereby fundamentally alter the services provided.

A.     **Plaintiffs Have Failed to Prove that Allowing Unlimited and Near-Immediate Access to WDW's Rides and Attractions Is Reasonable**

At all times, plaintiffs bear the ultimate burden of persuasion on the issue of reasonableness. *Larsen*, 242 F. Supp. 2d at 1343. To satisfy this burden, a plaintiff must introduce evidence that the modification sought is "reasonable in the general sense, that is, reasonable in the run of cases." *Johnson v. Gambrinus Co./Spoetzl Brewery*, 116 F.3d 1052, 1059 (5th Cir. 1997). This requires the plaintiff to present "sufficient evidence so that a

defendant can evaluate the proposed solution to a barrier, the difficulty of accomplishing it, [and] the cost [of] implementation." *Gathright-Dietrich v. Atlanta Landmarks, Inc.*, 452 F.3d 1269, 1274 (11th Cir. 2006). Because this request is plaintiff's burden, where reasonable jurors could not find otherwise, a court may find a proposed modification to be unreasonable as a matter of law. *See Elitt v. U.S.A. Hockey*, 922 F. Supp. 217, 224-25 (E.D. Mo. 1996).

Plaintiffs cannot meet this burden. First, it is unreasonable to require Disney to adopt a policy that would cause the large-scale fraud and abuse that existed under GAC. The evidence shows that guests fabricated or exaggerated their need to get a GAC, paid those with GACs to be "tour guides" to provide non-disabled guests with top tier access to WDW, sold unexpired GACs on the internet, and created counterfeit GACs "to bypass all lines." *See* DSOF ¶ 12.[20]

Second, plaintiffs cannot prove that their requested modification is "reasonable" because they already have access to WDW under DAS, which provides the maximum accommodation required by law. In considering reasonableness, courts consider whether alternative accommodations have been made available to the plaintiff. For example, in *Badgett v. Ala. High Sch. Ath. Ass'n*, 2007 U.S. Dist. LEXIS 36014, at *15 (N.D. Ala. May 3, 2007), the court explained that the ADA does not require an entity "to adopt the 'best' modification or the modification requested by a person with a disability;" it only requires a *reasonable* modification. In *Dryer*, the court held that plaintiff's requested modification was not reasonable because she had other alternatives available to her but *chose not to use them*. 383 F. Supp. 2d at 940-41.

Finally, plaintiffs have failed to show that their request is "reasonable" when Disney has already provided an accommodation with the DAS system that relieves waiting in lines -- a

---

[20] Shortly after assuming the role of Director of Park Operations, Alison Armor consistently received feedback from Disney's park operators that the GAC system was being abused. Ex. 6, Armor Dep. 9:1-15. She also observed the abuse first-hand when she did an on-site shadowing at WDW in February 2012. *Id.* at 9:21-10:15.

tremendous benefit that allows guests to experience other attractions within the parks during the virtual wait and avoid completely the lines in which ████ of the guests wait.  It is not reasonable for any guest to expect immediate access to all of their favorite rides at one of the world's most popular theme parks, including rides that most guests may have to wait more than an hour to experience.[21]  Indeed, if plaintiffs' requested modification were reasonable, the same would necessarily be true at any place of public accommodation -- movie theaters, grocery stores, malls, sports arenas would all have to provide similar immediate access for guests who claim they cannot wait (even virtually) in a regular line.  That is certainly not what Congress intended when it enacted Title III.

In short, plaintiffs cannot establish that it is reasonable to require Disney to provide A.L., along with other guests with autism, with unlimited and near-immediate access to all of Disney's rides and attractions.  Because plaintiffs' requested modification is not reasonable, they cannot prevail on their Title III claim even if they could meet the "necessary" requirement.

**B.    A GAC System Would Fundamentally Alter the Theme Park Experience**

Even if the Court were to determine that plaintiffs' requested modification is necessary and reasonable, their claim still fails because it would impact wait times for other guests so adversely as to constitute a fundamental alteration of their ride experience.  The defendant in this type of case has a complete defense if it can show that the requested modification would "fundamentally alter" the nature of the services provided.  There is uncontroverted evidence that

---

[21] The unreasonableness of this request is made all the more apparent by plaintiffs' allegation that it is needed to head off "meltdowns," as though Disney could prevent them, let alone is required to do so, given their multiple causes completely unrelated to DAS, including the particular child's expectations, health and fatigue, as well as the weather, crowds, noise and commotion during the day of the child's visit.  Ex. 24, James Dep. 180:17-181:10; Ex. 25, Kelderman Dep. 134:19-135:4; Ex. 27, James Rep. at 11; Ex. 22, Kelderman Rep. at 3-4; Ex. 28, Spector Rep. ¶12.  In any event, there is no evidence or even an allegation that A.L. had a meltdown during his visit to the Magic Kingdom.  *See* DSOF ¶ 6.

reverting to a GAC system would cause longer wait times for the majority of guests and thereby limit their ride opportunities, overall satisfaction, and intent to return, fundamentally altering the theme park experience.[22]  As Mr. Laval opined, and consistent with the testimony of Disney's Director of Park Operations, the excessive use of GAC fundamentally altered the company's ability to deliver attraction experiences to ███████ of guests, as GAC cardholders were "consuming so much of [Disney's] preferred attraction capacity." Ex. 6, Armor Dep. 58:18-59:17; Ex. 5, Laval Dep. 92:7-93:2; Ex. 3, Laval Rep. ¶¶ 38 and 45.

Disney's Planning and Industrial Engineering team recently studied five popular attractions to determine the impact of the use of re-admission passes by DAS guests on the wait times of other guests. DSOF ¶ 14.



Ex. 3, Laval Rep. ¶ 41.  In short, the overwhelming weight of the evidence shows that the requested modification would fundamentally alter the nature of the services Disney provides and, therefore, summary judgment is warranted.

## III.  PLAINTIFFS LACK STANDING BECAUSE THEY CANNOT SHOW THEY WERE INJURED, MUCH LESS THAT DAS CAUSED THEIR INJURY

At the most fundamental level, plaintiffs filed a complaint alleging that "Disney maliciously caused injury to Plaintiff" when that is just obviously not so. Doc. 98, Pls.' Am. Coml. ¶ 60.  Plaintiffs make an array of inflammatory allegations, proven indisputably untrue by

---

[22] Prior research and studies showed that ████████████████████████████ See DSOF ¶ 15.

their testimony and the uncontroverted records of their visit to Magic Kingdom.  Among their

many meritless assertions is a claim that they were harmed by DAS because "the family would

not be able to avoid a meltdown" and had no option but to leave the park after experiencing only

one attraction.  *Id.* ¶ 79.  The undisputed facts show that they did not leave the park after one

attraction but, rather, spent several additional hours seeing a show, a holiday parade and other

attractions.  *See* DSOF ¶ 7.  In fact, in the 42-page complaint, there is not one mention that A.L.

actually had a meltdown during his December 2013 visit to WDW.  To the contrary, A.L.'s

mother testified that he was doing well that day.  *Id.* at ¶ 6.  Plaintiffs thus cannot possibly prove

an injury-in-fact, let alone that any injury was caused by Disney's conduct as required by the

Supreme Court in *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-561 (1992).[23]  Nor can they

defeat summary judgment with such unfounded and untrue stories of inaccessibility, entirely

refuted by undisputed evidence that A.L. had the opportunity to experience his preferred rides at

Magic Kingdom, including more rides and shorter wait times than the vast majority of guests.

### CONCLUSION

For all the foregoing reasons, Disney respectfully requests that summary judgment be

granted in its favor.

---

[23]  Injunctions -- which are the only relief available to plaintiffs under Title III of the ADA -- regulate future conduct and therefore "a party has standing to seek injunctive relief only if the party alleges . . . a real and immediate -- as opposed to a merely conjectural or hypothetical -- threat of future injury."  *Shotz v. Cates*, 256 F.3d 1077, 1081 (11th Cir. 2001).  Because plaintiffs contend that "[t]hey will not attend the Parks in the future" and D.L. testified that they have not been back to the Magic Kingdom since the visit at issue, they have also failed to establish a real and immediate threat of future injury.  *See* DSOF ¶ 17.

## CERTIFICATE OF SERVICE

I hereby certify that on this 7th day of October, 2015, a copy of the foregoing was sent via

First Class Mail to:

Andy Dogali
Dogali Law Group, P.A.
101 East Kennedy Blvd., Suite 1100
Tampa, FL 33602

Eugene Feldman
Arias Sanguinetti Stahle & Torrijos, LLP
6701 Center Drive West, Suite 1400
Los Angeles, CA 90045

/s/ Jeremy M. White
Jeremy M. White
KAYE SCHOLER LLP
901 15th Street, NW
Washington, DC  20005
Phone:  (202) 682-3500
Fax:  (202) 682-3580
jewhite@kayescholer.com