UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

A.L. and D.L.,

                    Plaintiffs,

v.                                                        Case No:  6:14-cv-1544-Orl-22GJK

WALT DISNEY PARKS AND
RESORTS U.S., INC.,

                    Defendant.

## ORDER

This cause comes before the Court on cross-motions for summary judgment.  Defendant,

Walt Disney Parks and Resorts U.S., Inc. ("Defendant"), moved for summary judgment on

October 30, 2015.  (Doc. No. 159).  Plaintiff, A.L. by and through D.L. as Next Friend, Parent,

and Natural Guardian ("Plaintiff"), filed a Response in Opposition to Defendant's Motion on

November 16, 2015.  (Doc. No. 190).  Defendant filed its Reply on December 3, 2015.  (Doc. No.

203).  On November 10, 2015, Plaintiff moved for summary judgment, or alternatively for partial

summary judgment (Doc. No. 180) and submitted a separate memorandum in support (Doc. No.

181).  Defendant filed its Response in Opposition to Plaintiff's Motion on December 10, 2015.

(Doc. No. 208).  Plaintiff filed his Reply on December 23, 2015.  (Doc. No. 213).  For the following

reasons, this Court will grant Defendant's Motion and will deny Plaintiff's Motion.

## I.  BACKGROUND

Plaintiff is a resident of Orange County, Florida living with moderate to severe autism.

(Doc. No. 190 p. 11 ¶ 2; Doc. No. 98 ¶ 68).  He is generally in the care of his mother ("D.L.").

(*Id*. at ¶ 67).  She brought this action on his behalf.  (*Id*.).  Plaintiff is allegedly "incapable of

deviating from consistency, order, and routine" because of his impairment.  (*Id*. at ¶ 70).  This

requires him "to travel in one direction, stopping at only some places, in the same order, every time" when visiting amusement parks.  (*Id.*).

Defendant is one of the world's most popular amusement parks.  (Doc. No. 159 p. 23).  It is divided into four parks that are organized into six lands, comprising forty-one rides and attractions.  (*Id.*).  Plaintiff frequented Defendant's parks throughout childhood and into his adult life.[1]  (Doc. No. 181 p. 20).  He alleges that not following his set routine when visiting amusement parks results in episodic "meltdowns."  (Doc. No. 98 ¶ 80).  A meltdown consists of exhibiting a specific tic or tendency which could be humming sounds, making random noises, striking out, swinging arms, hitting oneself, or flailing wildly.  (*Id.* at ¶ 20).  They are triggered by exposure to stimuli that overwhelm a person with autism.  (*Id.* at ¶ 80).

Prior to Plaintiff's most recent visit, Defendant would issue a Guest Assistance Card ("GAC") to certain disabled guests at its parks.  (Doc. No. 219 p. 8 ¶ 9.2) (Joint Pretrial Statement). A GAC allowed these guests and their party (up to six people) to access the "Fastpass"[2] lines at attractions.  (Doc. No. 181 p. 2).  In some instances, in lieu of Fastpass access, these parties could enter attractions through alternative, "backdoor entrances."   (Doc. No. 159 p. 4).   Plaintiff perceived Defendant's GAC regime as the finest in the country for accommodating individuals with autism.  (Doc. No. 181 p. 2).

Defendant, however, abandoned the GAC system because of alleged abuse by both guests that needed GACs and those that did not.  (Doc. No. 219 p. 8 ¶ 9.3).  The most common way guests abused the former GAC system was by requesting the accommodation with no need for it

---

[1]      At the time this action was brought, Plaintiff was twenty-two years old.  (Doc. No. 98 ¶¶ 67-68).
[2]      Fastpass lines are for guests with appointments to visit a given attraction.  (*See* Doc. No. 181 p. 2).  This system was developed to reduce wait times.  (Doc. No. 159 p. 3).  Return times are issued until the ride reaches its capacity for the day.  (*Id*).

altogether.  (Doc. No. 159 p. 4).  Individuals were also creating counterfeit GACs, posting Craigslist advertisements offering unauthorized tours guided by GAC holders, and selling unexpired GACs online.  (*Id*.).

The Disney Disability Access Service ("DAS") was adopted to replace the GAC system. (Doc. No. 219 p. 8 ¶ 9.3).  Starting October 9, 2013, guests needing accommodations for a cognitive disability at Defendant's parks had to obtain a DAS card from its Guest Relations personnel upon arrival.  (*Id*.).  DAS affords guests with disabilities such as autism the ability to "virtually wait" for attractions without standing in lines.  (Doc. No. 181 p. 4).  A guest using DAS arrives at an attraction, presents the card, and receives a return time.  (Doc. No. 159 p. 6)  This can be done endlessly for the duration of their visit.  (*Id*.).  The virtual wait using DAS is the posted time for the attraction minus ten minutes.  (Doc. No. 159 p. 6).  The goal is to afford DAS cardholders the opportunity to "avail of many other attractions throughout the park—the concerts, characters, and stores" until their return time.  (*Id*.).  In addition to DAS, some guests receive a number of "readmission passes" permitting them to enter the Fastpass line for any attraction without having to stand in line or wait virtually.  (*Id*. at p. 7).

On December 19, 2013, Plaintiff visited Defendant's Magic Kingdom park.  (Doc. No. 219 p. 8 ¶ 9.5).  Upon arrival, Plaintiff separated from his family to watch a performance while they went to receive a DAS card and twenty-four readmission passes for the six-person party.  (Doc. No. 159-3 p. 17, 132:9-14); Doc. No. 219 p. 8 ¶ 9.5).  Plaintiff then skipped the first attraction from his routine, and visited the second one where there was a forty-minute wait.  (Doc. No. 159-1 p. 10-12 No. 7; Doc. No. 98 ¶ 79).  Considering this too long to avoid a meltdown,[3] Plaintiff's

---

[3]    D.L. testified that Plaintiff could wait for short periods of roughly five to ten minutes. (Doc. No. 159-3 p. 4, 95:5-16).  However, D.L. has traveled by air and car to Cancun, Mexico and North Carolina, U.S., respectively.  (*Id*.).

party each used one readmission pass to enter the ride without "experiencing extended idle wait times." (*Id.*). After finishing this one ride, Plaintiff alleges that his family left the park on a perceived inability to continue his preordained route. (*Id.*). D.L. partially retracted that allegation, stating that Plaintiff was instead redirected to other attractions not on the route. (Doc. No. 159 p. 16). Based on their dissatisfaction with the December 19, 2013 visit, and the expectation of a similar experience in the future, Plaintiff does not plan to return to Defendant's parks because DAS is in place. (Doc. No. 98 ¶ 83). As a result, Plaintiff requests injunctive relief requiring Defendant to modify its policy for accommodating cognitive disabilities to mirror the former GAC system. (*Id.*).

## II. <u>LEGAL STANDARD</u>

Granting a summary judgment motion is proper if the moving party "shows that there is no genuine dispute as to any material fact." Fed. R. Civ. P. 56(a). A dispute of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Hairston v. Gainesville Sun Pub. Co.*, 9 F.3d 913, 918 (11th Cir. 1993).

At bottom, a grant or denial of summary judgment hinges on whether there is a triable issue. Such issue exists when there is "sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson*, 477 U.S. at 249. However, the Court must deny a motion if "the evidence . . . is so one-sided that one party must prevail as a matter of law." *Id.* at 251-52. In making this determination, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255 (quoting *Adickes v. S.H. Kress &*

*Co.*, 398 U.S. 144, 158–59 (1970)); *Allmond v. Akal Sec., Inc*., 558 F.3d 1312, 1316 (11th Cir. 2009).

## III.  DISCUSSION

The only legal issue at hand is Defendant's alleged failure to accommodate Plaintiff by implementing DAS and discontinuing GACs.  Congress enacted the ADA specifically to protect individuals with mental and physical impairments from societal discrimination and exclusion.  *See generally* 42 U.S.C. § 12101(a)(2).  This was based on its finding, amongst other things, that "historically, society has tended to isolate and segregate individuals with disabilities, and, despite some improvements, such forms of discrimination against individuals with disabilities continue to be a serious and pervasive social problem."  *Id*.; *PGA Tour, Inc. v. Martin*, 532 U.S. 661, 674-75 (2001).  Such discrimination includes "outright intentional exclusion as well as the failure to make modifications to existing facilities and practices."  *Id*. at 675 (citing 42 U.S.C. § 12101(a)(5)) (internal quotations omitted).

The ADA accordingly prohibits discrimination by private entities providing certain amenities to the public.  Generally, Title III of the ADA provides that "[n]o individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation by any person who owns, leases (or leases to), or operates a place of public accommodation."  *Id*. at § 12182(a).  Myriad entities, including amusement parks, are deemed public accommodations by the ADA.  *Id*. at § 12181(7)(I).  The statute also lists specific prohibitions.  The parties agree (Doc. No. 219 p. 8 ¶ 9.4) that only one prohibition is at issue:

> [F]ailure to make reasonable modifications in policies, practices, or procedures, when such modifications are necessary to afford such goods, services, facilities, privileges, advantages, or accommodations to individuals with disabilities, unless the entity

> can demonstrate that making such modifications would
> fundamentally alter the nature of such goods, services, facilities,
> privileges, advantages, or accommodations.

42 U.S.C. § 12182(b)(2)(A)(ii).

Pursuant to this prohibition, the parties disagree over the extent of the accommodations Defendant is required to provide.[4]  The *Martin* Court noted that § 12182(b)(2)(A)(ii) "contemplates three inquiries: whether the requested modification is 'reasonable,' whether it is 'necessary' for the disabled individual, and whether it would 'fundamentally alter the nature'" of the accommodation.  532 U.S. at 683 n.38.  Therefore, a plaintiff must show that he requested a modification and that such modification is reasonable "in the run of cases."  *Johnson v. Gambrinus Co./Spoetzl Brewery*, 116 F.3d 1052, 1059 (5th Cir. 1997).  A defendant can then offer rebuttal evidence to the reasonableness of the request but the burden of proof on this issue remains with the plaintiff.  *Id*.  If the plaintiff satisfies the burden of showing that the requested accommodation is reasonable and necessary, the modification must be made unless the defendant proves it would fundamentally alter the nature of the public accommodation.  *See Johnson*, 115 F.3d at 1058-60; *Larsen v. Carnival Corp*., 242 F. Supp. 2d 1333, 1342-43 (S.D. Fla. 2003).  Assessing whether a request works a fundamental alteration goes hand-in-hand with determining its reasonableness.  *See id*.  Courts have considered "the effectiveness or feasibility of the proposed modification and whether it imposes undue costs or administrative burdens on the defendant" in making this

---

[4]      The parties do not dispute whether Plaintiff is disabled.  Under the ADA, a disability is defined three ways: "(1) a physical or mental impairment that substantially limits one or more major life activities of such individual; (2) a record of such an impairment; or (3) being regarded as having such an impairment."  42 U.S.C. § 12102(1)(A)-(C).  The statute's regulations note that "it should easily be concluded that . . . autism substantially limits brain function."  29 C.F.R. § 1630.2(j)(3)(iii).  Plaintiff's disabled status is therefore not an issue.

determination.  *Id.* (citing *DeBord v. Bd. of Educ. of the Ferguson–Florissant Sch. Dist.*, 126 F.3d 1102, 1106 (8th Cir. 1997); *Staron v. McDonald's Corp.,* 51 F.3d 353, 356 (2d Cir. 1995)).

Courts have used the "full and equal enjoyment" language in § 12182(a) to guide the "necessary" inquiry in § 12182(b)(2)(A)(ii).  *Martin* states that an accommodation is necessary if it is beyond the individual's capacity to access a public accommodation without it.  532 U.S. at 682.  Though this is telling regarding an accommodation's necessity, it was dicta.[5]  Accordingly, courts have interpreted the "full and equal enjoyment" clause, in the context of the necessary requirement, to mean that Congress intended for all individuals to have an opportunity to experience an equal benefit from public accommodations to the extent it is feasible.  *Argenyi v. Creighton Univ.*, 703 F.3d 441, 450-51 (8th Cir. 2013) ("Congress require[s] public accommodations . . . to furnish reasonable . . . services so that all individuals have an equal opportunity to gain 'a like' or 'equal' benefit."); *Baughman v. Walt Disney World Co.*, 685 F.3d 1131, 1135 (9th Cir. 2012) ("Public accommodations must start by considering how their facilities are used by non-disabled guests and then take reasonable steps to provide disabled guests with a like experience."); *Liese v. Indian River Cty. Hosp. Dist.*, 701 F.3d 334, 343 (11th Cir. 2012) ("the proper inquiry [in determining if an accommodation was provided where necessary] is whether the auxiliary aid that a hospital provided to its hearing-impaired patient gave that patient an equal opportunity to benefit from the hospital's treatment.").  In sum, a key inquiry in determining that a requested accommodation is necessary is whether a disabled individual requires it to receive a benefit like that of a nondisabled person.

---

[5]     The petitioner conceded that the accommodation was reasonable and necessary, and thus the only remaining inquiry was whether it was a fundamental alteration.  *Martin*, 532 U.S. 683 n.38.

A. *Arguments Raised in the Parties' Motions*

Defendant's Motion characterizes Plaintiff's claim as requesting accommodations for his "specific, immediate, and unpredictable personal preference for instant unrestricted access to the rides of his choice . . . ." (Doc. No. 159 p. 1 and pp. 19-20). Defendant primarily argues that Plaintiff has not met his burden because an accommodation beyond DAS is not necessary as demonstrated by Plaintiff's conduct during the visit at issue and in other instances. (*Id*. at pp. 13-20). Defendant also contends that if the Court finds that reverting to the GAC system is reasonable and necessary, it would nonetheless fundamentally alter its operations based on the risk of abuse and an overall adverse impact on the wait times experienced by all other guests. (*Id*. at pp. 21-24). It also attacks Plaintiff's standing to sue, asserting that he did not suffer injury from his December 19, 2013 visit and he does not intend to return to its parks in the future. (*Id*. at pp. 24-25).

Plaintiff devotes a majority of his Motion to arguing that the ADA does not permit blanket, one-size-fits-all disability policies and that Defendant did not perform an individualized assessment of Plaintiff's needs by using DAS. *See Martin*, 532 U.S. at 688 ("an individualized inquiry must be made to determine whether a specific modification for a particular person's disability would be reasonable under the circumstances as well as necessary for that person, and yet at the same time not work a fundamental alteration."); (Doc. No. 181 pp. 11-21). He then asserts that even if Defendant's assessment was individualized, his disability necessitates accommodation and his request to return to the GAC system is reasonable based on its historic use. (*Id*. at pp. 20-21).

Based on the arguments identified by each party's motion, there are five issues to be considered:

1. Whether Defendant sufficiently provided an individual assessment of Plaintiff's impairment in providing him with accommodations;

2. Whether Plaintiff's requested modification is necessary to afford him access to Defendant's parks;

3. Whether Plaintiff's requested modification is reasonable;

4. Whether Plaintiff's requested modification would fundamentally alter the services provided by Defendant; and

5. Whether Plaintiff has standing to pursue his claim.

The subsequent analysis covers issues one, two, and five. Regardless if Plaintiff has standing to sue, this Court determines that Defendant provided a sufficiently individualized assessment of Plaintiff's needs and his requested accommodation is not necessary. Therefore, discussion on the reasonableness of Plaintiff's request and whether it is a fundamental alteration to Defendant's operations is not needed.

*B. Defendant Conducted a Sufficiently Individualized Assessment of Plaintiff's Needs*

The ADA's regulations contemplate that individual assessments of certain impairments will result in predictable outcomes. In accordance with the ADA's rationale that an impairment's impact is particular to the individual, *Martin* placed specific emphasis on assessing the reasonableness of an accommodation on a case-by-case basis. 532 U.S. at 688 ("As previously stated, the ADA was enacted to eliminate discrimination against 'individuals' with disabilities, 42 U.S.C. § 12101(b)(1) . . . ."). For certain types of impairments, however, "the necessary individualized assessment should be particularly simple and straightforward." 29 C.F.R. § 1630.2(j)(3)(ii). Autism is one of such impairments. *Id*. at §1630.2(j)(3)(iii).

Additionally, "blanket policies" do not violate the ADA depending on the circumstances. In *Ault v. Walt Disney World Co.*, the Eleventh Circuit approved Defendant's settlement resulting in a blanket ban on using Segways for mobility-disabled patrons in return for developing a single, alternative standing device. 692 F.3d 1212 (11th Cir. 2012). Defendant also highlights other one-

size-fits-all policies such as the minimum requirements for wheelchair ramps and video captioning in movie theatres.  (Doc. No. 208 p. 12).

Defendant's assessment of Plaintiff's needs and DAS are therefore sufficiently individualized.  Plaintiff's detailed description[6] of his experience with the protocol followed by Defendant's Guest Relations personnel demonstrates that Defendant performed an individual inquiry given the nature of Plaintiff's disability.  Moreover, although DAS could be categorized as a blanket policy, it provides patrons with cognitive disabilities equal access.  *See infra*, III. D. Lastly, Plaintiff's argument against one-size-fits-all accommodations is contradictory because he requests a return to the GAC system which is also a blanket policy.

### C.  Plaintiff's Requested Accommodation Is Not Necessary

Reversion to the GAC system is not necessary for Plaintiff to have equal access to Defendant's parks.  This is because (1) Defendant provided Plaintiff an opportunity to gain a like benefit from its park as nondisabled individuals; (2) Plaintiff can deviate from his preordained route; (3) he can wait for a sufficient amount of time to access attractions; and (4) DAS is an existing means to equal access.  Moreover, DAS and readmission passes would have allowed Plaintiff to experience the attractions he particularly listed in whatever order of his choosing.  (Doc. No. 159 p. 17).  The Court assesses the "necessary" inquiry first because a showing that Plaintiff did not need the accommodation obviates further discussion regardless if it is reasonable.  *Martin*, 532 U.S. at 682.

---

[6]     Plaintiff D.L.'s interaction with Guest Relations included the cast member asking a series of questions regarding A.L's concerns, the length of time his party was visiting the park, and what rides and attractions they wanted to visit.  (Doc. No. 208 p. 15).

### 1.  Defendant afforded plaintiff a like experience to nondisabled guests

Plaintiff was given an opportunity to experience Magic Kingdom in a similar manner as guests that do not need accommodations.  In *Baughman*, Defendant was sued by a guest with limb girdle muscular dystrophy which made it difficult for her to walk or stand.  685 F.3d at 1131.  As part of its "necessary" inquiry into the plaintiff's requested accommodation, the Ninth Circuit highlighted the importance of considering the way nondisabled persons experienced the amusement park and then assessing if the public accommodation took reasonable steps to afford a similar experience.  *Id*. at 1135.  In the present case, nondisabled guests visit Magic Kingdom for rides and attractions that most of them have to wait more than an hour to experience.  (Doc. No. 159 p. 23).  Comparing this to Plaintiff's experience, DAS and readmission passes allow him access to those same rides in a fraction of the time.  (Doc. No. 159 p. 18).  The plaintiff in *Baughman* had difficulty standing and walking; Plaintiff here alleges that he cannot wait or visit attractions outside of a specific order.  Having trouble walking or standing could create a different experience from nondisabled guests when viewing certain attractions or transitioning on and off of rides. However, nondisabled guests will inevitably have to wait to experience an attraction regardless of the order they choose to visit them.  Thus, DAS and readmission passes afford Plaintiff a similar, or better, experience as those not needing them.

### 2.  Plaintiff can deviate from his preordained route

The ADA does not require Defendant to accommodate Plaintiff's preference to browse its parks in a specific order.  In *Ault v. Walt Disney World Co*., Judge Presnell noted that "preference—standing alone—is not essential to accessing Disney's Park."  No. 6:07–cv–1785–Orl–31KRS, 2009 WL 3242028, at *7 (M.D. Fla. Oct. 6, 2009), *vacated and remanded on other grounds*, 405 F. App'x 401, 2010 WL 5078088 (11th Cir. Dec. 14, 2010).  Plaintiff's claim that

he must follow the preordained route on record (Doc. No. 159-1 p. 10-12 No. 7) is discredited by three occurrences on his December 19, 2013 visit: (1) him leaving his party upon arrival to see a performance that was not on the route (Doc. No. 159-3 p. 17, 132:9-14); (2) him skipping the first ride on his route to start at the second (Doc. No. 159-1 p. 10-12 No. 7); and (3) him going to see a show, a parade, and other attractions after his family rode one ride (Doc. No. 159 p. 10 ¶ 7).[7] Attempting to explain why Plaintiff started his visit in a different order than the route, D.L. stated that Plaintiff independently chooses where to start his visits at parks. (Doc. No. 159-3 p. 7, 104:4-8). This further dismantles Plaintiff's argument. Exercising such autonomy from his alleged need for routine shows that it is not "beyond his capacity" to access attractions in a different order. *Martin*, 532 U.S. at 682.

### 3. Plaintiff could have waited long enough to access the attractions on his list

The death knell to Plaintiff's position is that he could have waited long enough for DAS to allow him access to the attractions on his list. Plaintiff claims that his condition renders him unable to wait virtually or in queue. (Doc. No. 181 p. 9; Doc. No. 190 pp. 2-3). However, D.L. conceded that Plaintiff could wait in lines for five to ten minutes. (Doc. No. 159-3 p. 4, 95:5-15). Because Plaintiff can wait for this amount of time, and based on the December 19, 2013 wait time report, he could have ridden any of the rides on his preferred list using DAS and the remaining readmission passes. (*Id*. at p. 17).

Furthermore, Plaintiff has demonstrated his ability to defer gratification through traveling by car from Florida to North Carolina and by plane from Florida to Cancun, Mexico. (*Id*. at p. 16). The gratification in traveling is, for the most part, reaching the desired destination. From

---

[7]     Plaintiff also deviated from any routine on visits to Epcot in 2014 and 2015. (Doc. No. 159 p. 16).

anywhere in Florida, a flight to Cancun and a drive to North Carolina are trips requiring hours of travel time.  This is much more than Plaintiff's conceded ability to wait for five to ten minutes— gratification from these trips were anything but instant.  Therefore, Plaintiff had access to the attractions because he could wait for the amount of time required to experience them.

### 4.   DAS and readmission passes are existing means that afford equal access

Finally, Plaintiff's requested modification is not necessary because of the existing accommodations to access the attractions at the park.  Defendant cites a host of cases where federal courts have deemed an individual's request for accommodation unnecessary because accommodations were already in place that provided access.[8]  Plaintiff's case is no different.  As noted, a combination of DAS and readmission passes could have afforded Plaintiff access to the attractions on his preferred list.  *See supra*, III. B. p. 9. Based on these facts, a reasonable juror could not find that Plaintiff's requested accommodation is necessary.  Consequently, even if he had standing, which he does not as discussed *infra* III. D., Plaintiff failed to satisfy an essential element of his case.  *Celotex*, 477 U.S. at 322-23.  Discussion of the facts as they pertain to reasonableness and the fundamental alteration defense is unnecessary.  *Id.*

---

[8]    *See Logan v. Am. Contract Bridge League*, 173 F. App'x 113 (3d Cir. Mar. 9, 2006) (holding that a vision-impaired bridge player was not entitled to use a special deck of cards because alternate accommodations were available); *Murphy v. Bridger Bowl*, 150 F. App'x 661 (9th Cir. Oct. 5, 2005) (holding that allowing a companion to accompany an individual with a cognitive disability on a ski bike was not necessary to improve her skills because there were alternative methods available); *Coleman v. Phoenix Art Museum*, No. CV 08–1833–PHX–JAT, 2009 WL 1097540 (D. Ariz. Apr. 22, 2009) (holding that the plaintiff failed to meet his burden of showing that his own hip chair device was necessary to accommodate his disability when the museum offered to provide two different kinds of wheelchairs), *aff'd* 372 F. App'x 793 (9th Cir. 2010); *Dryer v. Flower Hosp.*, 383 F. Supp. 2d 934 (N.D. Ohio 2005) (holding that the plaintiff's requested modification of the hospital's policy prohibiting visitors from using its oxygen ports was not necessary because plaintiff was allowed to bring her own oxygen tank into the hospital); *Larsen*, 242 F. Supp. 2d at 1344 (holding that plaintiff's Title III claim was insufficient because he could not establish that it was necessary for plaintiffs to carry on, rather than check in a breathing machine used while sleeping to participate fully in a cruise).

### D.  *Plaintiff's Standing*

There are two issues regarding standing: (1) Plaintiff's alleged injury from his December 19, 2013 visit and (2) the risk of future injury pursuant to his claim for injunctive relief.  Regarding the risk of future injury, Defendant argues that Plaintiff stated that he and D.L. will not return to its parks.  (Doc. No. 190 pp. 19-20).  Although Plaintiff made that allegation, he qualified his statement.  Specifically, Plaintiff alleges that he and D.L. "will not attend the Parks in the future due to their expectation that the experience will again be a supremely un-accommodating [sic] one."  (Doc. No. 98 ¶ 83).

In other words, he does not plan to return because DAS is in place.  It is clear that Plaintiff would otherwise continue to visit Defendant's parks if GACs are reinstated.  He has been a patron of Defendant's parks for nearly his entire life.  (Doc. No. 181 p. 20).  Furthermore, he lauds Defendant's former GAC regime as the finest in the country for accommodating individuals with cognitive disabilities.  (*Id*. at p. 2).  GACs, however, are not necessary for Plaintiff to have equal access to Defendant's parks.  Therefore, regardless of his likelihood to return, injunctive relief is not proper and further analysis of the risk of future injury is not needed.

Plaintiff's December 19, 2013 visit, nonetheless, must be assessed under the three, bedrock elements of standing.  These are "(1) 'injury-in-fact'; (2) 'a causal connection between the asserted injury-in-fact and the challenged action of the defendant'; and (3) 'that the injury will be redressed by a favorable decision.'"  *Shotz v. Cates*, 256 F.3d 1077, 1081 (11th Cir. 2001) (citing *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560–61 (1992)).

In general, a motion for summary judgment is not the appropriate means for deciding jurisdictional issues.  *Sheely v. MRI Radiology Network, P.A.*, 505 F.3d 1173, 1182 (11th Cir. 2007) (treating the district court's grant for summary judgment regarding subject matter jurisdiction as a Federal Rules of Civil Procedure Rule 12(b)(1) motion to dismiss).  However, a

court can review a standing challenge on summary judgment if it is based on evidentiary support in the record. *Clapper v. Amnesty Int'l. USA*, 133 S. Ct. 1138, 1148-49 (2013) ("[T]he party invoking federal jurisdiction bears the burden of establishing standing—and, at the summary judgment stage, such a party can no longer rest on . . . mere allegations, but must set forth by affidavit or other evidence specific facts.") (internal quotations omitted).

Plaintiff's family's choice not to experience any other rides was independent of Defendant's conduct.   Plaintiff cites *Houston v. 7-Eleven, Inc.*, in arguing that deterrence unaccompanied by any other discernible injury, is sufficient injury-in-fact to have standing.   No. 8:13–CV–1845–T–17AEP, 2014 WL 5488805, at *6 (M.D. Fla. 2014).   However, his reliance on *7-Eleven* is incomplete.   Injury-in-fact alone is not enough; the injury has to be "fairly traceable" to the defendant's actions.   *Lujan*, 504 U.S. at 560-61.   The Eleventh Circuit has held that "a controversy is not justiciable when a plaintiff independently caused his own injury."   *Swann v. Sec'y, Ga.*, 668 F.3d 1285, 1288 (11th Cir. 2012) (dismissing action for lack of standing brought by an inmate that did not receive an absentee ballot for the 2008 Presidential Election because he did not list the return address to receive it).

Plaintiff's family did not even give DAS and their remaining readmission passes an opportunity to fail them because Plaintiff was redirected to other attractions after one ride.   (Doc. No. 159-3 p. 13, 118:17-23).   They did not schedule any return times using DAS and had eighteen remaining readmission passes among the six of them.   Plaintiff's family could have simply planned visits to the attractions on Plaintiff's list by using a combination of DAS return times and readmission passes.   (Doc. No. 159-1 p. 50 ¶ 30).   This is especially true because the wait time report from December 19, 2013 shows that seventy-five percent of the attractions on his list had queues of fifteen or fewer minutes, before the ten minutes are subtracted with DAS, which is within

the range of his ability to wait.  (Doc. No. 159 p. 17).  Readmission passes could have been used to access the other attractions with longer wait times.  Therefore, regardless if Plaintiff was injured, it was not fairly traceable to Defendant's conduct—the accommodations it provided were available and underutilized.

Defendant's Motion is granted and Plaintiff's Motion is denied because regardless if he has standing, Defendant made an individualized assessment of his needs and Plaintiff's requested accommodation is necessary.

### IV.  CONCLUSION

Therefore, based on the foregoing, it is **ORDERED** as follows:

1. Defendant's Motion for Summary Judgment (Doc. No. 159) filed on October 30, 2015 is **GRANTED**.

2. Plaintiff's Motion for Summary Judgment, or alternatively Partial Summary Judgment (Doc. No. 180) filed on November 10, 2015 is **DENIED**.

3. The Clerk is directed to enter judgment providing that Plaintiff shall recover nothing on his claims and that Defendant shall recover costs from Plaintiff.

4. The Clerk is directed to **CLOSE** this file.

**DONE** and **ORDERED** in Chambers, in Orlando, Florida on April 28, 2016.

ANNE C. CONWAY
United States District Judge

Copies furnished to:
Counsel of Record
Unrepresented Parties

- 16 -