UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

A.L., by and through D.L., as Next
Friend, Parent and Natural Guardian;
D.L., Individually,

    Plaintiff,

v.

WALT DISNEY PARKS AND RESORTS
U.S., INC.

    Defendant.
_____/

Case No. 6:14-cv-1544-ACC-GJK

**DEFENDANT'S AMENDED TRIAL BRIEF**

Walt Disney Parks and Resorts U.S., Inc. ("Disney"), in accordance with the Court's Case Management and Scheduling Order dated November 26, 2014 (Doc. 100) and Order dated November 12, 2019 (Doc 267), submits this Amended Trial Brief.

**PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW**

In accordance with Federal Rule of Civil Procedure 52(a), Disney respectfully submits these proposed Findings of Fact and Conclusions of Law. To the extent the Court determines that any proposed finding of fact is more properly considered a conclusion of law, Disney incorporates any such statement by reference into its proposed conclusions of law. To the extent the Court determines that any proposed conclusion of law is more properly considered a finding of fact, Disney incorporates any such statement by reference into its proposed findings of fact.

# FINDINGS OF FACT

## The Guest Experience at Magic Kingdom

1. Magic Kingdom is one of four theme parks at Walt Disney World ("WDW"). It is organized into six "lands," comprising 41 rides and other attractions. Throughout the day, guests can experience shows, parades and concerts, without having to wait in any line. There are also numerous shops, restaurants and special events located in close proximity to the rides and other attractions. At Magic Kingdom, the goal is for every guest to feel immersed throughout their visit in a constantly changing fantasy world played out on an enormous three-dimensional stage where there is always something for guests to do.

2. Each year, millions of guests from around the world visit the theme parks at WDW. To experience the attractions, guests generally stand in a line, called the stand-by line, and wait until they move to the front of the line to enter the attraction.

3. The majority of attractions also have a separate line, the so-called "FastPass" line, which typically has a very short wait. This line is available to guests who take advantage of the FastPass system, whereby guests receive a designated return time from a ride location, essentially saving their place in line without having to stand in an actual line. At the return time, guests can enter the FastPass line. ██████████████████████████
██████████████████████████████████

4. ██████████████████████████████████
██████████████████████████████████████████
██████████████████

5. For approximately five years, WDW has offered FastPass+ as a successor to FastPass. FastPass+ allows guests to schedule in advance a designated time to enter the FastPass

line for up to three rides.  The guests may also change FastPass+ at any point prior to the scheduled times.

**The GAC System Led to Widespread Fraud and Abuse**

6. Until October 9, 2013, Disney accommodated certain guests with the Guest Assistance Card ("GAC").  The GAC system generally provided guests with disabilities and their families unlimited, repeated and near-immediate access to rides and attractions through alternative "backdoor" entrances or shorter FastPass lines without requiring them to wait in the regular attraction lines.  GAC had six different tiers of assistance.  However, through social media and other sources, guests increasingly learned about the top tier and demanded it even when they did not need it.  Because Disney is not allowed to ask about a guest's disability[1] -- thus making it difficult for the employees to effectively filter guests into the various tiers or to deny them GAC cards altogether -- GAC became an unlimited front-of-the-line pass for anyone willing to tell a Disney cast member that they could not wait in line.

7. GAC was subject to increasing fraud, abuse, and misuse.  Among the abuses: Most commonly, some guests fabricated their need for a pass at all.  For example, on at least one occasion, Guest Relations employees at Magic Kingdom witnessed a teenage boy celebrating with his friends after leaving City Hall with a GAC.  More egregiously, some guests created counterfeit GACs, posted Craigslist ads offering the use of GACs -- at the cost of thousands of dollars -- for unauthorized "tours" of WDW, and used the internet to sell unexpired GACs.  This

---

[1] *See* 28 C.F.R. § 36.302(c)(6) ("A public accommodation shall not ask about the nature or extent of a person's disability [and] shall not require documentation . . . ."); *see also Cordoves v. Miami-Dade Cty.*, 104 F. Supp. 3d 1350, 1356 (S.D. Fla. 2015) (recognizing that this "regulation thus protects individuals with disabilities from possibly unwanted questioning"); *Hurley v. Loma Linda Univ. Med. Ctr.*, 2014 WL 580202, at *8 (C.D. Cal. Feb. 12, 2014) (noting that "the regulation prohibits all inquiries regarding the nature or extent of a person's disability other than the two exceptions specified").

exaggeration or fabrication of need for a GAC reached the point where a ride sometimes had more guests in the GAC line than in the stand-by line.

8. The misuse became notorious. In May 2013, the *New York Post*, NBC News, Fox News and other media outlets ran stories documenting accounts of wealthy mothers from New York City paying disabled tour guides to lead them through WDW so they could skip the lines.

9. ████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████

10. ████████████████████████████████████
████████████████████████████████████████
██████████████████████████████
████████████████████████████████████
████████████████████████████████████
██

11. ████████████████████████████████████
████████████████████████████████
████████ Moreover, ████████████████████████

4

███████████████████████████████████████████████████ As such, GAC was causing significant damage to the business.

**DAS and Other Services Provided to Guests**

*Development and Implementation of DAS*

12. In Spring 2012, Disney began considering changes to the GAC system. An Attractions Access working group was assembled. This group comprised leaders from various departments, including Services for Guests with Disabilities, Park Operations, Guest Relations, Public Affairs, and Legal, among others. The objective was to reduce the fraud and abuse under the GAC system, while providing a sustainable, optimal level of service to guests with disabilities who are unable to wait in a line. The team spent many months analyzing the abuses of GAC (including the results of the IE Easter Study) and carefully considering how to develop a program that would provide a complete accommodation to guests with disabilities who could not stand and wait in a line. The team also consulted various autism organizations and considered their suggestions.

13. At the time that GAC misuse was publicized by various media outlets in May 2013, Disney had already conceptualized the DAS system.

14. Disney's extensive work led to replacing GAC with the DAS system on October 9, 2013. As with FastPass, instead of physically standing in line, DAS passholders may wait for their entry virtually. Unlike with FastPass, however, DAS return times never run out for the day and can always be requested. While FastPass provides guests with return times that expire, DAS return times are valid until redeemed prior to park closing. There is also no limit to the number of times DAS can be used in a day.

15. DAS therefore provides significant benefits to guests with disabilities that are not available to other guests.

16. DAS return times, which are the posted ride wait times minus ten minutes, are issued at each ride or attraction, although the first one may be issued at Guest Relations when the DAS pass is received. Once the return time arrives and the DAS return time is redeemed, a guest may then obtain another return time for the same attraction or for any other attraction.

17. At the return time, DAS passholders enter the ride through the FastPass line or through an alternative entrance.

18. Before guests using DAS redeem their return time, they can avail themselves of the many other attractions throughout the park -- other rides, parades, shows, character meet-and-greets, dining, and shops. During this time period guests can also take advantage of FastPass.

19. Another benefit of DAS is that it provides near-immediate access to rides with short wait times, which is not true with FastPass. For example, if the wait time posted at the attraction is less than 15 minutes, DAS passholders are typically given access right away. Combined with the FastPass (or FastPass+) system, DAS guests are provided the opportunity to experience a very high number of attractions in a single day -- far more than most guests could without DAS. ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

20. Under DAS, ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

21. ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

22.     Since its implementation, Disney has not made any changes to the substance of DAS, though it has changed the DAS technology at WDW to allow employees to authorize DAS for guests and provide attraction return times by loading the information into their electronic tickets.

23.     DAS has been a popular and successful program.

*Other Guest Services*

24.     DAS is one tool in the toolkit used to assist guests with disabilities.  In addition to DAS, Guest Relations employees offer guidance to guests, such as warning about large crowds or suggesting that guests attend nighttime parades, which attract smaller crowds than daytime parades.  They also help guests with itinerary planning based on guests' needs and interests, providing advice about the best route to follow.

25.     About the same time that DAS was implemented, Disney developed in collaboration with an outside organization, Autism Speaks, a guide titled "Planning a Trip to the Walt Disney World Resort:  A Resource for Guests with Cognitive Disabilities including Autism Spectrum Disorder (ASD)."  This guide provides strategies for parents to use when visiting WDW with a child with a cognitive disability.  For example, it suggests planning ahead, utilizing a visual schedule and bringing along a device or activity to use as a distraction while waiting.  The guide also identifies quiet areas, and includes descriptions of each step of arrival and a detailed chart highlighting features of rides that may be relevant to a guest with cognitive disabilities.  According to Disney's expert, Dr. Jill Kelderman, a neuropsychologist, the strategies identified in the WDW guide are consistent with evidence-based techniques in the autism literature.

26. Guests, including those using DAS, may also be offered re-admission passes (sometimes referred to as "re-ads"). Sometimes DAS guests and each member of their party may receive re-admission passes, even though Disney is not legally required to offer them. Re-admission passes allow guests to immediately enter the shorter FastPass line at any attraction on any given day without requiring them to stand and wait in a line or even to wait virtually.

27. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

**Plaintiff's Visit to Magic Kingdom**

28. This lawsuit involves a single visit to Magic Kingdom on the evening of December 19, 2013.

29. On that evening, plaintiff A.L.'s mother, D.L., spent more than 45 minutes discussing her child's needs with Guest Relations employees at Magic Kingdom. Following an assessment of his individual needs, A.L. was given a DAS card and ▮▮▮▮▮▮▮▮▮▮ for the six people in his party. In addition, Disney offered A.L. and his family itinerary planning services.

30. During that visit, A.L. and his family only went on one ride, Jungle Cruise, using re-admission passes, and then watched a show and a holiday parade. At no time did they use the DAS card, and they did not use ▮▮▮▮▮▮▮▮▮▮▮▮▮▮.

31. Less than four months later, plaintiff A.L., by and through his mother, D.L., filed this lawsuit, alleging that because GAC was replaced by DAS, A.L. was discriminated against in violation of Title III of the ADA, and injured as a result of the DAS system.

32. There is no evidence or allegation that A.L. had a meltdown during his December 2013 visit to Magic Kingdom. In fact, according to his mother, A.L. was doing well that day.

33. A.L. is not incapable of deviating from his supposed consistent routine of going on specific rides in an exact order, as shown by his changing the order on his list of preferred rides at Magic Kingdom, going "off his route" to experience a show, a parade and other attractions during his December 2013 visit, and not following the same routine during two separate visits to Epcot in July 2014 and July 2015.

34. A.L. has shown that he can wait in lines for at least 15 minutes.

35. A.L. has been on several trips and vacations within the past eight years that required him to travel by car or plane, including a drive from Florida to North Carolina and a flight to Cancun, Mexico. Such travel involves significant periods of waiting.

36. Individuals with autism spectrum disorder ("ASD") are not incapable of waiting. An inability to wait or a need for immediate gratification is not an intrinsic aspect of ASD, and any desire for immediate, unfettered access to the rides and attractions of his choice at WDW is not a requirement of plaintiff's disability; rather it is a personal preference of A.L. and his family when visiting the parks.

37. With his DAS card and remaining re-admission passes, A.L. could have gone on all of the 17 rides and attractions on his preferred list[2] during his December 19, 2013 visit to the Magic Kingdom. Indeed, Disney's wait time report for that day shows that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮, and the few rides on A.L.'s list with longer wait times that day could have been accessed with a DAS

---

[2] One of A.L.'s preferred rides, the Snow White ride, was not in operation during his December 2013 visit, and it is unclear from plaintiff's interrogatory responses what character meet-and-greet was on his list.

9

return time or by using the ███████████ given to A.L.'s party, a few of which they used to access Jungle Cruise. After reviewing this report, Dr. Kelderman concluded that A.L. "easily could have accessed his entire preferred list of rides that day in his preferred order with the accommodations that were available to him without having to wait more than 15 minutes."

38. This is consistent with other evidence showing that guests with DAS can experience significantly more rides in a day than guests without DAS. The point was confirmed by a study Disney conducted in which testers used the ride passes available to them (*i.e.*, DAS, FastPasses or re-ads) to experience as many attractions as possible during three days. ███████ ████████████████████████████████████████████████████████ ███████████████████████████████████████████████ ███████████████████████████████████████████████ ████████████████████████

39. As Bruce Laval, Disney's industrial engineering expert with 30 years of experience in planning, development and operation of theme parks, concluded, "DAS not only reasonably accommodates and provides equal access to guests with disabilities, for whom it may be difficult to wait in a traditional queue," but it provides more than equal access to such guests overall "because they can experience the most popular attractions faster and, if they desire, in greater number than what ███████ of guests [i.e., non-DAS guests] at Walt Disney World can do without DAS."

40. Thus, not only did A.L. have the same access as any guest without DAS to WDW, but he had significantly *more* access with DAS.

## CONCLUSIONS OF LAW

41. Under Title III of the Americans with Disabilities Act ("ADA"), the term "discrimination" includes:

> a failure to make *reasonable* modifications in policies, practices, or procedures, when such modifications are *necessary* to afford such goods, services, facilities, privileges, advantages, or accommodations to individuals with disabilities, *unless* the entity can demonstrate that making such modifications would *fundamentally alter* the nature of such goods, services, facilities, privileges, advantages, or accommodations . . . .

42 U.S.C. § 12182(b)(2)(A)(ii) (emphasis added).

**A.L.'s Requested Accommodation Is Not Necessary**

42. A.L. seeks injunctive relief ordering Disney to revert to a GAC-type system.

43. In order to show that changing DAS is "necessary," plaintiff must prove that it is "beyond [A.L.'s] capacity" to access the rides at WDW with the DAS system in place. *PGA Tour, Inc. v. Martin*, 532 U.S. 661, 682 (2001). It is not sufficient under *Martin* for plaintiff to demonstrate that using DAS would be "uncomfortable or difficult" for A.L. *Id.*

44. Numerous federal courts applying *Martin* have held that a requested modification is not "necessary to afford access" to defendant's facilities under Title III if there are other available means of ensuring access. Judge Presnell followed the rule in *Martin* in another case involving the same legal issue, *Ault v. Walt Disney World Co.*, 2009 U.S. Dist. LEXIS 92911, at *27 (M.D. Fla. Oct. 6, 2009), concluding "[a]lthough some individuals may, with good reason, not want to use [mobility devices available at WDW] and instead prefer to use a Segway, *that preference -- standing alone -- is not essential to accessing Disney's Parks.*" *Id.* at *27

(emphasis added) (*rev'd on other grounds*); *see also Ault v. Walt Disney World Co.*, 2011 U.S. Dist. LEXIS 45268, at *8 (M.D. Fla. Apr. 4, 2011).[3]

45. Similarly, in *Logan v. American Contract Bridge League*, 2006 U.S. App. LEXIS 5914, at *2 (3d Cir. Mar. 9, 2006), a person with a vision impairment sought to modify a bridge league's policy of prohibiting him from using a special deck of playing cards. The Third Circuit affirmed the district court's decision, finding that the plaintiff's contention that "he can't play to the maximum of [his] potential" without the requested modification failed to set forth a meritorious claim under Title III. *Id.* at *8-9. Applying *Martin*, the court reasoned that, although the special cards enhanced plaintiff's ability to play bridge, the requested modification was not necessary to afford access to the bridge games and tournaments in light of the alternative accommodations. *Id.*; *see also Murphy v. Bowl*, 2005 U.S. App. LEXIS 21788, at *5-6 (9th Cir. Oct. 5, 2005) (citing *Martin*, the Ninth Circuit held that the requested modification of allowing a companion to accompany an individual with a cognitive disability on a ski bike was not necessary to improve her skills because there were alternative methods available).

46. Moreover, under well-established legal precedent, plaintiff's preference to have near-immediate, repeated access does not meet his burden under Title III of the ADA. *See, e.g., Martin*, 532 U.S. at 682; *Ault v. Walt Disney World Co.*, 254 F.R.D. 680, 688 (M.D. Fla. 2009)

---

[3] *See also Coleman v. Phoenix Art Museum*, 2009 U.S. Dist. LEXIS 38905 (D. Ariz. Apr. 21, 2009) (citing *Martin* and holding that the plaintiff failed to meet his burden of showing that his own hip chair device was necessary to accommodate his disability when the museum offered to provide two different kinds of wheelchairs), *aff'd* 372 Fed. Appx. 793 (9th Cir. 2010); *Dryer v. Flower Hosp.*, 383 F. Supp. 2d 934, 941 (N.D. Ohio 2005) (plaintiff's requested modification of the hospital's policy prohibiting visitors from using its oxygen ports was not "necessary" under *Martin* because she was allowed to bring her own oxygen tank into the hospital); *Larsen v. Carnival Corp.*, 242 F. Supp. 2d 1333, 1344 (S.D. Fla. 2003) (finding that plaintiff's Title III claim failed because he could not establish that "it was necessary for Plaintiffs to carry on, rather than check in, the Bi-Pap [which is a breathing machine used while sleeping] in order to fully participate in the cruise").

(explaining that a preference to use a Segway over other types of mobility devices need not be accommodated under the ADA as a matter of law); *Dobard v. S.F. Bay Area Rapid Transit Dist.*, 1993 U.S. Dist. LEXIS 13677, at *9-10 (N.D. Cal. Sept. 7, 1993) (finding that plaintiff failed to state a claim for an ADA violation because defendant was not required to provide the most advanced technology to those who are hearing-impaired as long as it allows for some means of ensuring effective communication).

47. Indeed, as Judge Presnell explained with regard to the mobility device case noted earlier, when a plaintiff has access to a public facility through alternative means, the plaintiff's preference, "as a matter of law, need not be accommodated under the ADA." *Ault v. Walt Disney World Co.*, 2011 U.S. Dist. LEXIS 45268, at *8 (M.D. Fla. Apr. 4, 2011). "Stated plainly, under the ADA a qualified individual with a disability is not entitled to the accommodation of her choice, but only to a reasonable accommodation." *Stewart v. Happy Herman's Cheshire Bridge*, 117 F.3d 1278, 1286 (11th Cir. 1997) (internal citation and quotations omitted); *see also A.L. v. Wait Disney Parks & Resorts U.S., Inc.*, 900 F.3d 1270, 1296 (11th Cir. 2018) ("[F]acilities are not required to make the preferred accommodation of plaintiffs' choice. Facilities need make only reasonable accommodations that are 'necessary.'") (citations omitted). In *Stewart*, the plaintiff alleged that the defendant violated the ADA because it "could have easily accommodated her with the thirty minute paid lunch break she requested" in place of the company's 20-minute policy. *Id*. at 1284. The Eleventh Circuit held that the defendant accommodated the plaintiff's disability because it offered several alternative work options and was "not required to accommodate an employee in any manner in which that employee desires." *Id*. at 1285; *see also Moore v. Accenture, LLP*, 2007 U.S. App. LEXIS 26275, at *11 (11th Cir. Nov. 9, 2007) (dismissing plaintiff's ADA claim under Rule 12(b)(6)

13

because defendant had "no duty under the ADA to provide Plaintiff with his choice of a different accommodation").[4] Thus, A.L. is not entitled to his choice of accommodation.

48. A.L.'s requested modification of DAS is not necessary to afford him access to WDW. A.L. has failed to prove he is incapable of waiting or that he could not access the park under DAS. He has also failed to prove that he cannot deviate from consistency, order and routine. There is no reason that A.L. could not take advantage of the many different shows, parades, concerts, shops restaurants, and special events available to him had he attempted to use DAS on his visit to Magic Kingdom.

49. Of course, nearly every family visiting WDW would prefer to go on any ride they want, as soon as they want, for as many times as they want and in any order they want. But neither Disney nor any other public accommodation is required to accommodate these types of preferences or desires that go well beyond fundamental access to a facility.

**A.L.'s Requested Accommodation Is Not Reasonable**

50. The "reasonable" requirement goes beyond whether the modification is necessary to afford access and focuses on the totality of the circumstances, including the practicality, cost, effectiveness or feasibility of the proposed modification, among other factors, in determining reasonableness. *Larsen*, 242 F. Supp. 2d at 1343. Plaintiff has the burden of proving reasonableness. *Dudley v. Hannaford Bros. Co.*, 333 F.3d 299, 309 (1st Cir. 2003).

51. Plaintiff has not met his burden of proving reasonableness. It is unreasonable to require Disney to adopt a policy that would cause the type of large-scale fraud and abuse that existed under GAC. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

---

[4] Although *Stewart* and *Moore* involved Title I claims, the Eleventh Circuit's analysis applies here because "there appears to be little, if any, substantive difference between the 'reasonable accommodation' which title I requires and the 'reasonable modification' which title III mandates." *Dahlberg v. Avis Rent a Car Sys., Inc.*, 92 F. Supp. 2d 1091, 1105 (D. Colo. 2000).

██████████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████████████ Moreover, Plaintiff cannot show that his request is "reasonable" because Disney has already provided an accommodation with DAS that relieves waiting in line -- a tremendous benefit that allows guests with autism to experience other attractions within the parks and avoid the standard lines in which other guests have to wait.

52. Moreover, in considering reasonableness, courts consider whether alternative accommodations have been made available to the plaintiff. For example, in *Badgett v. Ala. High Sch. Ath. Ass'n*, 2007 U.S. Dist. LEXIS 36014, at *15 (N.D. Ala. May 3, 2007), the court explained that the ADA does not require an entity "to adopt the 'best' modification or the modification requested by a person with a disability"; it only requires a *reasonable* modification. In *Dryer*, the court held that plaintiff's requested modification was not reasonable because she had other alternatives available to her but *chose not to use them*. 383 F. Supp. 2d at 940-41. Here, the requested modification is not reasonable because A.L. already has access to WDW under DAS, which provides the maximum accommodation required by law.

53. Plaintiff argues that a reasonable accommodation invariably requires an individualized accommodation. Plaintiff is wrong. The Eleventh Circuit already held in this case that "Disney's generalized issuance of DAS cards, in and of itself, does not violate the ADA" because Disney "provides an identifiable and quantifiable accommodation based on its assessment of its most severely disabled guests." *A.L.*, 900 F.3d at 1291. Additionally, many court-approved class action settlements provide for accommodations that apply to all settlement class members. In *Ault v. Walt Disney World Co.*, 692 F.3d 1212 (11th Cir. 2012), the Eleventh

Circuit approved a settlement by which Disney maintained a ban on Segways, but agreed to offer a four-wheeled, electric stand-up device for guests with mobility disabilities. This blanket accommodation was approved over the appellants' objections that "a blanket Segway ban is a *per se* violation of the ADA" and that the law does not permit a one-size-fits-all solution. *Id*; *Ault*, Appeal No. 11-12013-B, Appellants' Br. at 35-36 (Sept. 12, 2011). Similarly, plaintiff's counsel previously settled a case with Disney where they agreed to "reasonable and appropriate modifications and assistive measures to enhance equal access for guests with visual impairments at the Disney Parks." *Shields v. Walt Disney Parks & Resorts US, Inc.*, No. 10-cv-5810 (C.D. Cal.), Doc. 290-2 at 5. The relief provided was for an entire class of individuals with visual impairments, and not individualized based on the severity of disability or any other factor.

54. There are many other examples of "blanket accommodations" that have been widely adopted throughout the country. When the United States Access Board sets minimum requirements for the grade of a wheelchair ramp, that policy applies to all wheelchair users. Ramps with different gradients are not required simply because some persons using wheelchairs are weaker than others. Similarly, movie theaters provide video captioning to persons with hearing impairments regardless of whether their hearing loss is 20 percent or 100 percent. The same is true with DAS, which offers the opportunity to completely avoid waiting in stand-by lines to all persons with autism or other cognitive disabilities. It does not matter how severe or mild the autism is because a DAS holder has the benefit of not waiting in any traditional queue, which all other guests must do on every ride except when they are using the FastPass system. The fact that this right is also provided to guests with mild forms of autism does not mean that a different accommodation is required for persons with more severe impairments. DAS is a perfect example of a policy that applies across-the-board and provides access across-the-board.

16

55. Furthermore, the evidence demonstrated that Disney did consider and accommodate A.L.'s individual circumstances by assessing his individual circumstances, providing him itinerary planning services and giving his family ▬▬▬▬▬▬▬▬▬▬. Thus, even if individual assessment were required in all cases, Disney met such a requirement here.

**The Requested Modification Would Fundamentally Alter WDW**

56. Even if the Court were to determine that plaintiff has met his burden in proving that his requested modification is both "necessary" and "reasonable," plaintiff's claim still fails. Indeed, the ADA does not require that an entity "employ any and all means" to make services accessible to persons with disabilities, but rather only requires "reasonable modifications" that would not "fundamentally alter the nature of the service or activity" provided. *Bircoll v. Miami-Dade Cty.*, 480 F.3d 1072, 1082 (11th Cir. 2007).

57. The evidence shows that reverting to a GAC system would cause longer wait times for the majority of guests and thereby limit their ride opportunities, overall satisfaction and intent to return, fundamentally altering the theme park experience. The excessive use of GAC fundamentally altered the company's ability to deliver attraction experiences to the vast majority of guests, as GAC cardholders were "consuming so much of [Disney's] preferred attraction capacity."

**ATTORNEY'S FEES AND COSTS**

58. If the Court finds that Disney is the prevailing party in this action, for purposes of 42 U.S.C. § 12205, Disney may seek its costs and attorney's fees by appropriate post-judgment motion.

**Conclusion**

59. Accordingly, this Court shall enter a judgment in favor of Disney.

Dated:  November 26, 2019

Respectfully submitted,

**McDERMOTT WILL & EMERY LLP**

*/s/ Kerry Alan Scanlon*
Kerry Alan Scanlon (admitted pro hac vice)
Jeremy M. White (admitted pro hac vice)
Lauren H. Evans (FBN 125671)
McDermott Will & Emery LLP
500 North Capitol Street, NW
Washington, DC 20001
(202) 756-8696 telephone
(202) 591-2791 facsimile
kscanlon@mwe.com
jmwhite@mwe.com
levans@mwe.com

*Attorneys for Defendant Walt Disney Parks and Resorts U.S., Inc.*

**CERTIFICATE OF SERVICE**

      I hereby certify that November 26, 2019, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all Counsel of Record.

                                            /s/ Lauren H. Evans
                                            Lauren H. Evans