**UNITED STATES DISTRICT COURT FOR THE**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

**A.L., by and through D.L., as Next**
**Friend, Parent and Natural Guardian;**
**D.L., Individually,**

      **Plaintiffs,**

                                     **Case No. 6:14-cv-1544-Orl-22GJK**

**v.**

**WALT DISNEY PARKS AND RESORTS**
**US, INC.**

      **Defendant.**

_____/

## PLAINTIFF A.L.'S POST-TRIAL BRIEF

Plaintiff A.L. by and through D.L., as his Next Friend, Parent and Natural Guardian, provides the following brief of evidence, authorities and argument that were presented at the trial of this cause.

**I.**     **Issues to be Adjudicated**

Many common ADA issues were adjudicated or foreclosed prior to trial. There was no need to present evidence that A.L. is person with a disability under ADA, or that Disney is a place of public accommodation under ADA.

Rather, the Court issued its own pretrial Order ruling, in light of the Eleventh Circuit's prior consideration of the issues, that:

> A.L. is required to prove at the bench trial: (1) what is "necessary" to accommodate his individual behavioral characteristics and (2) that his proposed modification would be "reasonable."

1

Order of December 3, 2019 [Doc. 277] at 4, citing Order of November 12, 2019 [Doc. 267] at 6-8

and *A.L. v. Disney*, 900 F.3d 1270, 1298-1300 (11th Cir. 2018).

## II.   A.L.'s Individual Behavioral Characteristics

### A.   A.L.'s Mother, D.L.

The principal testimony regarding A.L.'s individual behavioral characteristics came from

his mother, D.L., who has been A.L.'s primary caregiver for all of his 28[1] years.  D.L.'s credibility

as a witness, and sophistication regarding autism, are beyond reproach.

D.L. is an employee of the Department of the Treasury, where she investigates claims of

tax fraud and testifies in federal court on behalf of the United States in prosecutions relating to her

investigations. V1 13:1-10.

Separate from her experience and capacity as A.L.'s mother, D.L. has an impressive

background in relation to autism. She has been instrumental in the Autism Society of Greater

Orlando since its formation in 1996, and is its present President and CEO. V1 13:11-25. In carrying

out her duties in that role, she runs the ASGO's social skills program for disabled persons 21 years

of age older. V1 14:7-12.  She trains law enforcement officers regarding autism awareness, and

teaches methods of interaction with persons on the autism spectrum.  She provides an eight-hour

training course which is required of law enforcement officers throughout Florida, and issues a

certificate demonstrating compliance with the state requirements.  She has trained 35,000 law

enforcement officers in over 225 law enforcement agencies throughout Florida and Georgia. Tr.

V1 14-15.

---

[1] A.L. was 27 at the time of trial.

2

For the last three years, D.L. has been a consultant to the Universal Orlando Resort, training Universal's employees, including ride operators, security personnel, administrators, and others, about four times per year. The training encompasses a broad range of autism awareness issues. D.L. provided input into Universal's recently released cognitive disability guide. A.L. has always accompanied her to Universal, including during trips through the park. V1 15-17.

On several occasions, Disney has initiated unsolicited outreaches to D.L., for consultation relating to autism:

- Prior to this lawsuit, D.L. gave an autism awareness training to Disney employees. V1 17.

- Prior to release of the DAS, Disney's ADA coordinator Mark Jones, contacted D.L. to discuss the DAS and how it was planned to work.  Following this communication, she provided a summary of her DAS-related experiences, along with her commentary and insights, none of which were refuted by Mr. Jones. V118:9-13.

- About a year ago, D.L. was contacted by Disney security personnel for the purpose of arranging a law enforcement training session. The session was cancelled with no explanation. V113:17-18.

### B.    A.L.'s Behaviors and Comprehension

A.L. has autism which manifests in many severe challenges and disabilities.[2]

---

[2] During the trial, Disney made an issue out of whether A.L. has "severe autism." Disney's reasons for doing so are unclear, since it is A.L.'s disability, much more so than his diagnosis, that gives rise to his entitlement to a reasonable modification. At one point Disney even stated that Plaintiff's counsel told the Eleventh Circuit "that A.L.'s autism is severe," which is not true. Counsel scrupulously told the Court, as the Court accurately noted in its footnote 5, that the Plaintiffs have severe <u>challenges</u> as a result of their autism. Disney actually stipulated that all Plaintiffs have sever autism. *A.L. v. Disney*, 900 F.3d at 1279.

A.L. has extremely limited ability to verbally communicate. He cannot engage in two-way conversation. Effectively, he can only convey his present need in the form of one-word utterances. He cannot even communicate the fact that he may be in intense pain. V1 13:20.

Though A.L. is 28 years old, he still sleeps on the floor of his parents' bedroom. When he does so, he requires that his body be entirely covered, and that he be entirely surrounded by precisely nine pillows. V1 21:9-13; 23:12-20, 24:13-15.

A.L. cannot feed himself, dress himself, or reliably clean up after himself in the bathroom. V1 23:1-2; 29.

A.L. eats at precisely the same time every day, without exception. Every lunch, at 12:00 every day, is chicken tenders.  Every afternoon snack, at 2:00 every day, is a Hershey Bar.  Every dinner, at 5:00 every day, is totally plain pasta – no butter, oil, just plain pasta. V1 21-22.

If they are to go to McDonald's for lunch, A.L. needs the vehicle to follow the same route, every time. V1 24:1-5.

A.L. will never marry, drive a car, live alone, have kids, hold a job, or have friends. V1 31; 34:15-35:8.

A.L. cannot tell time. He can read the numbers on a clock, but cannot tell time, just as he can recognize certain words but cannot read. That is, he can identify the numbers on a clock, but he does not know what they mean. A particular time of day, like 3:00, means nothing to him. Similarly, increments of time, like an hour, or a day, are meaningless to him, as are references to days of the week. V1 30:4-31:10.

For calmness and stability, A.L. depends upon a security device, one which becomes a rigid part of his routine and structure. Through the security device he exhibits stimming behaviors.

4

Stimming behaviors are repetitive physical movements or noises which persons with developmental disorders commonly make as their levels of anxiety and stimulation escalate. At present, A.L. is never without a small red tube, which he shakes increasingly as his anxiety and instability increases. If he continues to shake the tube with increasing ferocity, D.L. will know that steps need to be taken to deescalate the situation, such as by removing him from the stimulating situation. V1 24:18-26:13.

The red tube is so critical to A.L.'s routine and function that even when the red tube gets dirty and tattered and is many months old, A.L.'s family must work long and hard to replace the tube with a new one. V1 26:14-27:5.

Through A.L.'s entire childhood he had an Individual Education Plan, created and applied under the federal Individuals with Disabilities Education Act. The school district recognized each year through A.L.'s IEP that his behaviors entitled him to substantial accommodations. A.L. was always entitled to and accompanied by a one-on-one assistant with a behavioral therapy background. A.L. was always relieved of the need to mingle or wait for class – he proceeded directly to each classroom, where he would be met by his one-on-one. He was then permitted to leave each class 5 to 10 minutes early, again allowing him to proceed to the next classroom without waiting. A.L.'s IEP also allowed him additional time for test-taking, and for completing homework assignments. V1 32:1-33:7.

If A.L.'s stimming situation is not deescalated fairly promptly, he will progress all the way to autism meltdown. For A.L., an autism meltdown involves falling to the ground, becoming non-responsive to anything or anyone. V1 27:21-28:3. Whereas a non-disabled child's temper tantrum can be terminated by simply giving the child whatever it is that he or she is throwing a tantrum

5

about, a meltdown due to autism cannot be terminated by anything. A.L.'s mother or caregiver must simply wait it out, and the time to do is unpredictable.  A.L. stands 6'6" and weighs 300 pounds, so removing him from the situation is not an option for his mother or caregiver. V1 28:4-25.

### C.    A.L.'s December 19, 2013 Visit to Magic Kingdom

A.L.'s behaviors and his ability to tolerate disruption were tested during his first post-DAS visit with his family, which occurred December 19, 2013.  As D.L. had been instructed, she proceeded first to Disney Guest Relations to obtain a DAS card.  In Guest Relations, a Disney employee issued A.L.'s DAS card and then proceeded to try to educate D.L. about the best route for A.L. to follow in the park.  V1 39:19-40:12; 44:3-45:7.

D.L. tried to make the Guest Relations employee understand that her son's disability prevents him from experiencing the park in the same fashion as other guests. He has no ability to "browse" or idly kill time in between attractions along his route, nor can he divert to some other part of the park and return to his route at a later time.  Consequently, instead of browsing the park in an unrehearsed and adventurous manner, A.L.'s disability requires him to experience only certain Disney attractions, and only in a precise order.  The Disney employee ignored D.L., thereby ignoring facts and science relating to persons with developmental disorders. V1 44:12-45:7.

For a routine-driven disabled guest like A.L., Disney's so-called "itinerary planning" accommodation achieves little or nothing.

The family left Guest Relations with A.L.'s DAS in hand, along with the readmission passes that had been granted to them prior to the visit.  The family proceeded to the left from Main Street, stopping first at the Jungle Cruise, where the posted wait time was 40 minutes.  Upon

showing A.L.'s DAS, the family was told to return after passage of that much time, a concept which A.L. – due to his disability – could not process. A.L. stood in place at that spot in the line, immovable, holding up all the other guests. When D.L. recognized that A.L. might become unstable and that she would not be able to move him, she used one of her readmission passes so they could promptly enter the ride. Upon emerging from the ride, she knew the system was built for failure, at least for A.L. In her experience, the Jungle Cruise was not generally a long-wait-time attraction, and if the Jungle Cruise wait time was 40 minutes, other wait times would be similarly unbearable for A.L. She could not predict the wait times she would face as she accompanied A.L. along his predetermined route. V1 46:4-47:5.

Prior to the December 2013 visit, A.L. would have proceeded along his clockwise route, visited some attractions along the way, and left the park. Because D.L. feared they would be confronted by further unmanageable wait times if they proceeded through the park, she took steps to distract A.L. and detour him. Because the time of their visit was not an ordinary park day but was instead a Christmas party event, she was able to do so, with special Holiday-themed events, after which they left the park. V1 47:13-48:10.

A.L. has visited the Magic Kingdom twice since the December 2013 visit. A.L. had largely pleasant experiences on those visits, because each occasion was a holiday-themed evening (another Christmas party, and a Halloween event), to which A.L. took the family a bit later in the evening, to avoid crowds, and because Disney granted A.L. an increase to five readmission passes. V1 48:11-49:7; 50:2-14. Also, since the December 2013 visit, A.L. has visited Disney's Epcot theme park on a number of occasions. Those visits have been largely pleasant because Epcot includes

fewer long-wait-time attractions, and A.L.'s five readmission passes are usually adequate. V1 50:15-51:16.

Hoping to return to the Magic Kingdom, D.L. has requested an increase in the allowed readmission passes. Disney has refused. V1 51:21-52:9. The same apprehension D.L. has about returning to the Magic Kingdom without additional accommodations has caused her to refrain from taking A.L. to Disney's Animal Kingdom and Hollywood Studios theme parks. V1 53:4-13.

D.L. has attempted to use Disney's Fastpass system as well. Fastpasses offer little in the way of accommodating A.L.'s need for routine, in that a guest cannot predict the particular attractions for which Fastpasses will be available, when they will be available, and, perhaps most importantly, the time of the day for which they will provide access to an attraction. For example, a 4:00 p.m. Fastpass appointment time for one of the early attractions on A.L.'s route, like the Jungle Cruise or Pirates of the Caribbean, is useless to A.L. V1 53:14-54:13.

Based upon D.L.'s experience with A.L., which of course extends through his entire life, she believes he can probably tolerate wait times of 15 minutes, perhaps 20. V1 54:18-55:1. To follow A.L.'s routine with this level of wait time, D.L. believes the family would probably need about 10 readmission passes rather than four or five.

## III. Predictable Wait Times are Necessary to Accommodate A.L.'s Individual Behavioral Characteristics

Wait times which might have been prevalent during a past visit contribute little toward predicting those that will confront A.L. on any future visits, the visits for which he seeks injunctive relief. Even so, A.L.'s behavior at the Judge Cruise on December 19, 2013 is a clear marker for A.L.'s ability to handle similar future situations at the park.

8

Due to A.L.'s intolerance for wait times, his family works to avoid them.  A.L. and his family do not visit restaurants with unpredictable wait times. V1 55:22-56:3. A.L. does not face significant wait times at doctors' offices, because the family either arranges for the first morning appointment, or the office sees A.L. on an expedited basis after he arrives. V1 55:16-21.

D.L. identified A.L.'s principal treating professionals, including his neurologist, Dr. Ananthi Rathinam, and his behavioral analyst, Johanna McDonald. V1 19:10-17.  Plaintiff called Ms. McDonald as a witness at trial.[3]

Ms. McDonald received her bachelor's degree in psychology from St. Bonaventure and her master's degree in psychology with behavior analysis concentration from East Carolina University. V2 63:18-24.  She is a board-certified behavior analyst, with certification at the master level, having completed 1500 hours of field work. V2 62:12-63:11.

Generally, behavior analysis is a field of study which attempts to reduce maladaptive behaviors in individuals with developmental disorders and replace them with appropriate behaviors. V2 64:23-65:12; V1 33:8-34:14. Ms. McDonald has directly acted as the behavioral analyst for 50 to 75 clients with a diagnosis of autism in the last 20 years, and has done so through her agency for 150 to 200 clients. V2 68:2-7.

Ms. McDonald became familiar with Drew through a referral for behavior analysis and behavior assessment. V2 69:9-25.  One of the skills for which A.L. has long received behavioral analysis training is tolerance for waiting; that is, tolerating wait times is one of the skills the behavior analysts in her agency have been working with D.L. to improve. V2 73:14-74:6. The

---

[3] Upon learning that Dr. Rathinam was unavailable to attend trial, Plaintiff attempted to take Dr. Rathinam's deposition just prior to trial. The Hon. Thomas B. Smith, U.S. Magistrate Judge, entered a protective order on February 10, 2020 which prevented the pretrial deposition. The Court denied a renewed request to take the deposition during the trial.

agency has been performing behavior analysis for A.L. for 11 years, and he will continue to receive therapy through her agency to improve his capacity to say "no," and to learn to wait. V2 77:24-78:5.

When A.L. expects a reward for positive behavior and doesn't receive it, he will likely engage in problematic behaviors. 75:6-14.

When this case was scheduled for trial in early 2016, Plaintiff intended to call Dr. Joette James, a clinical neuropsychologist with a specialization in developmental disabilities, as an expert witness. During 2019 Plaintiff retained Dr. Lila Kimel to act in this role. Neither expert testified at trial.[4] Even so, as it turns out, the Eleventh Circuit extensively quoted Dr. James' opinions, deeming her deposition part of the record on appeal. The Eleventh Circuit found the following aspects of Dr. James' testimony to be pertinent to the questions at hand:

> Dr. James indicated that individuals with autism, like plaintiffs, demonstrate "global deficits in executive functioning, both in terms of behavioral regulation (i.e. impulse control, emotional control, flexibility), and in terms of metacognitive skills (i.e. initiation, independent planning/organization, working memory, and self-monitoring)." Dr. James explained that "[i]ndividuals with poor executive control typically have difficulty regulating their emotions, controlling impulses, using good judgment, sustaining attention, making sound decisions, initiating appropriate courses of action, and flexibly changing course when receiving feedback that current plans of action and behavior are not working."

---

[4] When the Court scheduled this case for trial, no pretrial compliance deadlines were in place, and Plaintiff did not understand that the parties' pretrial filings, witnesses and exhibits would be effectively frozen, notwithstanding the passage of four years. When Plaintiff learned that difficulty would exist in arranging for his prior expert, Dr. Joette James, to testify at trial, he retained another expert, Dr. Lila Kimel. Plaintiff's updated witness list was filed December 2, 2019. At that time, because he intended to call Dr. Kimel, there was no reason to provide deposition transcript designations for Dr. James. The next day, the Court issued an Order to Show Cause regarding the listing of a new expert witness, which the Court deemed inappropriate. On December 17, 2019, in response to the Order to Show Cause, Plaintiff explained these developments and requested leave to call Dr. Kimel as an expert witness. By the start of trial, no order had been issued on this request. Having no other option, Plaintiff offered deposition transcript designations for Dr. James. As the trial began, the Court denied Plaintiff's request to admit Dr. James' deposition testimony as her trial testimony.

In persons with autism, the need for "sameness and consistency ... often leads to high levels of anxiety when there are even minor changes in their routines." Dr. James cited a study of school-age children, which found that individuals with autism "struggled particularly with shifting- that is, the capacity to move freely from one situation, activity, or aspect of a problem to another as the situation demands, to transition, and solve problems flexibly."

Dr. James considered the example of the lead plaintiff in this case, A.L., whom she characterized as both severely disabled and having symptoms and behaviors like many individuals with severe autism. Dr. James opined that, "[l]ike many individuals with ASD, A.L. demonstrates significant executive dysfunction, and problems with emotional/behavioral regulation, flexibility, working memory, and language." In particular, Dr. James opined that: (1) "characteristic of individuals with ASD, A.L. also experiences significant difficulty with flexibility and anxiety"; and (2) "while [A.L.] can tell time, he does not comprehend the concept of time, nor is he able to 'hold onto' the idea of time in such a way as to accurately judge its passage," which "significantly affects A.L.'s ability to wait." Dr. James noted that A.L. has a "high level of rigidity" and a "biologically driven need for consistency and sameness," which results in his having a "nearly inflexible order in which he approaches the rides and attractions at Disney."

Dr. James also testified that for a person with autism, a routine or prescribed order is "more than [a] preference," and is "a biologically driven mechanism." Any deviation from the expected order can lead to a "behavioral meltdown" or "some kind of outburst," even if plaintiffs never need to wait in a physical line for a ride, and even if plaintiffs always have some alternate activity or ride in the park available.

*A.L. v. Disney*, 900 F.3d 1285-86.

Disney's own autism expert, Dr. Jill Kelderman, offered a number of comments regarding

A.L.'s behaviors that are actually favorable to his claims:[5]

---

[5] While some favorable acknowledgements can be found in the record, certain aspects of Dr. Kelderman's testimony are so extreme as to strain credulity. Her testimony should be considered against a general backdrop or context: Dr. Kelderman has prepared reports regarding each of about 60 Plaintiffs who have filed suit against Disney, earning at least $2,900 per Plaintiff. Combined with her $575 per hour for the present trial effort, she has earned perhaps $200,000 in exchange for opining that *each and every one of the 60 Plaintiffs, without exception*, is accommodated by the DAS without need for any modification of any kind, reasonable or unreasonable. V5 20:4-11; V6 7:18-24; V6 7:1-6. She also testified that an autism child's behavioral analyst is always better capable of accurately predicting the child's behaviors than is the child's mother. V2 21:15-23. In a shocking diversion from the "do no harm" concept, she also deliberately induces meltdowns in her autistic patients, just to observe them. V5 54:16-24.

- Predictability and consistency can be helpful in reducing problematic behaviors in those with autism. Tr. V5 32:19-25.

- Preference[6] to go on rides in a particular order is a symptom of autism spectrum disorder. V6 34:7-10.

- A decreased ability to wait may occur at a higher level among people with autism spectrum disorder. V6 34:15-22.

- For people on the autism spectrum with behavior plans, waiting can produce anxiety because they don't know what to expect. V6 35:2-15, 34:12-15.

- A.L. has been receiving ABA therapy for the last 23 years. V6 10:10-14.

- D.L. was diligent in procuring appropriate ABA therapy for A.L. V6 13:3-9.

- A.L. has received treatment with the goal of teaching him how to wait. V5 83:8-10.

- When A.L. started ABA therapy the target goal was to increase his capacity to wait to 30 seconds. After more than 20 years of therapy, he is now capable of waiting 15-20 minutes. V6 17:19-25.

- The use of the re-admit pass possibly mitigated the meltdown of blocking the access to the ride. V6 20:24-21:2.

---

[6] Dr. Kelderman apparently shares Disney's penchant for characterizing every stated need as a "preference," as if an individual like A.L. makes deliberative choices. "The Supreme Court has noted that, "[t]he simple fact that an accommodation would provide a 'preference'—in the sense that it would permit the worker with a disability to violate a rule that others must obey—cannot, *in and of itself,* automatically show that the accommodation is not 'reasonable.'" Plaintiffs have put forth a reasonable accommodation for consideration, and the fact that it provides them a benefit does not defeat it. *Bower v. Fed. Express Corp.*, 287 F. Supp. 2d 840, 846 (W.D. Tenn. 2003). quoting *U.S. Airways, Inc. v. Barnett,* 535 U.S. 391, 398, 122 S.Ct. 1516, 152 L.Ed.2d 589 (2002).

12

- Dr. Kelderman does not refute D.L.'s testimony that Drew's meltdowns have caused her physical harm. Based on Drew's physical dimensions as a large person, a meltdown by him poses a danger to D.L. and those around her. V6 23:11-20.

- Having to experience the wait at guest services for 45 minutes could have been a source of anxiety for Drew even if he didn't experience a meltdown. V6 37:12-21; 21:15-23.

## IV.   Each of A.L.'s Proposed Modifications is Reasonable, and Will Not Fundamentally Alter Disney's Business

Plaintiff offered evidence that several different suitable approaches might be taken to accommodate his special need.  His need for predictable and manageable wait times could be accommodated by:

1. Permission to access Disney's attractions through Disney's Fastpass lines, which are designed to consistently provide shorter wait times; or

2. Readmission passes, which allow guests to access the Fastpass lines – this accommodation is the same as allowing access to the Fastpass lines, except that it would not be unlimited – Fastpass line access would be limited to the number of readmission passes provided, V1 52:10-15; or

3. A simple promise that wait times will not exceed a certain maximum, like 15 minutes, V1 54:18-55:1; or

4. The ability to make appointments for attractions through the day, but sequentially and predictably, rather than through the Fastpass system.

### A.   Disney Provided the Requested Modification for 20 Years

The reasonableness and fundamental alteration components of the ADA analysis are often intertwined, due in part to the fact that the two concepts arise from the same ADA clause:

13

> Discrimination includes… a failure to make *reasonable modifications* in policies, practices, or procedures, when such modifications are necessary to afford such goods, services, facilities, privileges, advantages, or accommodations to individuals with disabilities, unless the entity can demonstrate that making such modifications would *fundamentally alter* the nature of such goods, services, facilities, privileges, advantages, or accommodations.

42 U.S.C.A. 12182(b)(2)(A)(ii).

From the time A.L. was an infant and continuing until he was 21 years and nine months old, Disney provided, as one part of Disney's GAC program, the accommodation A.L. presently requests. Evidence that Disney historically accommodated Plaintiff's disability-compelled need for predictable wait times supports a finding that Plaintiff's requested modification is reasonable, as well as a finding that the modification would not create a fundamental alteration. See, for example, *Burriola v. Greater Toledo YMCA*, 133 F. Supp.2d 1034, 1037 (N.D. Ohio 2001) (court accepted as evidence that child with autism, if given reasonable modifications, could succeed in YMCA program, fact that YMCA had been able to accommodate him for over twenty months in the past, prior to failing to do so); *Wong v. Regents of Univ. of California*, 192 F.3d 807, 820–21 (9th Cir. 1999) ("The fact that the school previously made the exact modification for the Surgery and Medicine clerkships that Wong requested for the Pediatrics clerkship, however, is certainly persuasive evidence from which a jury could conclude that the accommodation was reasonable"); *Forbes v. St. Thomas Univ., Inc.*, 768 F. Supp. 2d 1222, 1228 (S.D. Fla. 2010) ("The fact that St. Thomas allowed Forbes (along with several other law students) to take exams with these benefits demonstrates that the accommodations did not impose an undue burden to the law school or undermine the school's teaching goals"); *Matthews v. NCAA*, 179 F.Supp.2d 1209, 1226 (E.D. Wash. 2001) ("Most notably, the NCAA already has granted Plaintiff two waivers, including one waiver of the 75/25 Rule. The Court finds it difficult, particularly in light of the individualized

14

inquiry required by Martin, to see how granting a third waiver to Plaintiff would fundamentally alter the NCAA's purpose, when the first two waivers did not"). <u>See also</u> *Redding v. Nova Southeastern University, Inc.*, 165 F.Supp.3d 1274 (S.D. Fla. 2016) (simple fact, that university had previously permitted student to reschedule make-up exams, standing alone, created question of fact). <u>See also</u> *Isbell v. John Crane, Inc.*, 30 F. Supp. 3d 725, 734 (N.D. Ill. 2014) (where facility withdraws previously-granted accommodation, issue becomes reasonableness of the withdrawal, not reasonableness of the accommodation); <u>accord</u>, *Seidel v. New Caney Indep. Sch. Dist.*, 2015 WL 6549895, *4 (S.D. Tex. 2015).

The Eleventh Circuit stated that "[t]he "majority of Disney's rides have wait times of 15 minutes or less." *A.L. v. Disney*, 900 F.3d at 1278.[7]  Consequently, for at least "the majority" of attractions, A.L. requests *no accommodation at all*, because the problem for which he requests a solution has been found not to exist.

**B.**     **Disney Presently Provides the Requested Modification to Others**

Two other Disney guests testified during rebuttal. Helen Rosemurgy (née Moore) testified that she is the mother of a son with autism. For her son's first couple of visits after the DAS was released, Disney provided five readmission passes, the same number which Disney has awarded to A.L., which proved unworkable. V6 55:18-23. Thereafter, for each of at least *twenty visits*,

---

[7] Neither the trial court's summary judgment record nor the record on appeal established this statement as fact. This general rule might exist only if one aggregates wait times for all attractions, for all parks, all days of the year, for all times of day, regardless of weather conditions, etc. Simply considering all times on all days, regardless of demand or other facts, it may be true that the wait time for a majority of rides would usually be 15 minutes or less.

Disney provided to her son the same modification that A.L. requests – 10 readmission passes.[8] Those visits have been successful and enjoyable.[9]

Cheri Maxwell is also the mother of a son with autism. She recalls that when she took her son to Disney World for the first time after the DAS was released, her son received the same number of readmission passes as A.L. - five. Since that time, encompassing an estimated four more visits, her son received the same modification that A.L. requests – 10 readmission passes. V6 57:16-58:3; 59:17-60:2.[10]

The testimony of Ms. Rosemurgy and Ms. Maxwell directly refuted the testimony of Disney's principal fact witness, Alison Armor, who expressed shock at the notion of any disabled guest being awarded 10 readmission passes. V3 33:22; 43:6-12.[11]

---

[8] Ms. Rosemurgy has been a client of the undersigned since 2014. She never filed suit because the accommodation her son receives is adequate for his special need, and was never withdrawn by Disney.

[9] Ms. Maxwell recalled one additional visit for which the family did not receive readmission passes, an occasion when they went to Hollywood Studios only to see the lights. V6 62:21-63:2.

[10] This Court has had before it a record relating to the Maxwell family, the case of *D.M, by and through C.M. v. Disney*, case no. 6:14-cv-1895-ACC-GJK. Disney's cross-examination of Ms. Maxwell established that Ms. Maxwell's son is a Plaintiff who suffered an adverse summary judgment but did not appeal. When his case was initially filed, he did not receive adequate accommodations. At a later date, he began receiving 10 readmission passes on each visit. For this reason, no appeal was filed.

[11] Disney and Ms. Armor cannot have been surprised by Ms. Rosemurgy's and Ms. Maxwell's testimony. The facts relating to each were expressly discussed in the trial brief filed by Plaintiff in advance of the early 2016 trial date: "A number of witnesses can testify for Plaintiff to establish that Disney has in fact awarded large numbers of passes to many guests. These include Plaintiff's witnesses H.M. (10 passes per person per visit); C.M. (10 passes per person); M.G. (8 passes with special membership; 8 more "one time only")." *A.L. v. Disney*, Doc. 218 at 46. Plaintiff's original witness list in January of 2016 identified both of them as witnesses to be called at trial. After the Court's motion in limine rulings in 2019, the witnesses did not appear on the Plaintiff's Second Amended Witness list. They appeared at trial as rebuttal witnesses.

### C.      Disney's Competitors Adequately Accommodate A.L.'s Special Need

D.L. has personal knowledge of the accommodations provided by Universal Orlando Resort in relation to attraction access, because she regularly provides autism awareness training and consultation for Universal, V1 15-17, and because she and A.L. have visited the two Universal theme parks, Universal Studios and Islands of Adventure, on many occasions.  At the Universal theme parks, A.L. is provided with the same accommodation he seeks from Disney.  Universal issues a card to A.L. which permits him to access rides and attractions using Universal's Quick Queue lines, which are Universal's version of Disney's Fastpass lines. V6 56:21-57:3.

A.L. receives similar accommodations when he visits Sea World Orlando. V6 57:4-5.

### D.      Other Disney Facilities Adequately Accommodate A.L.'s Special Need

One of Disney's affiliates, Disney Cruise Line, admirably accommodates A.L.'s disabilities, so much so that the family continues to take Disney cruises, with a total of 21 cruises to date. V6 57:6-11. The accommodations provided to A.L. are many, including relief from wait times, such as during boarding, and during muster drills. V6 57:12-23.

### E.      Fastpasses do not Obviate the Need for the Requested Modification

Disney's Fastpass lines are otherwise reserved for guests who make appointments to visit the attractions.  Fastpass appointments may be reserved on-line by guests who have reservations in a Disney hotel property 60 days in advance, and by guests who have planned a vacation 30 days in advance. The remaining inventory of Fastpass line appointments typically expires early on any given day of a Disney park visit, because the number of appointments is limited and guests consume the available appointment times at the beginning of the day.  Additional Fastpass

appointment times become available at various, unpredictable times throughout the day.  Fastpass appointment times can vary widely throughout a day, from late morning to late afternoon, making them useless when following a predetermined route.

      **F.**      **Disney Offered No Evidence of Impact, Monetary Cost or Economic Burden Associated with Providing the Requested Modification to A.L.**

Disney offered no evidence of the cost or economic impact of providing the modification A.L. requests. Specifically, Disney's witness attested that it is "impossible to compute" the cost of providing one readmission pass, or ten readmission passes. V3 45:24-46:5.

Neither can Disney calculate or even estimate any non-monetary impact of providing the requested modification to A.L.:

Q.      What is the extent to which providing FASTPASS line access to my client, [D.L.], would fundamentally alter Disney's operations?

A.      Again, we cannot do that for just one client because it is the entire system, and it is our entire policy on how we accommodate guests with disabilities.

V3 47:17-25.

Disney proposes that adding A.L. to the Fastpass lines will unacceptably increase wait times in Disney's standby lines.  But Disney offered no evidence regarding the standby wait times which Disney finds acceptable or which, more importantly, its non-disabled guests find acceptable. Disney offered no evidence regarding the extent to which providing a modification to A.L. will increase wait times for other guests, or the extent to which any such theoretical increase might cause Disney's guests, who are already enduring extensive wait times for the attractions, to stop coming to the parks. The Court is left to guess whether accommodating A.L. would cause other guests' wait times to increase by even one minute. And whether one additional minute, in a park already full of long lines, will cause guests to stop coming to the parks.

18

The lack of evidence to support Disney's claim of fundamental alteration, particularly any evidence specific to A.L., is fatal to the affirmative defense.  The Fifth Circuit has stated that if a Plaintiff's requested modification is reasonable:

> … the defendant must make the requested modification unless the defendant pleads and meets its burden of proving that the requested modification would fundamentally alter the nature of the public accommodation. The type of evidence that satisfies this burden focuses on the specifics of the plaintiff's or defendant's circumstances and not on the general nature of the accommodation.

*Johnson v. Gambrinus Co./Spoetzl Brewery*, 116 F.3d 1052, 1059–60 (5th Cir. 1997).

Many courts have similarly held that the affirmative defense of fundamental alteration must be supported by adverse impact specific to the plaintiff's circumstances, rather than to generalized assumptions and unsupported inferences of impact.  See, e.g., *Haddad v. Arnold*, 784 F. Supp. 2d 1284, 1304 (M.D. Fla. 2010) (evidence was not specific to the individual plaintiffs and their program, and instead related to various programs and overall waiting list trends and impacts); *Cruz v. Dudek*, 2010 WL 4284955, *14 (S.D. Fla. 2010), rep. and rec. adopted, 2010 WL 11601831 (S.D. Fla. 2010); *Disability Advocates, Inc. v. Paterson*, 598 F. Supp. 2d 289, 335 (E.D.N.Y. 2009) ("Lower courts have thus required states to provide a 'specific factual analysis' in order to demonstrate that the requested relief would constitute a 'fundamental alteration.'"), citing *Fisher v. Oklahoma Health Care Auth.*, 335 F.3d 1175, 1183–84 (10th Cir. 2003) (refusing fundamental alteration defense absent specific evidence that the costs of providing the requested relief would "in fact, compel cutbacks in services to other Medicaid recipients" or be inequitable to others with disabilities), quoting *Townsend v. Quasim*, 328 F.3d 511, 520 (9th Cir. 2003); *Pierce v. Cty. of Orange*, 761 F. Supp. 2d 915, 940, 953 (C.D. Cal. 2011) ("County offered little specific evidence of the fiscal or other impact of altering the physical facilities in the jail system or providing

programs, services, and activities in ways to accommodate mobility- and dexterity-impaired detainees"); *Oconomowoc Residential Programs v. City of Milwaukee*, 300 F.3d 775, 786 (7th Cir. 2002) (failure to present specific evidence regarding increase in police calls that might result from permitting brain-injured persons with disabilities to live in group home).

In *Alumni Cruises, LLC v. Carnival Corp.*, 987 F. Supp. 2d 1290, 1314–15 (S.D. Fla. 2013), the Southern District considered claims by disabled Carnival cruise guests for modifications of Carnival's disability program. One such requested modification related to tenders to carry passengers to shore. The passengers asked that Carnival:

> Provide a specific time of day when families with developmentally disabled children can board an otherwise empty tender and provide such families with a designated space large enough for each child to have sufficient room to move. Provide trained staff to accompany families on the tender to attend to the guests and to assist as needed when disability characteristics manifest themselves. Provide staff trained to be able to accompany such guests when in port and to return with them on the tender for assistance.

The court's discussion of the issue is thus:

> Tenders are smaller boats that shuttle passengers between the cruise ship and land… AOTS seeks, effectively, an appointment for the tender, so its clients do not have to wait in line, where challenging behaviors may have a tendency to manifest themselves… Carnival has supplied this modification, but the sole issue concerns standardization of providing it.
>
> In view of the fact that Carnival has been able to accommodate passengers with developmental disabilities by scheduling specific times for them to take tenders to and from shore, a jury could find this proposed modification to be reasonable. Nor has Carnival submitted any evidence to demonstrate that providing this modification on a standardized basis would cause a fundamental alteration to the services that Carnival offers.

*Alumni Cruises,* 987 F. Supp.2d at 1314–15.

D.L. testified that A.L. will need to follow a particular route within the Magic Kingdom, visiting many of a group of particular attractions with each visit. During each visit, after

20

completing the predetermined route, A.L. and his companions will leave the park. They will not whimsically stray off course to engage in other activities, or impulsively visit other attractions. V1 38:4-15. This means that each time A.L. visits the Magic Kingdom, there will be at least 40 other attractions he will _not_ visit. The number of attractions he will not visit greatly exceeds those he will visit. Even so, Disney fails to account for this fact when raising its sky-is-falling wait time fears. This failure should also be fatal to Disney's fundamental alteration affirmative defense, because whenever a facility proposes that a particular modification creates an undue burden or fundamental alteration, the facility must also consider, along with any additional cost impacts experienced, any cost savings that are experienced. See *Disability Advocates, Inc. v. Paterson*, 598 F. Supp. 2d 289, 350 (E.D.N.Y. 2009) (fundamental alteration analysis includes consideration of cost savings resulting from modification, as well as costs), citing *Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581, 604-607 (1999). Accord, *Williams v. Wasserman*, 164 F. Supp. 2d 591, 632 (D. Md. 2001).

### G.     Disney Offered No Evidence Sufficient to Support System-Wide Impact

If Disney suggests that it cannot extend the requested modification to A.L. without extending it to a broad group of guests who will, in the aggregate, create increased standby wait times, Disney's proof fails here as well.[12]

Disney cannot calculate the monetary cost of providing a readmission pass, or any number of readmission passes, to guests with cognitive impairments, because Disney has no idea how many such guests might visit its parks. V3 46:13-20.

---

[12] Plaintiff objects to any such argument Disney may make, as the argument would not be specific to A.L., and would therefore be contrary to the rulings of the Eleventh Circuit and this Court. Plaintiff was barred from introducing evidence relating to system-wide DAS and GAC impacts, causation, exceptions, and abuse.

Inexplicably, Disney suggests that offering the requested modification to A.L. will require Disney to offer it to *all disabled persons, regardless of their disability*. It is impossible to find logic in this suggestion.

Disney admits that it does not know how many of its guests may be similar to A.L. in diagnosis, disability, or need. V3 46:13-20; 69:24-70:7-10; 72:12-23; 72:24-73:3. Effectively, Disney proposes that providing a modification to A.L. will require that the same modification be given to all DAS holders, because Disney cannot break the DAS holders down by diagnosis or special need. V3 69:24-75:10. But Disney has always proposed that DAS *works* for the vast majority of the guests who receive it. With this in mind, Disney makes no sense when it suggests that it would suddenly be required to offer more than the DAS to everyone, even though the large majority of DAS holders request nothing more.

If Disney's supposition that all DAS holders would suddenly be entitled to more than the DAS by virtue of the fact that A.L. is entitled to more than the DAS, Disney does know how many persons this would be, because Disney does know how many persons receive a DAS each day. According to Disney's own exhibit, the number of GACs issued per day in Walt Disney World was about 1.3 percent. V3 68:20-24. Of course, the number of disabled persons holding a DAS must be considerably lower because the GAC program included persons with mobility challenges as well as persons who are blind or deaf. 96:18-97:3.

Disney's position that A.L's request for five additional readmission passes, over the five Disney already gives him, is at best of leap of logic. Extrapolating that one disabled person's request for a modification necessitates a system-wide change for countless guests must require much greater proof than Disney has offered. As one court has noted:

22

> In order to withstand judicial scrutiny, "the employer's undue hardship defense will have to have a strong factual basis and be free of speculation or generalization about the nature of the individual's disability or the demands of a particular job."
>
>   * * *
>
> Nor have Defendants explained how the transfer of four officers a year into a 9,500 employee organization (Career Service) would require the City completely to modify its personnel system, causing undue hardship

*U.S. v. City & Cty. of Denver*, 943 F. Supp. 1304, 1312 (D. Colo. 1996), aff'd sub nom, *Davoll v. Webb*, 194 F.3d 1116 (10th Cir. 1999), quoting Barbara A. Lee, *Reasonable Accommodation Under the Americans with Disabilities Act: The Limitations of Rehabilitation Act Precedent,* 14 Berkeley J.Empl. & Lab.L. 202, 250 (1993).

### H.    Disney Should Not be Heard to Argue that A.L.'s Requested Modification will be Unreasonable Because Disney will not Assess It

In this case A.L. brings only one claim; he seeks injunctive relief under ADA.  A.L. asks to be reasonably accommodated on his future visits to the park.  For this reason, his experience on December 19, 2013 can have only limited relevance. For example, Disney admits that December 2013 wait times are not relevant to predicting future July wait times. V3 61:2-62:2.

Disney has said "no" to the requested modification for any future visit A.L. may take, no matter what the date, time or conditions. Rather than standing ready to individually assess A.L.'s need in the context of his next visit, whenever that may be, Disney simply says "no" as a matter of policy, making a blanket refusal to even consider a modification for any future visit.  Disney apparently proposes that the burden to Disney or the impact on other guests will be the same regardless of the future date on which A.L. may visit the parks, so Disney need not evaluate the requested modification at that time, and can do so now, for all future dates. But Disney's suggestion that wait times for non-disabled persons will be impacted cannot conceivably apply to

23

each and every day A.L. might attend in the future.  Disney cannot credibly contend that providing the requested modification to A.L. will have the same cost to Disney or the same impact on others' wait times if A.L. attends on a rainy Tuesday in February, versus a clear Saturday in June.  Disney is obliged to assess A.L.'s requested modification in the specific context of the request, rather than simply preempting all future requests without regard for the conditions that may prevail at the time.

**I.      The So-Called "Abuse" Phenomenon Does Not Support Disney's Fundamental Alteration Defense**

On the oft-mentioned topic of GAC "abuse", Disney offered nothing other than anecdotal evidence. Disney offered:

- No evidence of the cost or extent of past "abuse;"

- No evidence of the projected cost or extent of future "abuse" which might have otherwise occurred;

- No evidence of the existence of any "abuse" by persons with cognitive impairments; and

- No evidence of any "abuse" by A.L. or D.L.

**V.     If Potentially Increased Wait Times Exist for Non-Disabled Persons, This Impact will Result from Disney's Unrelated Business Practice, Not from A.L.'s Requested Modification**

Disney offered an expert, Bruce Laval, to testify about the DAS and wait time impacts. Mr. Laval's testimony is telling, in many ways.

Mr. Laval offered no opinion about whether the DAS permits a guest to visit attractions in a particular order or sequence.

24

Mr. Laval adopted the premise that extending the requested modification to A.L. will necessarily require extending it to everyone. Mr. Laval noted:

Q.     Well, does a fundamental alteration of Disney's operations happen if this plaintiff were to receive three readmission passes in addition to his DAS?

A.     Not if that one individual, but, unfortunately, we're not able to restrict it to that one individual. If we give it to that one individual, we have to then change our whole policy on the system and we have to make it available to everybody, not just one person.

Alison explained that very clearly and, you know, whatever policy we do, we have to be consistent in how we enforce that policy. And once you start doing it for one, you have to do it for all. And it doesn't take much time for the word to get out that all of a sudden you're offering four, five, six of them and it gets out on social media, and then everybody demands four, five, six, whatever that number is. We all know how quickly it spreads on social media, and that's when you get to the abuse.

V4 109:2-18.

Apparently because of this assumption, Mr. Laval notes that the number of readmission passes a plaintiff may request is irrelevant, because awarding any to one will be awarding them to all: "it doesn't matter if it's two, three, four, five, six, seven." V4 108:22-23.

Strangely, while Mr. Laval attested that however many readmission passes A.L. may be awarded is irrelevant because the award will necessarily extend to the universe of guests, he explained away the fact that A.L. already receives five readmission passes when he visits Epcot by noting that "one person is not a problem."  V4 110: 2-14.  In the present trial, only one person is at issue; A.L.  Because, as Mr. Laval states, providing the requested modification to A.L. "is not a problem," A.L. is entitled to injunctive relief.

Perhaps more telling is Mr. Laval's testimony about the sanctity of Disney's Fastpass lines. Mr. Laval acknowledged that if a disabled guest is granted a readmission pass as a modification

of the DAS, *it is not the readmission pass that creates an increased wait time in the standby line*.

Rather, the standby wait time increases because Disney refuses to allow Fastpass line wait times

to increase.  That is, with each disabled guest who is placed in the Fastpass line, Disney refuses,

for its own business reasons, to allow the Fastpass wait time to increase. The dialogue with Mr.

Laval is as follows:

> Q.    Do you ever know -- do you know of any study that Disney has done that
> would increase or introduce flexibility into the FASTPASS line that might
> raise from five minutes maximum to ten, for example, that would ameliorate
> this impact on the standby line?
>
> A.    That really is not possible to do because FASTPASS has been extremely,
> extremely successful.  As a matter of fact, that's why it's copied everywhere
> around the country, around the world, like we've mentioned. And the reason
> it's been very successful is people that are frustrated in long lines, they want
> to have their wait time reduced. And it's a big selling feature that Disney
> offers this FASTPASS system that guarantees them wait times under five
> minutes. They have great expectations for that. That's why they're coming
> and why they love Disney so much.
>
> And we can't afford to then all of a sudden say, well, you know, it might be
> five minutes, but it might be 20 minutes. It might be 30 minutes. Talk about
> dissatisfaction. We just further compounded the dissatisfaction of guests.
> Not only do they have long lines in the standby line, but now we're not
> delivering them the promise of if you go to the FASTPASS system in the
> advantage of Disney, we provide FASTPASS for free, not charge people a
> lot of money for it like other places do. It's a free service. So it's a major
> feature at Disney that distinguishes us from everybody else. So we have to
> deliver on that promise. We try to promise five minutes or less. We can't
> just say, well, maybe it's going to be 20 minutes today. You can't do that.
>
> Q.    So the answer is, no, Disney has not studied what the impact would be on
> the standby line if giving more re-ads was also combined with increasing
> the FASTPASS line capacity to, say, seven minutes or eight minutes?
>
> A.    No. Because we would never do it. I mean, we know the result because, I
> mean, it's based on the same queuing theories we've shown here.  We know
> what would happen.  The wait times would go up for the FASTPASS
> people, and they would be even more dissatisfied than the regular guests
> because we promised them something and now we're no longer delivering
> on the promise. So it's not an option. We don't have to study it.

26

Q.      That 5-minute cap on the FASTPASS line is one that Disney, for its own business reasons, will remain loyal to, right?

      A.      The cap on the FASTPASS line?

      Q.      Yes.

A.      Yes. We have a finite amount of capacity we assign to FASTPASS, and when -- we know that the remaining capacity will be filled in with other guests who are using the standby line.

\* \* \*

Well, I would just say we -- it would result in longer waits for the FASTPASS line, which is one of the biggest selling features we have. Not the biggest, but it's a very big amenity and advantage that Disney has in delivering this guarantee of five minutes or less with a FASTPASS. And you can have this access for free. It's not an entitlement that we charge guests for. It's a free entitlement. So it's a very big perceived benefit to guests who come to Disney World.

V4 112:5-113:25; 114:19-115:1.

With this line of questioning, Mr. Laval admitted Disney's actual interest here. It is not preventing an adverse impact on standby wait times, it is preventing _any_ impact on Fastpass wait times, for reasons founded completely in business competition, and nothing else.

## VI.   __Conclusion; Requested Relief__

A.L. has offered extensive proof of the severe challenges that prevent him from being able to tolerate extended and unpredictable wait times. His special need for relief from extended and unpredictable wait times can be accommodated in a number of different ways:

- Permission to access Disney's attractions through Disney's Fastpass lines, which are designed to consistently provide short wait times; or

- An award of about ten (10) readmission passes for A.L.'s visits to Walt Disney World parks other than Epcot; or

27

- A simple promise that wait times will not exceed a certain maximum, like 15 minutes; or

- The ability to make appointments for attractions through the day, but sequentially and predictably, rather than through the Fastpass system.

A.L. has demonstrated conclusively that the modification he seeks will accommodate him, because he received a substantially similar accommodation from Disney for the first 21 years of his life, one which always worked.

The modification A.L. requests cannot create a fundamental alteration of Disney's operations because:

- A.L. is a single disabled person, and the cost of providing the requested modification to him is negligible, or zero;

- A.L. does not represent a class of persons, nor does the relief he requests necessitate any change in policy by anyone toward a class of persons;

- Disney provided essentially the same accommodation to A.L. for 20 years;

- Disney provides essentially the same accommodation to other guests, each and every time they visit the parks;

- Disney provides a version of the same accommodation to A.L. now – it provides an adequate number of readmission passes for A.L.'s visits to Epcot; he proposes only that an adequate number for Magic Kingdom must be higher, and requests that number;

- Disney already provides A.L. with five readmission passes for Magic Kingdom, so what he seeks is an incremental increase, not relief to be fashioned from whole cloth;

28

- Suggesting that a system-wide change to Disney's business is contrary to the directive of the Eleventh Circuit, and to the pretrial Orders of this Court;

- Disney has failed to show anything other than anecdotal evidence of past "abuse" of the GAC, certainly insufficient to support any projection of future abuse;

- Disney's projections of future wait time impacts strain credulity;

- While creating strained analyses of projected future wait time increases, Disney creates no analysis of the wait time decreases that will result from A.L. receiving the requested accommodation, since such decreases must logically be offset against any increases;

- Although A.L. seeks injunctive relief for future visits to the parks, Disney offered no wait time or other data that might be used to determine the wait times A.L. will face during future visits to the parks, and Disney admits that data regarding the December 2013 visit is not useful to do so.

The most impactful testimony in favor of A.L.'s claims may have come from Disney's own expert, Bruce Laval. Mr. Laval testified that Disney will never consider – it will never even study – the extent to which extent any increase in standby wait times will be ameliorated by adjustment of the Fastpass lines.

Mr. Laval's testimony brings to mind the example of a commercial airline. Consider, hypothetically, an airline that is directed to add to its airplane sufficient capacity to carry one additional disabled person. In response, the airline flatly refuses to use any of its first-class cabin space to create the additional space, but instead insists on carving the space out of the main cabin seating. In this example, the impact of adding the additional disabled person is borne completely by passengers in the main cabin, each of whom will suffer slightly less room. But the first-class

cabin passengers will not suffer at all. In fact, the airline will not even consider allowing them to suffer, since it has promised those passengers a roomy ride.

Disney is the airline. Disney's standby line guests will suffer wait times only because Disney has two classes of guests, Fastpass line guests and standby line guests, or, essentially, guests with appointment times, and guests without appointment times.  For its own business reasons, and not as a result of anything this Court might order, Disney will not consider disrupting the Fastpass line guests' experience – it will not reduce the number of them who might receive appointment times, nor will it extend their wait times upon arrival.

This is also akin to a restaurant that is directed to give a disabled patron a table. Upon doing so, the disabled guest will likely join the restaurant guests who are already seated because they had a reservation time. The walk-in guests who arrived without reservations will likely wait incrementally longer. The restaurant should not be heard to bemoan the increase in walk-in wait times, at least so long as the restaurant refuses to consider adjusting its policy regarding reservations.

Again, if Disney is worried about how long the walk-in guests will need to wait for a table, it should at least consider adjusting its policy toward reservations.  At a minimum, Disney should not be permitted to use disability accommodation as the blanket behind which its true loyalty can stay hidden – loyalty to Fastpass guests.

The Court should order Disney to accommodate A.L. in the future by granting him any of the four above-listed modifications of Disney's disability access policy, the DAS.  Because the Court should avoid entering permanent mandatory injunctions, A.L. proposes the injunction should end in 10 years, or upon further order of the Court.

Upon entry of an order granting injunctive relief, the Court should retain jurisdiction to hear a claim for attorneys' fees and costs for A.L., who will have been the prevailing party.

Dated:  March 23, 2020

**DOGALI LAW GROUP, P.A.**

 /s/ *Andy Dogali*
Andy Dogali
Fla. Bar No.: 0615862
Barbara U. Uberoi
Fla. Bar No.: 0145408
401 East Jackson St., Suite 1825
Tampa, FL 33602
(813) 289-0700
adogali@dogalilaw.com, buberoi@dogalilaw.com,
reception@dogalilaw.com, lfair@dogalilaw.com

AND

Eugene Feldman, Esq. (*pro hac vice*)
Arias, Sanguinetti, Wang & Torrijos, LLP
6701 Center Drive West, Suite 1400
Los Angeles, CA 90045
(310) 844-9696
eugene@aswtlawyers.com

AND

Domenick G. Lazzara, Esq.
Fla. Bar No.: 0103071
Dom Law, P.A.
1814 North 15th Street
Ybor City, Florida 33605
(813) 606-5036
dom@domlaw.com

*Attorneys for Plaintiffs*

31

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that a copy of the foregoing has been furnished by CM/ECF this

23rd day of March 2020 to all parties who have requested notice via electronic filing.

**DOGALI LAW GROUP, P.A.**

*/s/ Andy Dogali*
Andy Dogali