# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### ORLANDO DIVISION

A.L., by and through D.L., as Next
Friend, Parent and Natural Guardian,

        Plaintiff,

v.                                    Case No:   6:14-cv-1544-Orl-22GJK

WALT DISNEY PARKS AND
RESORTS US, INC.,

        Defendant.

---

## MEMORDANDUM DECISION AND ORDER

A.L., through his mother, D.L.,[1] brings a claim against Defendant Walt Disney Parks and Resorts US, Inc. ("Disney") for its alleged failure to accommodate his disabilities, in violation of Title III of the Americans with Disabilities Act (the "ADA"), 42 U.S.C. § 12182(b)(2)(A)(ii).

A.L. seeks a permanent injunction requiring that he be permitted unlimited access to Disney's theme park attractions via Disney's expedited "FastPass" lines, or similar relief through at least ten "readmission passes,"[2] in order to accommodate his special needs: (1) to follow a particular, predetermined route and ride certain attractions in a specific order each time he visits;[3] and (2) to predictably avoid wait times that exceed 15 to 20 minutes.

Disney's general position is that unlimited, near-immediate access to every ride at its parks, the proposed accommodation for A.L.'s autism, is not required by the ADA or necessary for the characteristics inherent in A.L.'s disability. Disney contends that offering near-immediate access

---

[1] For ease of reference, the Court refers to A.L. as the proponent of the arguments made on his behalf by D.L., A.L.'s mother, who brought suit as his next friend and natural guardian on his behalf. D.L.'s individual claim was previously dismissed. (*See* Doc. 12).

[2] As explained in more detail below, "readmission passes" are similar to FastPasses in that they allow holders to by-pass the longer standby lines and enter the ride through the FastPass lanes.

[3] A.L. does not seek reasonable accommodation for the contention that he needs to ride the same rides repeatedly in the same visit.

to all guests who state they cannot wait in the standard queue would lead to the kind of abuse that existed under the former disability-accommodation system. It would also increase the wait times for the vast majority of other guests waiting in "standby lines" without the same type of expedited access. Moreover, Disney argues, the majority of rides have waits of less than 20 minutes, and for those with longer waits, the FastPass+ system allows guests, with planning, to make three reservations each day for premium rides. In addition, the current disability-access system allows guests such as A.L. who are cognitively disabled to wait virtually for the popular rides with longer wait times while enjoying other restaurants, stores, and attractions with no waiting in line.

Shortly after the parties filed their post-trial briefing in late March 2020, state and local authorities in Orange County, Florida instituted a stay-at-home order and Disney temporarily ceased park operations. With the stay-at-home orders lifting, on May 27, 2020, Disney announced plans to begin reopening the parks on July 11, 2020 with "significantly limited" capacity, reservations-only admission to the parks, all FastPass+ selections cancelled, and FastPasses suspended because Disney will use the space in the FastPass queue to "manage capacity at its attractions and keep the recommended physical distancing between parties"; these changes are in effect until the end of 2020.[4] These changes deal with social distancing to avoid the spread of Covid-19, and are considered to be "temporary changes" until the Covid-19 pandemic is contained (and at least until the end of 2020). Neither party has raised mootness as an issue. The Court considers this case is an exception to the mootness doctrine akin to the type of case that is "capable of repetition, yet evading review." *See Lewis v. Continental Bank Corp.*, 494 U.S. 472, 481, 110 S.Ct. 1249, 108 L.Ed.2d 400 (1990). As soon as the need for social distancing is reduced, and the

---

[4] "Disney World Suspends FastPass, Cancels Dining Reservations As Part Of Reopening Plan," *Orlando Sentinel*, May 28, 2020. *See* https://www.orlandosentinel.com/travel/attractions/the-daily-disney/os-et-disney-cancels-FastPass-reservations-20200529-mz3k2ikcrve5lgir3t3xr4bw2q-story.html.

FastPass lines re-open, A.L.'s request for injunctive relief would be revived, since he intends to return to all of the Disney parks if he receives the accommodations sought.

A.L. and Disney tried this case to the Court from February 18 to 21, 2020. After carefully considering the evidence and the parties' arguments, and keeping in mind the guidance of the Eleventh Circuit's decision in remanding the case for trial,[5] the Court now issues the following decision:

## I.    FINDINGS OF FACT

### A.  *Plaintiff A.L. and his mother D.L.*

Plaintiff A.L. is a twenty-seven-year old individual with autism,[6] a developmental disorder and diagnosed cognitive impairment; his developmental age is five to seven years old. He is generally in the care of his mother D.L., and they reside in Orange County, Florida, with other family members.

A.L. has an extremely limited ability to communicate, and he does not engage in two-way conversations, primarily using one-word utterances, even if in pain. A.L. cannot provide meals or clothing for himself, or reliably take care of his hygiene. A.L. can read the numbers on a clock, but he cannot tell time because he does not understand what the numbers mean or that they refer to a particular time of day. He also does not understand references to days of the week or increments of time. However, he does comprehend that "tomorrow" means a different time in the future.

---

[5] The Court had previously granted Disney's Motion for Summary Judgment, a decision appealed to the Eleventh Circuit, who remanded the case to this Court to consider specific factual issues related to A.L.'s individual claim under the ADA. *A.L. by & through D.L. v. Walt Disney Parks & Resorts US, Inc*., 900 F.3d 1270, 1291 (11th Cir. 2018).

[6] D.L. testified that A.L.'s autism is "moderate to severe" in her opinion, although she contends that "some medical professionals" have said his condition is "severe." The evidence at trial showed that A.L. had received a diagnosis of "mild/moderate" autism in childhood and Dr. Kelderman opined she would categorize his condition as "moderate." The Court focuses on the reasonable and necessary accommodations required to accommodate A.L.'s actual behavioral needs from his autism, and not simply the diagnosis of "severe" or "moderate" autism.

A.L. is substantially limited in his ability to care for himself, perform manual tasks, speak, read with comprehension, communicate, and work. Through A.L.'s entire childhood he had an Individual Education Plan at school, as required under the Individuals with Disabilities Education Act,[7] and the school district provided A.L. with accommodations including: an assistant with a behavioral therapy background; entering and exiting the classroom early to avoid waiting; and additional time for test-taking and homework.

A.L. eats the exact same foods each day for breakfast, lunch, dinner, and snack, and if offered other food he will refuse it; he eats at precisely the same time every day without exception; he is given thirty minutes of cell phone time between 9:30 and 10:00 p.m., and once the time runs out, he knows it is time to go to sleep. "Routine is instrumental in keeping [him] grounded," thus, D.L. "manipulates the environment in order for him to get to a point where he is a participating member of society." When A.L.'s routines are disrupted he becomes anxious, gets louder with audible noises, and shakes a red tube that he holds in his hand (a common autistic response called "stimming"), which is a way for him to self-calm and exercise self-control; if he increases the amount of shaking of the tube that indicates to D.L. that she should take steps to de-escalate his anxiety by removing him from the stimulating situation. If A.L. becomes overwhelmed his behavior leads to "meltdowns" which consist of outbursts and dropping to the floor, becoming non-responsive, and D.L. will have to wait out his behavior.[8]

A.L. can successfully wait 15 or 20 minutes in a line as "a baseline." A.L. has gone on family vacations "a lot," including 21 cruises, and car rides as long as seven hours (with breaks). Because A.L. is a big fan of music and singing, he has attended Broadway shows for up to three

---

[7] *See* 20 U.S.C. § 1400 *et seq.*, requiring schools to provide a free appropriate public education for disabled children.

[8] A.L. stands 6'6" and weighs 300 pounds. Due to A.L.'s physical size, D.L. explained that it is not possible for her to physically move him if he does not want to move.

hours, and his sister's recent law school graduation. A.L. sat in the courtroom during the first day

of this trial and stood up and responded "Hello" when greeted by the Court but had no further

interaction and was not called to testify at trial. A.L. was not present for the entire trial as he was

able to leave the courtroom with an adult when he wanted to leave, but he was present for hourlong

stretches of the trial at times.

A.L.'s mother, D.L., is employed full-time as a government investigator. D.L. currently

serves as president and CEO of a non-profit organization regarding autism called the Autism

Society of Greater Orlando ("ASGO"), which she has been involved with since 1996. D.L. runs

the adult social skills program for ASGO to help autistic adults integrate into the community by

working on social and other skills. D.L. has also served as an "autism awareness" trainer for law

enforcement officers and first responders in Florida and Georgia for ten years. D.L. has provided

autism awareness training to the Universal Orlando Resort employees for three years and has

previously given an autism awareness training to Disney employees.

### B. Findings Regarding A.L.'s Behavioral Issues Related to Autism

Due to A.L.'s autism, he has received Applied Behavior Analysis ("ABA") behavioral

support services since the time he was four years old. The behavioral support services are designed

to modify and reduce his "maladaptive behaviors," *i.e.*, the strategies are designed to replace the

behaviors with more appropriate ones through interventions, task analysis, preplanning, and

modeling such as showing pictures or videos before visiting somewhere to know what to expect

after arriving. As a child, when denied access to a preferred food or amounts of food, A.L. would

engage in loud vocals and often aggression, but over time he significantly improved in tolerating

denial of access to a preferred item or activity. As an example, A.L. worked very hard over the

years and reduced his maladaptive behaviors from 96 aggressions per hour to one or two per

month. As part of the ABA therapy, D.L. also worked with A.L. to improve other maladaptive behaviors such as his insistence on sameness or "rigidity"; resistance to changes in routine; and "tolerating wait" for items that are not available immediately. In 2008, A.L.'s target wait time was to tolerate wait of 30 seconds; however, through ABA therapy over the years, he expanded his ability to wait to 15 to 20 minutes at his present age of 27 (at trial). D.L. believes that "wait time is always going to be an issue" for A.L.

Johanna McDonald, a Board-Certified Behavioral Analyst,[9] runs an agency which has provided behavioral therapy services to A.L. for eleven years, including up to the time of trial; she supervises individual analysts working with A.L. on a monthly basis, observing and giving feedback. She believes that autism is treatable and individuals with autism can lead a fulfilling life, but how much progress they will make depends on the individual person. ABA therapy is the "gold standard" and is effective with autism clients because maladaptive behaviors or symptoms of autism can often be modified or changed to varying degrees by ABA therapy through interventions like visual supports and preplanning.

Some of the maladaptive behaviors that they are working on with A.L. are to decrease physical aggression, threatening gestures, socially inappropriate behaviors, and disruptive behaviors, as well as improving tolerating "no," tolerating waiting, functional communication, and increasing functional social skills. She offered a specific example to improve A.L.'s ability to tolerate waiting: if he requests something and it is not available at the moment, the therapist may offer an alternative and reinforce him for tolerating that. "So if he says, can I have a Hershey bar, and – and it's not time for a Hershey bar, the therapist may say, ['W]e're not going to have a

---

[9] Ms. McDonald testified as a fact witness; she was not designated as an expert by A.L. Over the years, Ms. McDonald has provided less direct services personally and now supervises others. She has personally seen 50 to 70 clients with autism in the last twenty years and well over 150 to 200 as clients of her agency.

Hershey bar now. You can have a Hershey bar at 3:00. Would you like an apple [or] . . . something else instead?'" The individual behavior analyst continues to work with A.L. on trying to improve his capacity for things like learning to tolerate "no" and waiting. Ms. McDonald explained, "If he does not receive the reward that he's expecting or there is a variation in routine, that can be quite upsetting to him."

Dr. Kelderman, Disney's expert witness, was qualified as an expert in autism and pediatric neuropsychology based on her education, board certification in clinical neuropsychology, experience having seen "thousands of families who are impacted by autism" and having worked closely with board certified behavioral analysts and medical providers who treat individuals with autism. Dr. Kelderman's unrebutted[10] expert testimony was that A.L.'s putative inability to wait or "defer gratification" are not diagnostic criteria or requirements of autism. The characteristics of autism are not immutable; a great deal of research has demonstrated that ABA is effective in altering these types of characteristics. Dr. Kelderman opined that it is important to teach individuals with autism to be adaptable to their environments which are ever-changing because there are very few environments that are static and always predictable or consistent in our culture; thus, children and adolescents with autism have to be taught how to tolerate change and be flexible; therapists give them the tools to facilitate that or their development and quality of their lives will be limited.[11]

---

[10] A.L.'s neurologist, Dr. Rathinam, did not testify because she was allegedly unavailable for trial, although A.L. had plenty of time to prepare the case for trial following remand to this Court on November 26, 2018. (Doc. 256). A.L. filed a Motion to Stay Action Pending Trial of Similar Actions in Another District (Doc. 257), which the Court denied on September 10, 2019 and set the case for a bench trial on A.L.'s request for injunctive relief to commence more than five months later, on February 18, 2020. (Doc. 259). The parties were subsequently ordered to file the amended Joint Pretrial Statement and trial briefs by November 26, 2019. (Doc. 267). Despite having five months warning with a date certain for trial on February 18, 2020, A.L. waited until February 6, 2020, twelve days before trial, to file a notice to take the deposition of Dr. Rathinam, which was stricken. (Docs. 288, 293).

[11] Without timely seeking leave of court, A.L. attempted to substitute a newly-retained expert witness (Lila Kimel, Ph.D.) at the last minute by listing her in the Joint Pretrial Statement, even though he had previously designated a different expert that Disney had deposed and sought to exclude (Dr. James) because she was mistaken on some of

- 7 -

Learning to tolerate "no," or to comply with a nonpreferred request or to tolerate waiting, a "delay to reinforcer" in ABA parlance, are extremely common in the treatment or the behavior plans for individuals with autism. When it comes to avoiding meltdowns, the purpose of ABA therapy is to give the autistic individuals, parents, and caregivers tools and strategies in order to reduce this need for sameness, these maladaptive behaviors; ABA teaches the autistic individual more functional behaviors to express their needs rather than maladaptive behaviors. The bulk of the scientific research has shown parents should not reinforce the autistic child's behavior[12] but, instead, give the family tools and strategies such as using distractions, transitions, or ignoring the behavior to reduce the likelihood the behavior will continue to occur in the future. Dr. Kelderman described the effective behavioral treatments identified in peer-reviewed studies reported in leading scientific journals,[13] including the use of visual supports, schedules, modeling, video priming, and working with individuals with autism to help make their environments more predictable. "If operated with fidelity, an ABA treatment plan will almost certainly move the needle, and in many cases it will reduce and sometimes eliminate the problematic behaviors." Dr. Kelderman testified to specific examples from peer-reviewed literature describing ABA treatment

---

the details of A.L.'s December 2013 visit. (*See* Doc. 277). The Court struck A.L.'s unauthorized and untimely "Second Amended Witness List" substituting Dr. Kimel, filed a week after the parties' Joint Pretrial Statement. (*Id*.). It is not appropriate for A.L. in his post-trial brief to rely on a portion of dicta in the Eleventh Circuit's opinion which mentioned Dr. James' 2016 testimony to demonstrate a potential issue of fact (see Doc. 343 at 11 (citing *A.L.*, 900 F.3d at 1285-86), when A.L. did not have any expert testify at the trial. Moreover, a good deal of the cited testimony from Dr. James was generalizations about individuals with autism and the Court must reach a decision about A.L.'s individualized behavioral characteristics.

[12] Dr. Kelderman has seen parents as clients who are placed in very difficult and challenging situations with their autistic children but have enabled or reinforced the rigidity/sameness behavior because they thought that it was what their child needed. She finds that it is "understandable that, from the parents' perspective, they see this really intense desire [of the autistic child] and they see the repercussions of what happens and how upset their child is if they don't go along with it. So in their mind, it's a need. In their mind, they have to do it. And many parents really have that perception that I don't have any choice. . . . I have to go to this fast food restaurant every Monday morning" to buy fast-food chicken nuggets for the child to eat at every meal for the entire week.

[13] Dr. Kelderman testified: "There are thousands of articles over—published over decades outlining the efficacy of ABA. And more recently, there are several seminal meta-analytical studies, all three of which emphatically concluded the number one established convention is behavioral interventions."

to change maladaptive behaviors, such as video priming (not limiting visits to the place of the child's preferred choice) were used to reduce meltdowns, schedules, and other visual supports.[14]

In Dr. Kelderman's opinion, individuals with autism, including A.L., are not "incapable" of deviating from consistency, order, and routine. Rigidity, insistence on sameness, and adherence to routine are not unchangeable characteristics of autism, Dr. Kelderman opined, but they are symptoms that can be managed through behavioral strategies and interventions, and there are evidence-based treatments that have been effective. For example, preparing in advance and utilizing visual schedules to explain the order of events, social stories, and other visual supports have been shown to be effective in helping individuals with autism understand the order of events and to make the abstract concept of time more concrete.

### C. Disney Parks and the Guest Experience

Disney's principal business activity consists of the ownership, operation and management of theme entertainment parks, resorts and related facilities located in Florida and California. Disney's Magic Kingdom is one of four theme parks at Walt Disney World in Florida. It is organized into six "lands," comprising 41 rides and other attractions. Throughout the day, guests can experience certain shows, parades, and concerts, and visit numerous shops, restaurants and special events without having to wait in a line; these are located in close proximity to the rides and other attractions.

---

[14] Dr. Kelderman described the results of several studies in support of her opinion that "[b]ehavior modification strategies are helpful in reducing and accommodating symptoms of ASD." Def.'s Ex. 62 at 3 (citing NAT'L AUTISM CTR., FINDINGS & CONCLUSIONS: NATIONAL STANDARDS PROJECT, PHASE 2 (2015)). She also discussed examples from the studies of K. Brigid Flannery & Robert H. Horner, *The Relationship Between Predictability and Problem Behavior for Students with Severe Disabilities*, 4 J. BEHAV. EDUC. 157 (1994)); Laura Schreibman et al., *The Use of Video Priming To Reduce Disruptive Behavior in Children with Autism*, J. POSITIVE BEHAV. INTERVENTIONS, Winter 2000) (showing video priming).

Disney has about 55,000 guests per day visit Magic Kingdom and a minimum of 26,000 guests per day visit the other parks. *A.L. by & through D.L. v. Walt Disney Parks & Resorts US, Inc.*, 900 F.3d 1270, 1291 (11th Cir. 2018) (citation omitted). To experience the attractions, guests generally stand in a line, called the standby line, and wait until they move to the front of the line to enter the attraction. The majority of attractions also have a separate line, the "FastPass" line, which typically has a short wait of no more than fifteen to twenty minutes, while waiting times in the standby lines can sometimes more than an hour. The FastPass system was designed to reduce wait times and reduce the time guests spend physically standing in line in the standby queue waiting for their turn to enter the attraction. This line is available to guests who take advantage of the FastPass system, whereby guests receive a designated return time from a ride location, essentially saving their place in line without having to stand in an actual line. At the return time, guests can enter the FastPass line. FastPass return times are staggered throughout the day and issued until the FastPass ride capacity allocated for the attraction is reached.

Disney has implemented a modified FastPass program called FastPass+ since 2015. FastPass+ allows guests to schedule in advance a designated time to enter the FastPass line for up to three rides on an "app" either through their own device or on a device at the park. The guests may also change their FastPass return time at any point prior to the scheduled times. In order to take advantage of the benefits of the FastPass systems, some advanced planning is required.

### D. Misuse of GAC Leads to a New Accommodation System for Disabled Customers

Disney invests a tremendous amount of capital and marketing [15] into new rides and "marquee" attractions; some Disney guests plan for years to visit to experience those new rides, which is the core of Disney's business. Disney's industrial engineers found visits to the parks are

---

[15] This marketing includes spending on billboards and television advertising.

based on whether guests think they will be able to ride Disney's marquee attractions. Because Disney employees were not allowed to ask about a guest's disabilities under ADA regulations, some guests were able to misrepresent their impairments or the severity of their impairments and ended up with—as Disney characterizes it—"an unlimited front-of-the-line pass for anyone willing to tell a Disney cast member that they could not wait in line."

Until October 9, 2013, Disney accommodated certain disabled guests with the Guest Assistance Card ("GAC passes")[16] which provided these guests and their families unlimited, repeated and near-immediate access to rides and attractions through the shorter FastPass lines, without requiring them to wait in the regular attraction standby lines.[17] Alison Armor, the Vice President of Transportation Operations at Walt Disney World, witnessed at the parks the misuse of GAC passes and testified to why the GAC program could not be executed consistently. Ms. Armor led a team of 20 to 25 subject matter experts in operations who would work with other entities within the company to formulate recommendations including the task force Disney formed to review the "attraction access" issues caused by GAC fraud and overuse. She testified at length that officials up to and including the highest levels of the company unanimously made the decision, following several rounds of intense debate and an extensive investigation she headed that lasted more than a year, that GAC was impossible to continue.

The GAC system had different levels of accommodation and when guests sought accommodations at Guest Relations, they were not required to provide any proof of disability since it was prohibited by law; employees did not ask for medical diagnoses or medical conclusions

---

[16] The GAC was a physical card with a stamp on it that you could clearly see, and the employee would write on it the name, the party size, and the date.

[17] Apparently there may be some rides with only standby lines and no FastPass line, although according to Ms. Armor, "more and more attractions over time implemented onto the FastPass system and [Disney's] most popular attractions were on FastPass." A.L.'s access to the rides without a FastPass entrance and the wait times for these rides were not raised as issues in the trial.

regarding their capabilities. Over time, the GAC system "failed" because as guests found out about how the system worked, they requested or demanded the highest level of service out of the six levels. Disney also lost control over who received the GAC passes, eventually learning GAC passes were being used repetitively and excessively. According to information Ms. Armor learned from the operators of Disney rides, guests who received the GAC passes were using them to the extreme compared to guests without GAC passes. She personally witnessed in Guest Relations a guest reading from a script on her cell phone to get a pass; the information a guest needed to present to get a GAC had become commonly known on the internet, blogs, and different websites. There reached a point when most of the guests (more than 90%) were requesting the highest-level, all-entrance GAC pass. Those without an all access pass (*e.g*., limited to wheelchair access) would learn that their access was through the standby line and not the FastPass line, so they would return to Guest Relations because they had observed other people with the same pass and but a different stamp getting access through the FastPass return line and "it was transparent to them that they needed to get . . . the alternate entrance" stamp. Thus, it became more difficult for Disney employees to discern what was appropriate because the guests were able to "essentially work the system to say what they needed to say." There was an increase of people coming through Guest Relations asking for the GAC pass, and the GAC system became subject to an unsustainable level of fraud and abuse.

Disney managers[18] described examples of guests creating counterfeit GAC passes, posting Craigslist ads offering unauthorized "tours" of Disney with the GAC passes, or used the internet to sell unexpired ones.[19] On different occasions managers saw groups of teens celebrating right

---

[18] Ms. Armor as Disney's corporate representative, and Disney's Regional Senior Duty Manager, Steve Riggs, testified at trial to abuse and overuse of the GAC system they personally observed while walking the parks and interacting with guests at Guest Relations.

[19] There is no evidence that A.L. or his family engaged in any of this behavior. This information is merely

after getting a GAC pass outside Guest Relations, as if they had just "pulled one over" on the staff. The misuse of the GAC passes became well-known to the point that national media outlets such as the TODAY show, the *New York Post*, and Fox News ran stories in May 2013 documenting accounts of wealthy individuals who hired guests with GAC passes, even special passes designed for terminally ill children, to act as "tour guides" to lead them through Disney so they could skip the standby lines—all of which was embarrassing for Disney. In addition to abuse of the GAC passes, there was also overuse of the passes.

When more guests with GAC passes entered the FastPass line for the most popular rides, fewer guests in the standby lines were able to experience them even once. Disney's rides are strategically designed to be repetitive, which is a requirement in the theme park business, and most of the Disney guests are repeat visitors; without the repeat visitors Disney's business would suffer financially. On an extremely popular ride such as Buzz Light year's Midway Mania where guests receive a score each time, Ms. Armor would see GAC holders immediately run around from the exit and circle back to the entrance to go on the ride again and improve the score. On one premium ride, Space Mountain, an elderly lady gave her GAC pass to a couple of teenage boys who used it to go on Space Mountain multiple times, even though the GAC pass was actually not meant for them. Some rides had so many guests with GACs that they spilled out of the alternate entrance and blocked the walkways, interfering with the operation of the rides. At times, the sheer number of guests coming back with the GAC passes outweighed the number of guests that were going into the standby line.

These situations led to the empirical study of the GAC ridership to learn the extent of the abuse and overuse problems, including tracking how many cards were handed out manually. In a

---

offered to explain Disney's rationale for the change to DAS.

two-week study conducted by Disney's Industrial Engineering team in April 2013, the team found that GAC pass usage at five of the most popular attractions at Disney (the "GAC Study") was much higher than the percentage of guests in the park who held a GAC pass. At that time, approximately 3.3% of guests at Disney used a GAC pass, yet the percentage of guests on the most popular rides who had a GAC pass and entered through the FastPass line was significantly higher than 3.3%. The GAC Study showed that 11% of riders on Space Mountain, 13% of riders on Splash Mountain, and 30% on Toy Story Mania used a GAC pass to access the ride. Disney's industrial engineers concluded that the small portion of the guest population who held GAC pass was consuming a substantial portion of the ride capacity. For example, guests with a GAC pass were riding Toy Story Mania an average of ten times more than guests who did not have a GAC pass. GAC guests were riding Toy Story Mania on average two to three times a day, whereas guests without a GAC had only a 0.3 chance of getting on the ride even once. The issues with the GAC program were felt most strongly on the most popular or premium rides which were the most important to the guests.

Ms. Armor opined that a return to a system with unlimited access to FastPass lines, similar to GAC, would be equally if not more unsustainable than it was before Disney implemented DAS because even more popular new premier attractions have opened, like Stars Wars—Rise of the Resistance and Pandora. These new rides are essential to Disney's business because most of Disney's attendance is repeat attendance; thus, opening new experiences is one of the key components to achieving the repeat attendance. Given the long wait times at the Rise of the Resistance ride, where Disney had to create an entirely new queuing system to meet guests' demand, Ms. Armor opined that she could not conceive how Disney would have functioned with GAC because the "majority" of the capacity for the ride would go to the guests with GAC and

- 14 -

most guests (who do not have GAC passes) would not be able to experience the ride at all. This observation is consistent with the results of the April 2013 GAC Study, except that demand for the newer rides is even more intense, with guests arriving as early as 2:00 a.m., with all ride capacity allocated by 6:10 a.m. As another example, when a popular new ride opened at Disneyland in California where the company also had GAC passes, Disney saw a jump in GAC requests of approximately 40% associated with the opening of just one new popular ride.

Disney concluded that the GAC system was unintentionally providing a small minority of guests multiple opportunities to experience a given ride while the vast majority of guests had to endure longer stand-by wait times on the most popular attractions or were denied the chance to experience it at all; thus, causing significant damage to Disney's business. Once Disney's leadership found out about the results of the GAC Study, they unanimously agreed that Disney "could not continue" with GAC because "it was not sustainable" and was impacting Disney's business. The Court finds that the documented fraud and abuse of the GAC program led Disney to develop the Disability Access Service ("DAS") which replaced GAC on October 9, 2013.

The Disney summary brochure explains "the goal of the DAS Card is to accommodate Guests who aren't able to wait in a conventional queue environment due to a disability." After arriving at the park, the disabled guests stop at Guest Relations to discuss their specific needs and a Disney employee provides a DAS card or other accommodations. Disney's description of the Disability Access Service Card is as follows:

> The Disability Access Service, "DAS" Card, is intended for Guests whose disability prevents them from waiting in a conventional queue environment. This service allows Guests to schedule a return time that is comparable to the current queue wait for the given attraction. Once a return time is issued, Guests are free to enjoy other theme park offerings such as meeting a character, grabbing a bite to eat, enjoying entertainment or even visiting another attraction until their listed return time. Return times are valid until redeemed prior to park closing.

> Guests may only have one active return time. As soon as an outstanding attraction return time is redeemed, Guests may receive a return time for the same or a different attraction. . . .
>
> At Walt Disney World Resort, visit an attraction to receive your first return time, which will be comparable to the current wait time for the attraction. . . .
>
> -Once the return time is issued you are free to enjoy other theme park activities such as visiting with a character, grabbing a bite to eat, enjoying entertainment or even riding another attraction while you wait.
>
> -Return times are valid until redeemed prior to park closing.
>
> -You may only have one active return time at a time. As soon as you finish one attraction, you can receive a return time for the same or a different attraction.
>
> -*Another member of your travel party may obtain a return time, but the DAS Cardholder must board the attraction with his/her party.*
>
> - You can use the DAS Card in conjunction with Disney FastPass Service and Disney FastPass+ service.

Def.'s Ex. 17 (emphasis added).

Unlike the FastPass, DAS return times never run out for the day and can always be requested. At the return time, DAS cardholders enter the ride through the FastPass line or an alternative entrance. Once the return time arrives and the DAS return time is redeemed, a guest may then obtain another return time for the same attraction or for any other attraction. If the wait time posted at the attraction is 15 minutes or less, DAS cardholders are typically given access right away.

While FastPass provides guests with return times that expire, DAS return times are valid until redeemed prior to park closing. There is also no limit to the number of times DAS can be used in a day compared to a single FastPass, which can only be used once. As a Disney industrial engineer explained it, DAS reservations can be used in combination with FastPass reservations which allow DAS guests simultaneously to keep their place in line for multiple attractions while, at the same time, they can enter rides with shorter wait times right away. If they so choose, DAS

guests never have to wait in the standby lines which can be as long as one to two hours. During the transition from GAC to DAS, some guests were given readmission passes which are very similar to FastPasses—they allow use of the FastPass lines—but they do not expire. However, these readmission passes are not given to guests as a disability accommodation, but as a "recovery tool" with which Disney employees can help someone having a bad experience recover from their bad time and hopefully have a good one. Therefore, they are considered a one-time only accommodation and not a permanent supplement to the DAS.

Along with the new DAS card, Disney also introduced its *Resource Guide for Guests with Cognitive Disabilities* (the "Guide") in October 2013 which recommends preplanning for these guests before entering the park. Specifically, it recommends before visiting Disney with the cognitively-disabled person for the first time under the new DAS program, to plan by creating a visual schedule, watch videos on the Disneyworld.com website, study the map, and practice waiting in line (such as at a store). The *Guide* also included advice about utilizing DAS, FastPass, FastPass+ and additional accommodation based on individual service needs. (Def.'s Ex. 27). The *Guide* described the DAS as "designed for Guests who are unable to tolerate extended waits at attractions due to their disability, and the service allows Guests to schedule a return time that is comparable to the current queue wait for the given attraction. Depending on a Guest with cognitive disability's individual service needs, additional accommodations are available." *Id.*

Dr. Kelderman opined that the *Guide* included several specific strategies that are "essentially ABA in terms of their orientation" and "consistent with the well-established literature" supporting the efficacy of these types of strategies in individuals with autism. It outlines some specific strategies on how to transition an autistic individual from GAC to DAS prior to the visit; recommendations include a visual schedules or outline and modeling using a video or run-through

prior to vising the park so parents can plan for the change in systems. From a neuropsychologist's

perspective, the *Guide* provides a lot of targeted information about what each ride is like so that if

a child has difficulty tolerating certain types of sensory input, they have an understanding that the

ride might not be a good fit; it also identifies specific places in the park that might be a little calmer,

with less commotion, because high commotion can be really hard for some individuals with autism

to tolerate for extended periods of time.

### E.  The Request for Accommodation on December 19, 2013 Visit to Magic Kingdom

D.L., A.L., along with four other family members and friends[20] went to Magic Kingdom

on December 19, 2013 to go to Mickey's Very Merry Christmas Party. Prior to that visit, A.L. had

visited Disney twice per year utilizing the GAC, which had allowed A.L. and his party to use the

FastPass lanes to reduce the wait times and move on to the next ride more quickly. During those

earlier years, A.L. followed a route that D.L. felt she could more ably manipulate A.L. to follow,

basically visiting the attractions in a clockwise direction around the park. D.L. believes that A.L.

is capable of waiting for 15 to 20 minutes in a line for a ride. Prior to implementation of the DAS

on October 9, 2013, Disney had allowed A.L. and his family to access Disney's rides with the

GAC pass through the FastPass lines without limitation on the number of rides or the sequence of

the rides. After Disney replaced the GAC program with the DAS in October 2013, the DAS

program generally still allowed passholders, instead of physically standing in line, to wait for their

entry virtually.

Prior to A.L.'s visit to the Magic Kingdom on December 19, 2013, D.L. communicated

with two Disney employees, thus, she was aware that the GAC program was changing to the new

DAS program before she visited the park. In early fall of 2013, at the time D.L. talked to Mark

---

[20] D.L. testified that they often bring with them an adult behavioral specialist.

Jones, a Disney employee in a disability-relations position, she had heard that Disney would be changing its disability pass system and there were a lot of parents who were "very afraid" of the impact of the change. D.L. had a "good conversation" with Mr. Jones who wanted to discuss "the changes that were coming" with the transition to DAS. An employee in Disney community relations, Joan Martin, contacted D.L. regarding "how it was going" because D.L. had her "finger on the pulse of the Central Florida autism community" and she wanted feedback from D.L. about the new program.

D.L. emailed Ms. Martin some of the concerns that she had been hearing from parents which did not match up with information she had received from Mr. Jones; Ms. Martin thanked her for the feedback. Once D.L. began planning to go to Disney in December 2013, she contacted Ms. Martin to ask for readmission passes to go with the DAS because she was nervous that there would be problems, and D.L. wanted to "ensure that I did everything I could to make sure that [A.L.] would be appropriately accommodated for his needs so that he can enjoy the event." Ms. Martin approved three readmission passes to supplement the DAS for their visit.

On the day of the visit, A.L.'s family arrived at the Magic Kingdom in the late afternoon at 4:30 p.m. to attend Mickey's Very Merry Christmas Party and went to Guest Relations to pick up the DAS card and the readmission passes Ms. Martin had promised.[21]  At Guest Relations, D.L. discussed A.L.'s needs with a Disney employee and requested accommodations for A.L. The Guest Relations employee gave her the DAS pass, and D.L. responded that Ms. Martin had added a notation for the readmission passes, but the employee could not immediately find the notation, so D.L. was forced to wait for some time before it could be located. Once Ms. Martin's notation was found, the employee told D.L.—as she characterizes it: "The three readmits and the DAS is all we

---

[21] There was no evidence presented that the "Christmas Party" would have made any difference, more or less, in the availability or wait times for the attractions.

got." D.L. tried to explain that A.L. was a "route follower" and they "probably needed more than three in order for him to be successful at the park." The Guest Relations employee ended up issuing a DAS card plus four readmission passes (per person in the party), but D.L. did not feel that would accommodate A.L. so she asked for the manager. Andie, the manager, tried to assist D.L. with planning a route around Magic Kingdom for A.L., but D.L. explained that A.L. had his own preferred route beginning in Adventureland and ending in Tomorrowland; in that conversation with Andie, D.L. requested an "unlimited FastPass" to avoid a meltdown by A.L. Andie suggested that, with the new DAS card, the party could split up so that someone "could run the path that A.L. would [prefer to] take and secure times for each of the attractions and then circle back to find the rest of the family" so they could all ride together, but D.L. "was appalled by that suggestion." At that point, D.L. was told, "There's nothing else we can do. There's no other additional accommodations" or additional passes beyond the ones she had already been given. Because they were delayed for about 40 minutes in Guest Relations, A.L. had missed part of the "Dapper Dans," a barber shop quartet-style signing group performing nearby.

A.L. has a list of rides he "prefers" to ride or experience in a "clockwise route" around the Magic Kingdom Park beginning at Main Street and heading stage left on the map to begin in Adventureland. However, A.L. does not have to actually go on the rides in the same pre-set order on each visit. According to D.L., he can "pick what he likes to do" and "he'll usually choose the rides that he likes or that he wants on his route unless for one particular day he decides he doesn't want to ride that specific ride. And then he'll go to the next ride on his order." He may "visit the ride" but not go on it and just "move on." D.L. testified that "[i]f he doesn't want to ride the ride that one particular time, he doesn't have to ride it. [Ninety-nine] percent of the time, it's going to be the same rides all the way around every single time we visit."

However, on December 19, 2013, D.L., A.L. and the others in their party headed to Adventureland, to ride Aladdin's Magic Carpets but A.L. decided to skip this first ride on his pre-set list because, according to D.L., "[f]or whatever reason, he did not want to ride that particular ride that day." Instead, A.L. chose his second preferred ride, the Jungle Cruise, and the entire party headed together over to the attraction. When D.L. showed the employee the DAS card, she was told that it would be a forty-minute wait and to come back after the time had passed. When A.L. learned that he could not access the ride immediately, he blocked the entrance line and would not move, so D.L. opted in the moment to use six of the 24 readmission passes to access the Jungle Cruise ride immediately.

D.L. was concerned about other wait times because, in her opinion, the Jungle Cruise generally had shorter wait times and she believed that the other rides A.L. intended to ride would have even longer wait times. Because D.L. was concerned about "what would happen with [A.L.] and her inability to get him to move," she used the Christmas-themed attractions of the Mickey's Very Merry Christmas Party as distractions for A.L.—the shows and "music and those kind of things" to avoid any potential meltdown. D.L. decided not to continue on A.L.'s preferred route because "she couldn't predict the length of [wait] time for each particular ride." The group also deviated from A.L.'s preferred route of attractions by not going to Pirates of the Caribbean, Big Thunder Mountain Railroad, Country Bear Jamboree, and instead by going to eat, see characters at meet-and-greets, shopping and watching several shows in Tomorrowland (on the other side of the park) and Cinderella's Castle, which were not on his preferred route and not on his list of rides. D.L. did not make an effort to find out what the wait times were for the other rides on A.L.'s list, nor did she have her husband, daughter, the behavioral assistant, or anyone else in the party go ahead separately to find out the wait times. The party spent about two hours at the other attractions.

At the end of the visit that day using DAS for the first time at Magic Kingdom, A.L. asked D.L. "Disney tomorrow?"

Because the Snow White ride was closed on December 19, 2013, D.L. talked to A.L. about it in advance and they went on a different ride that day. In general, when new rides were added at the parks, A.L. would watch information about them on Youtube and add them to his list. At a subsequent trip to EPCOT in July 2014, A.L. also had a preferred route for rides at Epcot, however, he deviated from that preferred order "one or two" times according to D.L. During a second subsequent visit to EPCOT in July 2015, A.L. followed a completely different order of rides from the visit the year before.[22] Despite deviating from his preferred routes at the two parks, A.L. experienced no meltdowns or problematic behaviors. A.L. was only upset that he did not get to see Dapper Dans perform more than one song, which was not related to wait times, just being on time for the show.[23] A.L. has returned to Disney twice[24] since his December 2013 visit, each time was a holiday-themed evening, and received five readmission passes each time. D.L. has requested an increase in readmission passes but been refused. D.L. has not taken A.L. to Disney's other two Florida parks, Animal Kingdom and Hollywood Studios, due to her concern about the DAS system.

D.L. has found it very difficult to effectively use the FastPass+ reservation system because she cannot anticipate when she would reach a particular ride at a particular time around A.L.'s preferred route and the window to use the FastPass+ reservation is only one hour. For example, having a FastPass+ appointment late in the day for one of the attractions early on A.L.'s preferred

---

[22] *See* Def.'s Ex. 33 (ride data for those two visits confirms that he went on different rides in a different order at Epcot).

[23] Disney contends that missing the Dapper Dans' other songs "had nothing to do with DAS and is something that could have been avoided had A.L. merely walked outside of Guest Relations" to the performance nearby.

[24] D.L. could not remember the dates of these visits, but they were after DAS was in place.

route, like the Jungle Cruise, would not be useful to A.L. Although D.L. has previously reserved FastPass+ times, she has not used many of them. D.L. is also concerned that the FastPass+ times are usually gone by the time she is planning to go to Magic Kingdom three or four weeks ahead; she does not plan to go months ahead. When D.L. has asked for more readmission passes for the Magic Kingdom, she has been told that five is the maximum they can do but if she used them and they ran out, she could go to back to Guest Relations and to see if there are any additional accommodations she could be given; however, in her opinion, that would depend on who is working in guest relations at that time. D.L. opined that she would need one readmission pass (per person) for each of A.L.'s 19 rides on his preferred list, but she "could make it work with about ten" for the family.[25]

Two other theme parks (Universal and Islands of Adventure) in her experience have accommodated A.L. with a "gold card" that allows him unlimited use of the FastPass-type lines at every ride. Disney Cruise Line, which A.L. has experienced on 21 cruises, accommodates A.L. and family with the number one boarding time and special meals delivered at the exact time he prefers, along with special access to characters to avoid some waiting.

A.L. returned to the Magic Kingdom in 2015 or 2016 for a Halloween event and later for a Christmas event and on both occasions A.L. received five readmission passes in addition to DAS. Ms. Martin, in Guest Relations, has continued to provide five readmission passes for A.L. at

---

[25] A.L. alternatively seeks a "simple promise that wait times will not exceed a certain maximum, like 15 minutes," (Doc. 340 at 28) without suggesting how the Court would enforce such a generalized "promise." Thus, the Court addresses only the tangible relief A.L. has proposed: (1) unlimited access to all rides through the FastPass lines; or (2) ten readmissions passes for all Disney parks (other than Epcot). The Court declines to consider A.L.'s fourth request for accommodation—to give him "the ability to make appointments for attractions through the day, but sequentially and predictably, rather than through the FastPass system" (*id.*) —because A.L. never raised this option at trial and it is waived. Moreover, its practicality was never discussed thus it is unclear how this option would modify the FastPass+ reservations made on a device in an app or the DAS card as it currently exists.

- 23 -

EPCOT, where he has visited once per year, which has worked because EPCOT has fewer rides that A.L. prefers to ride.

### F.  Evidence on the Impact of Wait Times on Disney's Business Model

Bruce Laval testified as Disney's industrial engineering expert[26] regarding wait times and access to rides/attractions, as well as attraction entitlements,[27] and their impact on guest wait time and guest satisfaction. His work has particularly focused on studying ride capacity, wait times, and how to reduce the time guests spent waiting in lines for the most popular rides. Mr. Laval's uncontradicted testimony was that wait times have always been "the number one priority at Disney," and they are "vitally important" to Disney's guest experience and business model; the wait time information for Disney rides is collected and analyzed for different purposes.

Mr. Laval, as well as a current Disney industrial engineer, testified about a "Tester Study" in which testers used certain ride passes—DAS, FastPasses, or readmission passes—to experience as many attractions as possible during a three-day period. The results showed that testers with DAS experienced, on average, 45% more attractions than those without DAS. On one of the days, the non-DAS testers waited in queues on average a total of 255 minutes or more than 4 hours, whereas the DAS testers only waited in line on average total of 107 minutes, or just under two hours. As a result, Mr. Laval concluded that the Tester Study showed that guests with a DAS can experience more rides and attractions—as the evidence showed, at least 4 or 5—with much less waiting than guests who do not have a DAS card.

---

[26] Mr. Laval worked as an industrial engineer for Disney beginning in 1971 since the time that the Magic Kingdom opened. A.L. did not present an expert witness on ride wait times, industrial engineering, or the theme park industry.
[27] The "entitlement" is the return time. For FastPass, it is the one-hour window for guests to use it, and then it expires and cannot be used for that attraction. For DAS card holders, after the initial wait, there is access for the rest of the day regardless of how many hours later it is. *Id*

Disney has conducted many studies over the years which demonstrate the connection between guest wait times and guest satisfaction with their visits, as well as how guest satisfaction correlates with their intent to return to the parks. These studies show that the guests' overall satisfaction with their trip to the parks is heavily influenced by the amount of time they have to wait for rides, and their "intent to return" to the parks is highly correlated to the number of attractions or experiences guests are able to accomplish that day, which in turn is directly correlated to how long guests have to wait in line to access them. Disney has determined that when the guests' intention to return to the park decreases, future attendance decreases and therefore future revenue decreases "sharply" because, in addition to losing revenue from lost attendance, Disney loses revenue from hotel stays, food purchases, associated merchandise, and "everything else."

Disney conducted a year-long study surveying 1500 people per day on guest satisfaction to develop a wait time standard of 15 minutes. Based on survey responses correlated to wait times, the engineers found guests were very satisfied while waiting ten minutes, but satisfaction dropped off significantly at 15 minutes, and precipitously at 20 minutes; thus, guest impressions of the wait times and the level of satisfaction led to a standard goal of 15 minutes of wait time. Anything beyond that window fundamentally undermines Disney's whole business plan and cuts into its "delivery of world-class guest service for the whole purpose of having the highest possible level of guest satisfaction. [Disney] know[s] there's a direct driver between guest satisfaction, intent to return, and future visitation."

The Disney Industrial Engineering team performed an "incremental analysis" study in 2015 which highlights the impact on wait times for the vast majority of guests at the Disney parks. The team measured the impact on wait times if every guest with a DAS pass were given one to three readmission passes, as well as the impact if the percentage of guests with DAS passes were to

increase by one or two percent. As more guests enter the FastPass line, the standby line will be slowed as more guests from the FastPass line are put onto the ride to keep that line moving quickly, since guests wait times are limited to around 15 minutes or less in the FastPass line. The "incremental analysis" study showed that the wait times increased significantly for all guests across the board when guests with DAS were given one or more readmission passes. Specifically, if every DAS guest were given two more readmission passes, the standby wait time at the popular Seven Dwarfs Mine Train ride would increase by 39 minutes, from 69 to 108 minutes. The wait times would also increase more significantly if the percentage of guests with a DAS increased, a scenario Disney anticipated as more guests learned about the increased benefits, based on similar problems and abuses that developed with the GAC program. Thus, for example, if all DAS guests were given two readmission passes for their party, a 1 % increase in daily DAS users would cause the standby wait time at Seven Dwarfs Mine train to increase by nearly an hour, from 69 minutes to 124 minutes. Similarly, there were significant increases in wait time for the other popular rides the industrial engineering team studied.

## II.      CONCLUSIONS OF LAW

### A.      *Title III of the ADA*

A.L. alleges Disney's DAS card fails to accommodate his disability in violation of Title III of the Americans with Disabilities Act (the "ADA"), 42 U.S.C. § 12182. The ADA was enacted in 1990 "to remedy widespread discrimination against disabled individuals" and to "provide clear, strong, consistent, enforceable standards" addressing that discrimination. 42 U.S.C. § 12101(b)(2); *PGA Tour, Inc. v. Martin*, 532 U.S. 661, 674, 121 S.Ct. 1879, 1889, 149 L.Ed.2d 904 (2001). In addition to prohibiting other types of discrimination against the disabled, Title III of the ADA prohibits discrimination by a "place of public accommodation," which is a private entity that offers

commercial services to the public. 42 U.S.C. § 12182(a); *Gathright-Dietrich v. Atlanta Landmarks, Inc.*, 452 F.3d 1269, 1272 (11th Cir. 2006).

The "General rule" of § 12182(a) provides that "[n]o individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation." 42 U.S.C. § 12182(a). Section 12182(b)(1) contains "general prohibitions" against discrimination, including the "denial of the opportunity" for a disabled person "to participate in or benefit" from services or facilities. *Id*. § 12182(b)(1)(A)(i). Another "General prohibition" provides that it is discriminatory to afford a disabled person "the opportunity to participate in or benefit from" services or facilities "that [are] not equal to that afforded to other individuals." *Id.* § 12182(b)(1)(A)(ii). The court has jurisdiction over the claim pursuant to 28 U.S.C. § 1331, federal question jurisdiction.

A.L., as an individual with autism, qualifies as a person with a disability under the ADA. *See A.L.*, 900 F.3d at 1290 (finding it was undisputed that the plaintiffs qualified as disabled individuals). "The term 'disability means, with respect to an individual – a physical or mental impairment that substantially limits one or more major life activities of such individual.'" 42 U.S.C. §12102(1)(A). "For purposes of paragraph (1), major life activities include, but are not limited to, caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working." *Id*. §12102(2)(A). A.L. is a "disabled" person because he has Autism Spectrum Disorder ("autism"), a neurodevelopmental condition characterized by impairment in reciprocal social communication and social interaction and restricted repetitive patterns of behavior, interest or activities, according to the American Psychiatric Association.

A.L.'s autism substantially limits one or more of the major life activities of caring for one's self,

learning, performing manual tasks, walking, and speaking. *See* 42 U.S.C. §12102(1)(A) & (2)(A).

Disney's theme parks constitute places of "public accommodation" within the meaning of

Title III of the ADA:

> The following private entities are considered public accommodations for purposes
> of this subchapter, if the operations of such entities affect commerce—
>
> * * *
>
> (I)      a park, zoo, amusement park, or other place of recreation.

42 U.S.C. §12181(7)(B). *Ault v. Walt Disney World Co.*, 692 F.3d 1212, 1215 (11th Cir. 2012)

(finding Disney Resorts to be a public accommodation under ADA); *Baughman v. Walt Disney*

*World Co.*, 685 F.3d 1131, 1135 (9th Cir. 2012) (same).

### B.      *Necessary*

Along with these general principles, § 12182(b)(2) provides for "Specific prohibitions,"

which are examples of actions or omissions that constitute such discrimination. One example is §

12182(b)(2)(A)(ii), which provides that discrimination includes a private entity's failure to make

"reasonable modifications" to procedures that are "necessary" to afford the services and facilities

of the private entity to the disabled, as follows:

> [Discrimination includes] a failure to make reasonable modifications in policies,
> practices, or procedures, when such modifications are necessary to afford such
> goods, services, facilities, privileges, advantages, or accommodations to
> individuals with disabilities, unless the entity can demonstrate that making such
> modifications would fundamentally alter the nature of such goods, services,
> facilities, privileges, advantages, or accommodations[.]

42 U.S.C. § 12182(b)(2)(A)(ii).

For a Title III public accommodation claim such as A.L.'s "an individualized inquiry must

be made to determine whether a specific modification for a particular person's disability would be

reasonable under the circumstances as well as necessary for that person, and at the same time not

work a fundamental alteration" to the defendant's business. *See Martin*, 532 U.S. 661, 688, 121

S.Ct. 1879, 1896. The statutory text of § 12182(b)(2)(A)(ii) contemplates three distinct inquiries

for determining whether a requested modification to a public accommodation's procedures is

required: (1) whether the requested modification is "reasonable"; (2) whether the requested

modification is "necessary" for the disabled individual; and (3) whether the requested modification

would "fundamentally alter the nature" of the public accommodation. *A.L.*, 900 F.3d at 1293

(quoting *Martin*, 532 U.S. at 683 n.38, 121 S.Ct. at 1893). In some cases, "the specifics of the

claimed disability might be examined within the context of what is a reasonable or necessary

modification." *A.L.*, 900 F.3d at 1293 (quoting *Martin*, 532 U.S. at 683 n.38, 121 S.Ct. at 1893

n.38). It is A.L.'s burden as the plaintiff to prove not only that he is disabled but also that his

requested modification is both "reasonable" and "necessary." *See A.L.*, 900 F.3d at 1292 (citing

42 U.S.C. § 12182(b)(2)(A)(ii); other citations omitted).

In the case of *PGA Tour, Inc. v. Martin*, the Supreme Court's decision focused almost

exclusively on the "fundamental alteration" issue because the defendant had not disputed the

plaintiff-player's use a golf cart was "reasonable" and "necessary." 532 U.S. 661, 682, 121 S.Ct.

1879, 1893, 149 L.Ed.2d 904 (2001). Thus, the Eleventh Circuit observed in the decision

remanding *A.L.*'s case that, even after *Martin*, "hard questions are presented by the legal contours

and factual complexity of what is 'necessary' for" an autistic plaintiff.[28] *A.L.*, 900 F.3d at 1293-

94 (citing *Martin*).[29]

---

[28] The appeals of thirty autistic and cognitively disabled plaintiffs were consolidated on appeal. *A.L.*, 900 F.3d at 1273. For that reason some of the quotations or references from the Eleventh Circuit are in the plural.

[29] The Eleventh Circuit noted the Supreme Court's hypothetical (as part of dicta in *Martin*) discussing the differences between "reasonable" and "necessary":

> Martin's claim thus differs from one that might be asserted by players with less serious afflictions that make walking the course uncomfortable or difficult, but not beyond their capacity. The Supreme Court instructed: "In such cases, an accommodation might be reasonable but not necessary."

*A.L.*, 900 F.3d at 1293-94 (citation omitted).

The Eleventh Circuit, addressing the requirements of a discrimination claim based on § 12182(b)(2)(A)(ii) for the first time in this Circuit in A.L.'s case, *id.* at 1292, instead turned to the legal standards applied in the Eighth and Ninth Circuits for guidance in defining "necessary" in § 12182(b)(2)(A)(ii). *Id.* at 1294 (citing *Argenyi v. Creighton Univ.*, 703 F.3d 441 (8th Cir. 2013) (applying §§ 12182(b)(2)(A)(ii)–(iii)); *Baughman v. Walt Disney World Co.*, 685 F.3d 1131 (9th Cir. 2012) (applying § 12182(b)(2)(A)(ii))). The court adopted the standard applied by these two sister circuits in cases decided after *Martin* to evaluate whether a plaintiff's requested modification is "necessary." *Id.* (*Argenyi*, 703 F.3d at 448–51; *Baughman*, 685 F.3d at 1134–35).

To determine what is necessary: "[p]ublic accommodations must start by considering how their facilities are used by nondisabled guests and then must take reasonable steps to provide disabled guests with a 'like experience.'" *A.L.*, 900 F.3d at 1294; *Argenyi*, 703 F.3d at 449-50 (comparing Title III to Section 504 of the Rehabilitation Act which requires a public accommodation to provide a disabled individual with "meaningful access or an equal opportunity to gain the same benefit as his nondisabled peers"); *Baughman*, 685 F.3d at 1135 (explaining that "[p]ublic accommodations must start by considering how their facilities are used by nondisabled guests and then take reasonable steps to provide disabled guests with a like experience" comparable to that of nondisabled patrons); *see also Murphy v. Bridger Bowl*, 150 F. App'x 661, 663 (9th Cir. Oct. 5, 2005) (holding that cognitively-disabled skier's requested modification for ski resort to allow her husband to accompany her on a ski bike was not "necessary" to provide her with full and equal enjoyment of facility); *cf. Liese v. Indian River Cty. Hosp. Dist.*, 701 F.3d 334, 343 (11th Cir. 2012) (holding the "proper inquiry" under a similar provision in the Rehabilitation Act was to determine if the defendant had "provided 'necessary' auxiliary aids," or "whether the

proffered aids 'gave [the disabled person] an equal opportunity to benefit from the treatment" the defendant provided to the non-disabled; discussed in *Argenyi*).

Applied to A.L.'s case, the Court must consider two factors: "(1) how nondisabled guests use Disney's facilities; and (2) whether its DAS Card provides disabled guests with a like experience and equal enjoyment." *A.L.*, 900 F.3d at 1296. The Court must decide if the DAS program afforded A.L. a "like experience and equal enjoyment" through "meaningful access" that gives him "the opportunity to have something akin to or similar to the experience nondisabled" guests enjoy at Disney's parks. *Id*. The Court considers all of this guidance in deciding whether the DAS Card program provides a like experience for A.L., given the behavioral features of his impairments. *Id.*

## C.    *Reasonableness of Modification*

Turning to the second consideration, the Court must consider "[w]hether a particular modification is 'reasonable' [which] involves a fact-specific, case-by-case inquiry that considers, among other factors, the effectiveness of the modification in light of the nature of the disability in question and the cost to the organization to implement it." *Staron v. McDonald's Corp.*, 51 F.3d 353, 356 (2d Cir. 1995). Reasonableness is generally a fact-specific inquiry, asking whether the specific modification is "reasonable under the circumstances." *Martin*, 532 U.S. at 688, 121 S.Ct. 1879. "A modification is reasonable if it is reasonable on its face, *i.e.*, ordinarily or in the run of cases." *J.D. ex rel. Doherty v. Colonial Williamsburg Foundation*, 925 F.3d 663, 674 (4th Cir. 2019) (internal quotation omitted).

"Facilities need make only reasonable accommodations that are 'necessary.'" *A.L.*, 900 F.3d at 1296 (citing 42 U.S.C. § 12182(b)(2)(A)(ii)). They "are not required to make the preferred accommodation of plaintiffs' choice." *Id.* (citing *Stewart v. Happy Herman's Cheshire Bridge*,

*Inc.*, 117 F.3d 1278, 1285–86 (11th Cir. 1997)). They are also not required to make "any and all possible accommodations that would provide full and equal access to disabled patrons," *Baughman*, 685 F.3d at 1135.

Judge Posner discussed the concern of the drafters' of Title III in striking a balance between the concerns of business owners and the interests of the disabled in *Doe v. Mutual of Omaha Insurance Co*mpany, 179 F.3d 557 (7th Cir. 1999):

> The common sense of the statute is that the content of the goods or services offered by a place of public accommodation is not regulated. A camera store may not refuse to sell cameras to a disabled person, but it is not required to stock cameras specifically designed for such persons. Had Congress purposed to impose so enormous a burden on the retail sector of the economy and so vast a supervisory responsibility on the federal courts, we think it would have made its intention clearer and would at least have imposed some standards. It is hardly a feasible judicial function to decide whether shoe stores should sell single shoes to one-legged persons and if so at what price, or how many Braille books the Borders or Barnes and Noble bookstore chains should stock in each of their stores.

*Id*. at 560. Applied to a theme park, the business is not required to create a service or access designed exclusively for cognitively-disabled individuals, such as adding an individual "disabled-only" ride or an exclusive "disabled-only" entrance line to a ride. However, the facility must provide an accommodation that provides autistic individuals with a "like experience" to the one nondisabled guests experience. *See, e.g., Argenyi v. Creighton Univ.*, 703 F.3d 443 (8th Cir. 2013) (holding a genuine issue of fact existed as to whether the defendant university had denied a hearing-impaired medical student who requested auxiliary aids "an equal opportunity to gain the same benefit from medical school as his nondisabled peers by refusing to provide his requested accommodations"); *cf. Alumni Cruises, LLC v. Carnival Corp.*, 987 F. Supp. 2d 1290, 1311 (S.D. Fla. 2013) (holding that proposed modification for cruise line operator to provide expedited check-in for families of developmentally disabled individuals during scattered times whenever they arrived was not reasonable where the cruise line provided contact information of a dedicated

- 32 -

employee for an expedited check in process for the families so that other staff would not have to drop everything to perform check-ins randomly throughout the day); *Larsen v. Carnival Corp.*, 242 F. Supp. 2d 1333, 1344 (S.D. Fla. 2003) (finding that plaintiff's Title III claim failed because his request to carry on a breathing machine, rather than check it with the porter, was not a reasonable modification necessary for him to fully participate in the cruise); *cf. D'Amico v. New York State Bd. of Law Examiners*, 813 F. Supp. 217, 221 (W.D.N.Y. 1993) (holding that allowing a vision-impaired law student four days instead of two for the bar exam was a reasonable accommodation).

### D.    *Fundamental Alteration*

Title III of the ADA "requires without exception that any policies, practices, or procedures of a public accommodation be reasonably modified for disabled individuals as necessary to afford access unless doing so *would fundamentally alter* what is offered." *Martin*, 532 U.S. at 688, 121 S.Ct. at 1896 (emphasis added; internal quotation marks omitted). "No ADA violation occurs . . . when the private entity demonstrates that the requested modifications would 'fundamentally alter the nature of' its services and facilities," or its "privileges, advantages or accommodations." *Martin*, 532 U.S. at 682, 121 S.Ct. at 1893; *A.L.*, 900 F.3d at 1292; 42 U.S.C. § 12182(b)(2)(A)(ii). The defendant operator of the facility or public accommodation bears the burden of proof on the "fundamental alteration" inquiry.[30] *See A.L.*, 900 F.3d at 1292 (citing *Gathright-Dietrich*, 452

---

[30] The Eleventh Circuit's decision briefly touched on Disney's arguments regarding the "fundamental alteration" inquiry – that the proposed modification would equate to unlimited access to FastPass lines and fundamentally alter the park experience – but left the fact finding to this Court to be addressed on remand. *A.L.*, 900 F.3d at 1299 ("This is but one example of knotty issues that must be sorted out before a court could decide whether plaintiffs' requested accommodation . . . would fundamentally alter the park experience. We thus conclude that . . . fundamental alteration inquir[y] must be addressed by the district court in the first instance, and we leave it to the district court how best to approach th[is] issue[] on remand.").

F.3d at 1273–75 (adopting the burden shifting framework for claims under § 12182(b)(2)(A)(iv), which requires reasonable modification unless the defendant shows it is not "readily achievable")).

A "fundamental alteration" is a "modification to an essential aspect of a public accommodation's program." *Halpern v. Wake Forest Univ. Health Scis.*, 669 F.3d 454, 464 (4th Cir. 2012) (internal quotation marks omitted). In analyzing this issue in *Martin,* the Supreme Court described two ways a modification would "fundamentally alter" defendant's golf games. *Martin*, 532 U.S. at 683, 121 S.Ct. at 1893. First, if it altered an "essential aspect" by affecting all competitors equally, such as changing the size of the hole. *Id.* Second, if it gave a disabled player an advantage over other players such that it fundamentally alters the character of the competition. *Id.*; *Ass'n for Disabled Americans, Inc. v. Concorde Gaming Corp.*, 158 F. Supp. 2d 1353, 1367 (S.D. Fla. 2001) (citing *Martin*, 532 U.S. at 683, 121 S.Ct. at 1893).

The Supreme Court held in *Martin* that the use of carts, or waiver of the "walking rule," was not inconsistent with the "fundamental character" or "essential attribute" of the game of golf which was "shotmaking—using clubs to cause a ball to progress" to a "hole some distance away with as few strokes as possible" based on historical references to the rules of golf dating back centuries, none of which referenced motorized carts until the 1950s as a means of speeding up play and generating revenue. *Id.* at 683-85, 532 U.S. at 683, 121 S.Ct. at 1893-95. In addition, the Supreme Court rejected the defendant-tournament's "outcome affecting" argument because there was a lack of evidence that the "walking rule" caused more fatigue for the average pro player in a tournament, with rests and refreshments, than for plaintiff Martin, who "endure[d] greater fatigue even with a cart." *Id.* at 686-88, 532 U.S. at 687, 690, 121 S.Ct. at 1895-97. The Supreme Court held:

> [T]he waiver of an essential rule of competition for anyone would fundamentally alter the nature of petitioner's tournaments. As we have demonstrated, however,

> the walking rule is at best peripheral to the nature of petitioner's athletic events, and thus it might be waived in individual cases without working a fundamental alteration.

*Id.* at 689, 532 U.S. at 683, 121 S.Ct. at 1896 (emphasis added). The guidance of *Martin*—to the extent it can be applied to the "theme park experience" and engineering "queuing theory"—is that if the proposed modification changes the "fundamental character," "essential attribute," or "rule" of participation, then it is a "fundamental alteration." However, if the proposed modification is "peripheral" and not "outcome affecting" in the sense that it would not give the disabled person "an advantage over others," then it does not "fundamentally alter the nature" of the defendant's public accommodation and defendant has not met its burden. *See id.* at 683 n.38, 121 S.Ct. 1879.[31] *Cf. Fortyune v. Am. Multi-Cinema, Inc.*, 364 F.3d 1075, 1084 (9th Cir. 2004) (requiring theater to accommodate wheelchair-bound patrons by ensuring availability of companion seats until ten minutes prior to showtime would not fundamentally alter theater's business, having a "negligible effect" on the service provided of screening films).

There is a challenge in this case with determining what is the "essential aspect" of a trip to a theme park that promotes itself as an immersive experience in a "Magic" Kingdom. In the *Association for Disabled Americans, Inc. v. Concorde Gaming Corporation*, the district judge noted the challenge of determining the "essential aspect" of the craps table on a cruise ship. 158 F. Supp. 2d 1353, 1367 (S.D. Fla. 2001). However, he held that the disabled individual's proposed modifications would alter the game of craps by changing the dimensions of the table, the level of the railing for the players, and the croupier's position. *Id.* Thus, "allowing disabled players to play

---

[31] As the dissent in *Martin* noted, there can be significant difficulty in determining the "essential elements" of any "amusement activity" since "the very nature of a game is to have no object except amusement (that is what distinguishes games from productive activity), it is quite impossible to say that any of a game's arbitrary rules is 'essential.' Eighteen-hole golf courses, 10–foot–high basketball hoops, 90–foot baselines, 100–yard football fields—all are arbitrary and none is essential." *Martin*, 532 S.Ct. 661, 700-01, 121 U.S. at 1903-04 (Scalia, J., dissenting).

from a spot on the table, that other players cannot play from, may provide the disabled players with an advantage not enjoyed by the other players" and would fundamentally alter an essential aspect of the game. *Id.*

In *J.D. by Doherty v. Colonial Williamsburg Foundation*, the Fourth Circuit considered the appeal of an eighteenth-century colonial-style tavern in the immersive atmosphere of Colonial Williamsburg, a well-known tourist destination with patrons from around the world, complete with re-enactors. 925 F.3d 663 (4th Cir. 2019). The tavern refused to allow a student to eat his homemade gluten-free meal in the tavern after it offered its own gluten-free meal and instead made him eat his meal outside. *Id.* at 676. The two-judge majority of the appellate panel held that "food service" was "*the* essential aspect" of the tavern and noted that Colonial Williamsburg had not been deluged with requests for special treatment. *Id.* at 676-77 (emphasis in original). They identified the issue for remand as whether requiring the tavern to allow "occasional" outside food requests from gluten-allergic patrons would "fundamentally alter" the nature of the Tavern's business model. *Id.* at 677. On the other hand, the dissenting judge would have found the requested accommodation to allow homemade meals in the tavern was disruptive "of the carefully cultivated eighteenth-century atmosphere" of the tavern; he pointed out that the majority decision was far from an "individualized" one because it was "tantamount to a ruling that restaurants must accept meals prepared outside their premises as a matter of course" with "real-world consequences . . . sweeping in effect" that "had the flavor of a de facto per se rule." 925 F.3d at 677-78, 681 (Wilkinson, J., dissenting) ("Only in the judicial monastery could this impractical and unworkable requirement hatch."); *Galvan v. Walt Disney Parks and Resorts,* 425 F.Supp.33d 1234, 1242 (C.D. Cal. Nov. 27, 2019) (holding that granting all guests with anxiety at Disneyland DAS passes would increase their inventory to an unsustainable level and "fundamentally alter the theme park

experience" at Disneyland); *cf. Larsen v. Carnival Corp.*, 242 F. Supp. 2d 1333, 1344 (S.D. Fla. 2003) (finding that requiring a cruise ship to wait indefinitely at the port for delivery of the plaintiff's breathing machine, the requested accommodation, would constitute a fundamental alteration of the company's operations by interfering with the port stops and other passengers' plans at those ports).

### E.    ADA Regulations and Injunctive Relief

D.L. testified at trial that she was there "only as A.L.'s mom" and to request appropriate accommodations only on her son's behalf. However, during the second day of trial, D.L. wrote on the Facebook page for the Autism Society of Greater Orlando[32] about the trial that, "We are requesting appropriate accommodations for each individual with autism, as each person's needs are different." D.L. described one of her conversations with a Disney employee as being "a fact-finding mission, listening to him and trying to figure out how 'my kids' would be accommodated with the new pass," but "[f]rom his description of Disney's DAS and the representations of how it would operate, [she] was skeptical about the DAS's ability" to "adequately accommodate" the needs of "our kids with autism." Although the suit is only on behalf of A.L., D.L. wants relief that would apply to all persons with autism**.** In fact, D.L. demonstrated during the trial that she will make sure that the relief will be publicized to the full autism community. Disney's anticipation that requests for DAS cards will grow exponentially once the accommodation is publicly known is not unfounded, given the fraud and abuse that occurred with the GAC system because Disney was unable to ask about the nature or extent of an individual's disability.

---

[32] On the same day, D.L. also spoke to a reporter for the *Orlando Sentinel* regarding the case giving her name, even though the Court had granted her request to remain anonymous in the trial transcript. D.L. gave the *Sentinel* reporter the noteworthy quote that "Disney is the happiest place in the world except for kids with autism."

The ADA is implemented and enforced through regulations enacted by the Department of Justice. 42 U.S.C. §12186(b). For Title III of the ADA which relates to public accommodations, such regulations are codified at 28 C.F.R. §§36.101 et seq. The Department of Justice's implementing regulations are entitled to deference. *Bragdon v. Abbott*, 524 U.S. 624, 646, 118 S. Ct. 2196, 2208, 141 L.Ed.2d 540 (1998); *Kornblau v. Dade County*, 86 F.3d 193, 194 (11th Cir. 1996) (noting that regulations promulgated by the Department of Justice interpreting the ADA are entitled to "considerable weight"). "A public accommodation shall not ask about the nature or extent of a person's disability." 28 C.F.R. § 36.302(c)(6) (with two exceptions related to service animals not relevant here). This "regulation thus protects individuals with disabilities from possibly unwanted questioning." *Cordoves v. Miami Dade Cty.*, 104 F. Supp. 3d 1350, 1356 (S.D. Fla. 2015).

Notably, the "ADA provides only prospective injunctive relief for violations and does not allow for damages for past discrimination or past remedied violations." *Norkunas v. Seahorse NB, LLC*, 444 F. App'x 412, 416 (11th Cir. 2011)[33] (citing 42 U.S.C. § 12188(a)(1)); *Houston v. Marod Supermarkets, Inc*., 733 F.3d 1323, 1329 (11th Cir. 2013) (injunctive relief is the only form of relief available to plaintiffs suing under Title III of the ADA).

## III.   ANALYSIS

In this ADA public accommodation case, the Court must determine whether the specific modification D.L. proposes for A.L. to accommodate the "behavioral features" of his impairment are reasonable under the circumstances as well as necessary for A.L., and whether the proposed modification would "at the same time not work a fundamental alteration" to Disney's business. The Court discusses the three issues applying the framework the Eleventh Circuit suggested,

---

[33] Unpublished opinions of the Eleventh Circuit constitute persuasive, and not binding, authority. See 11th Cir. R. 36-2 and I.O.P. 6.

although "[w]hether one question should be decided before the others likely will vary from case to case, for in logic there seems to be no necessary priority among the three.'" *A.L.*, 900 F.3d at 1293 (quoting *Martin*, 532 U.S. at 683 n.38, 121 S.Ct. at 1893).

### A.   Necessary

The Court must consider two factors to determine what is "necessary" in A.L.'s case: (1) how nondisabled guests use Disney's facilities; and (2) whether its DAS card provides A.L. with a like experience and equal enjoyment. *See A.L.*, 900 F.3d at 1296.

#### 1.   Nondisabled guests' access and wait times for rides at Disney

As described in great detail at trial, all nondisabled guests must stand in the standby line to access a ride[34] unless they have a FastPass. The FastPass line typically has a wait of less than 15 to 20 minutes, while the wait times in the standby lines for the most popular rides can sometimes last hours for the most popular rides. Nondisabled guests who want to use the FastPass line can obtain a designated time from a machine at the ride location and can enter the FastPass line at the designated return time. The FastPass return times are staggered throughout the day and are issued until there is no more capacity for FastPass riders for the day. In addition, nondisabled guests with park admission tickets or passes can schedule times well in advance through FastPass+ on a Disney app to receive a designated time to enter the FastPass line for up to three rides.

#### 2.   Access for A.L. Using the DAS Card and FastPass Is A "Like Experience"

The Court must decide if the DAS program affords A.L. a "like experience and equal enjoyment" through "meaningful access" that gives him the opportunity to have something akin

---

[34] According to the testimony at trial, there are "attractions" at Disney's parks which include shows, parades, performing singing groups, character meet and greets, as well as rides. However, the testimony focused on the wait times for "rides" rather than any of the other attractions, to the extent they even have queues.

to or similar to the experience nondisabled guests enjoy at Disney's parks. *See A.L.*, 900 F.3d at 1296.

### a. Behavioral Characteristics of A.L.'s Impairment

D.L. alleges that A.L.'s disabilities include: the inability to comprehend the concept of time, defer gratification, or wait more than 20 minutes for rides. A.L. also must strictly adhere to a pre-set route of rides in a specific order. For A.L. to be afforded an equal experience and enjoyment of Disney's parks, D.L. contends, "prompt and pre-set access to rides" is "necessary" to avoid A.L. having a meltdown. D.L. does not dispute that A.L. can wait up to 20 minutes in a line without a meltdown.

The Court finds that A.L. has some concept of time, can defer gratification, and can wait "virtually" for a ride because he can be successfully redirected to another activity while waiting for the ride return time on the DAS card. As Dr. Kelderman testified, the inability to wait or defer gratification is not in the diagnostic criteria for autism and individuals with autism are capable of deferring gratification, based on research studies finding that children with autism can defer gratification (with the exception perhaps the very severe levels of impairment that require residential treatment). She also testified that, in her opinion, A.L.'s statement of "Disney tomorrow?" at the end of his visit on December 19, 2013 shows that, "as is true for most individuals at his level of intellectual functioning," he has "some appreciation of the concept of time and that things are going to happen in an order," *i.e.*, "So tomorrow is a different day. We're going to do something different tomorrow. . . . [H]e is not only in the moment with no concept of time." Ms. McDonald, A.L.'s therapy supervisor, gave the specific example of modifying maladaptive behavior to improve A.L.'s skills at deferring gratification that involved waiting to eat a snack

until a particular time: "You can have a Hershey bar at 3:00." This indicates an understanding of the concept of time on some level.

More importantly, the DAS card is set up so A.L. would never have to physically wait in line more than 20 minutes. Notwithstanding D.L.'s belief that other rides more popular than the Jungle Cruise would have longer wait times on the day of A.L.'s December 19 visit, evidence tracked by Disney industrial engineers on that day showed that 72% of all rides at Magic Kingdom had posted wait times of less than 20 minutes; these wait times were posted electronically and updated in real time with a high degree of frequency. Nearly three-quarters of the nineteen rides and attractions that A.L. had on his preferred list had an average wait time of no more than 15 minutes; therefore, with the DAS card, A.L. would have been allowed to enter the FastPass lines immediately for those rides (without having to even "virtually wait"). D.L. also did not try to obtain any FastPass ahead of time.

D.L. admitted on cross examination that A.L. could have experienced all of the rides on his preferred list, in his preferred order, by waiting in the standby lines where they were short or by using his DAS card to immediately access the FastPass line for rides with wait times of 15 minutes or less, and he could have used his four readmission passes to immediately get on the few rides with longer waits. However, key to optimally using the DAS card, and the short standby lines (with waits less than 15 minutes) instead of the readmission passes, would have required D.L. to take steps to become aware of the various wait times for A.L.'s preferred rides. The Disney app shows the posted wait times for every ride and is constantly updated. Alternatively, D.L. could have sent someone in their party of six people, such as A.L.'s father or sister or the therapist, to walk ahead to the next ride in the same general area to check the sign in front of A.L.'s next

preferred ride for the posted wait times, which are also constantly updated, and obtain a return time for the entire party with the DAS card if the wait time was too long (exceeded 20 minutes).

D.L. declined to follow the explicit advice of the Guest Relations manager (Andie) and the DAS brochure which advised guests that "another member of your travel party may obtain a return time" with the DAS card *without* having to bring A.L. to the front of the ride, which could potentially upset him if he could not board right away. Thus, if another member of the party went ahead with the DAS card to obtain the return time, A.L. would only have to be at the ride when it was actually time to board the ride. The Court does not find credible D.L.'s testimony that she had to take A.L. with her to a ride in order to obtain a return time under the new DAS system. Her email to a Disney employee (Mark Jones) the following day complained that she was irritated at the suggestion (by the Guest Relations manager, Andie) that they split up the party for one person to go ahead of the group to get a return time without bringing A.L. with them to the ride unnecessarily.

If D.L. had followed the advice given at Guest Relations and used the DAS card properly, the evidence at trial showed A.L. could effectively wait "virtually" for the return time when necessary (if it was more than 20 minutes) because he could be effectively redirected so that he would not have a meltdown. However, instead of checking the posted wait times for any of the rides, D.L chose not to make any sincere attempt to test out the new DAS card, despite having as a back-up the remaining 18 individual readmission passes in case she needed them. In fact, D.L.'s party did not use any of the 18 remaining readmission passes that day. D.L. erroneously believed that if the posted wait time at the Jungle Cruise ride was forty minutes, then the other wait times would be even longer.

D.L. explained that instead of attempting to use DAS or the readmission passes at any other rides, she chose to divert from A.L.'s preferred route and "de-escalate the situation instead of setting him up to fail." As it turns out, D.L. was effective at distracting A.L. from his preferred route and he did not have a meltdown. In Dr. Kelderman's opinion, based on D.L.'s deposition and trial testimony about the December 19, 2013 visit, D.L. was able to effectively redirect A.L. and he transitioned off his preferred clockwise route; D.L. used replacement behaviors, a very common ABA strategy, to redirect A.L. for food, to see shows out of sequence in Tomorrowland and Cinderella's Castle, shopping, notably skipping the closed Snow White ride. Importantly, A.L. admittedly was able to deviate from his routine during the December 2013 visit, and at several EPCOT visits since 2013, without any meltdown. The Court finds that the proposed modification of ten readmission passes or unlimited access to the FastPass lines is not "necessary" to accommodate A.L.'s preference to follow a route or a pre-set list of rides.

### b. *Likeness of the experience for A.L. given his behavioral characteristics*

Compared to nondisabled guests, A.L. with the DAS card can access the same rides in less time and without physically standing in line. While "virtually" waiting A.L. can be redirected to a different activity. All nondisabled guests must plan ahead in order to reserve FastPass+ times and can obtain only three FastPass+ reservations in advance, and the FastPasses expire one hour after their return time. Nondisabled guests without a DAS Card have to physically wait in the standby line—sometimes for more than an hour for the most popular rides—to experience the rest of their chosen rides at Disney's parks. In comparison, with the DAS card, D.L. can obtain not only three FastPass+ advance reservations for A.L. but also a DAS Card "return time" for a fourth ride. After each DAS card ride is over, A.L.'s party can obtain one more DAS Card "return time" for a ride, all without waiting in a physical line. Another distinct advantage of the DAS card is that DAS

return times do not expire and are good for the entire day. Since the DAS system allows disabled guests to access the most popular attractions in the park with less wait time than the standby line, those guests can see more attractions than a non-DAS guest could experience because some of the wait time throughout the day has been eliminated.

For nondisabled guests to make the most of their time during their visit, they need to plan in advance to obtain FastPasses and, for rides where they will have to wait in the standby lines, they must decide whether they will electronically track the posted wait times through the app or by walking over to physically check the times in front of the rides. As the Eleventh Circuit noted in the appeal of this case, "It is not enough to show that the DAS Card does not eliminate all discomfort or difficulty." *A.L.*, 900 F.3d at 1296. "Because nondisabled guests must plan as well, Disney's asking parents of disabled guests to do so is reasonable and not illegal." *Id*.

Disney demonstrated at trial that, because A.L. is capable of waiting up to 20 minutes, the evidence shows that he could still have gone on all of the 19 rides and attractions on his list during their December 19, 2013 visit to Magic Kingdom with the readmission passes provided. The expectation of experiencing 19 rides in a single day—particularly when they did not arrive at Magic Kingdom until late afternoon—is a significantly higher number of rides than a typical non-disabled guest experiences in a day. D.L.'s admission that they could have gone on all of A.L.'s preferred rides on December 19 further shows that A.L. had more than equal access to the park. His experience at Magic Kingdom is also consistent with the Tester Study which showed that guests with a DAS card can experience significantly more rides in a day than guests without DAS. The testers with DAS experienced, on average, 45% more attractions than those without DAS, and waited in queues for half as much time as those without DAS cards.

In Dr. Kelderman's expert opinion, A.L.'s impairment does not require a modification of the DAS policy in order to have an experience at Disney which is like or similar to the experience of his nondisabled peers. DAS is consistent with the accepted treatments for autism, she explained, because it allows guests with autism to choose an alternative activity while waiting for another preferred activity similar to the distraction techniques that are used with A.L. as part of his ABA therapy. She opined that the DAS provides a higher level of service and access than the nondisabled experience, and he was able to "handle everything very well" on his visits to the Magic Kingdom.

For individuals with autism transitioning from the former GAC system to the new DAS system, Dr. Kelderman opined, the goal is to build as much predictability into the environment as possible and then attempt to reduce the maladaptive behavior; for A.L., visual schedules and visual supports should be used to make it an easier transition. The importance of preplanning for autistic individuals is stressed in Disney's *Guide for Guests with Cognitive Disabilities.* D.L. did no preplanning whatsoever to prepare A.L. for the transition from unlimited access under GAC to the new DAS system, even though D.L. had discussed the new system with two Disney employees prior to the visit. D.L. emphasized in her testimony that she plans for A.L. "every day," 365 days a year.

By all accounts, A.L. has worked hard and has made a great deal of progress in improving his maladaptive behaviors over the years; his reward has been a semi-annual trip to a Disney park. D.L.'s prominence and activism in the autism community speaks to her knowledge of autism and her dedication to her son and other autistic individuals. It is all the more surprising then that she did no preplanning with A.L. to make a sincere effort before their first visit with the new DAS system. Even though D.L. successfully uses visual aids such as scheduling and videos with A.L.

generally, she chose not to review any visual aids with him before the December 19 visit to Magic Kingdom. When pressed on why she did not do any preplanning to prepare A.L. for the change to DAS, as recommended by the *Guide for Guests with Cognitive Disabilities* (beyond emailing Disney employees for readmission passes), D.L. explained:

> I honestly felt based on -- on my history with Disney and doing the right thing and supporting those with disabilities that when we got there and I showed them [A.L.] -- right? Nobody had met [A.L.] until I brought him into guest relations. So they could clearly see that he was very involved. And I thought based on him and his size and his behaviors, that by seeing him, they would know that, in fact, the individual had autism and would need additional accommodations.

D.L. further admitted on cross-examination that she had fully anticipated that the accommodations would not only be the DAS card, but in addition, accelerated access for all of the attractions that A.L. wanted to visit that day, out of his list of 19 rides. In other words, D.L. anticipated that A.L. would be accommodated with the equivalent of the old GAC system, with unlimited access to all FastPass lines that would require no waiting and no pre-planning. The Court finds that Disney's DAS card provides A.L. with a "like," if not better, experience and equal enjoyment than nondisabled guests experience.

### B. The Reasonableness of A.L.'s Proposed Modification

Although D.L. did not seek a specific quantifiable number of readmission passes as an accommodation in Guest Relations on the day of the visit to the Magic Kingdom, December 19, 2013, she did request to receive more than the number of readmission passes (per person) that Ms. Martin had approved as the one-time accommodation. D.L. at trial stated the modification she believes is necessary to accommodate A.L.'s disability is to receive, in addition to the DAS card, ten readmission passes for visits to Disney parks[35] for everyone in his party.

---

[35] D.L. seeks ten readmission passes for Magic Kingdom, Hollywood Studios, and Animal Kingdom, and only five readmission passes for visits to EPCOT.

D.L. contends that the ten readmission passes would allow A.L. to visit the rides in his preselected order, without waiting, and fully accommodate his disability. Assuming *arguendo* that A.L. could show that his requested modification is "necessary" to accommodate his impairment, the Court must decide whether his requested modification of an automatic ten readmission passes, in addition to three FastPass+ reservations and the DAS card, would be "reasonable." A.L. attempted to argue at trial that granting the ten readmission passes to *only* his individual party would be reasonable because Disney had provided the requested modification for twenty years, as part of the GAC program.[36] He also argued that a competing theme park accommodates him with a pass for unlimited access to the shortest lines (similar to FastPass).

The Court finds that an automatic ten readmission passes for A.L. and everyone in his party—a total of up to 60 for a party of six—is not a reasonable modification because it would lengthen the wait times for all other riders, severely impacting the remaining non-DAS users, it would increase their wait time significantly, and potentially lead to the same fraud and overuse that existed with the GAC system, which required a complete overhaul to the current more-controllable DAS system.

A.L.'s proposed modification of ten readmission passes would essentially be like returning to the unlimited access to FastPass lines similar to the GAC system. Especially with the opening of new high-demand attractions like Stars Wars—Rise of the Resistance and Pandora, the demand by DAS cardholders for an additional ten readmission passes will certainly displace those without DAS cards. As Disney experienced with the GAC system, when a popular new ride at Disneyland opened, it drove a 40% increase in demand for GAC passes. When 3% of the guests admitted with

---

[36] To the extent Plaintiff argues that the modification is "reasonable" because Disney provided ten readmission passes to two other families with autistic children, their circumstances are very different. One mother has advanced cancer, the other inconsistently received extra passes. The evidence showed that Disney employees offer readmission passes to guests who are dissatisfied, as recovery tools, and for various reasons.

GAC passes use a disproportionate 30% of a popular ride's capacity, the system is not working the way it was designed and it is certainly working to the disadvantage of the non-GAC holding guests. The word spreading on social media that one disabled individual received an accommodation of ten readmission passes will increase the demand to be treated similarly by *every* disabled individual once they find out, as well as those willing to misrepresent they are disabled, until the exception for a "reasonable" request for readmission passes ends up swallowing the whole disability access system, once again, as it did with GAC.

The Court finds that A.L.'s proposed modification for unlimited access to the FastPass lines, or for ten readmission passes per person in his party, which amounts to virtually the same thing as unlimited FastPass access, is not a "reasonable" accommodation.

### C.  Fundamental Alteration to the Disney Park's experience

Disney presented substantial and uncontroverted evidence that the wait times for rides has a direct impact on guest satisfaction and whether guests intend to return. If guests' intention to return to the park decreases, future attendance decreases which decreases future revenue from lost attendance, hotel stays, food purchases, associated merchandise, and "everything else." Disney argues that allowing every person in a DAS holders' party to have ten additional readmission passes would have a significant impact on return business by lengthening wait times for approximately 97% of the other guests. One factor, as Disney has explained it, leading to abuse of the GAC program was that Guest Relations may not ask disabled individuals about the nature or extent of the person's disability, or ask for documentation, pursuant to federal regulations under the ADA.

This factor, uncontroverted at trial, distinguishes this case from *Colonial Williamsburg* where the Fourth Circuit found that, although the food sales were essential to the replicated 18th-

century tavern's bottom line, there was "no evidence that Colonial Williamsburg ha[d] been deluged with requests from people seeking to bring in outside food such that it couldn't give 'individualized attention to *the handful of requests* that it might receive'" on occasion from someone with severe food sensitivities. *J.D. by Doherty v. Colonial Williamsburg Found.*, 925 F.3d 663, 676-77 (4th Cir. 2019) (emphasis added); *but see id*. at 6 (Wilkinson, J., dissenting) (warning the impact of the "de facto" rule would be "sweeping in its effect" for proprietors who would not want to risk litigation).

In a case very much on point, a district court in California considered a guest's requested modification that Disneyland provide a DAS card to accommodate his anxiety condition. *See, e.g., Galvan v. Walt Disney Parks and Resorts,* 425 F.Supp.33d 1234, 1242 (C.D. Cal. Nov. 27, 2019). The court held that granting access to FastPass lines to significantly more guests with anxiety—which an expert testified 30% of the population has—would increase the inventory of DAS passes to an unsustainable level, place significant pressure on the FastPass lines, lengthen the ride wait times, impact park operations and "fundamentally alter" the "theme park experience." Similar concerns are present in this case.

Based on Disney's uncontroverted industrial engineering studies, Disney's expert opined that A.L.'s requested relief of additional readmission passes in the aggregate[37] would impact park operations by increasing wait times in the standby lines for most other guests without DAS (96.7%), interfere with their ability to access attractions at the parks, and decrease their trip satisfaction and their desire or intention to return to the park. Increased wait times, in turn, dramatically reduce the satisfaction levels of the guests, who become less likely to return to the parks. In the expert's queuing theory analysis, he determined that Disney's accommodation with

---

[37] Any additional accommodation supplementing a DAS card, as in 10 readmission passes, would have to be uniformly applied to the hundreds of disabled guests receiving a DAS card each day at all of the parks.

extra admission passes would basically be a return to the same system that GAC had, *i.e.*, "immediate and unlimited access to all attractions throughout the park." The former GAC system by definition allowed people to access the most popular attractions at a much higher rate and frequency—taking up 11% to 30% of the FastPass capacity on popular rides—and doubling the times in the standby lines. These increased wait times relate directly to guest dissatisfaction and "fundamentally alter" Disney's business model by undermining its revenue base.

## IV.   CONCLUSION

Based on the foregoing, the Court concludes that A.L.'s proposed modification of ten readmission passes or unlimited access to the FastPass lines is not "necessary" to accommodate A.L.'s preference to follow a route or a pre-set list of rides and the modification is not reasonable. Moreover, requiring the modification, based on the history of the former system, would lead to fraud and overuse, lengthen the wait times significantly for nondisabled guests, and fundamentally alter Disney's business model.

Accordingly, it is **ORDERED** as follows:

1.     The Clerk is directed to enter a final judgment providing that Plaintiff A.L. take nothing on his claim against Defendant Walt Disney Parks and Resorts US, Inc. The judgment shall further provide that the Defendant shall recover its costs of action.

2.    The Clerk shall close this case.

**DONE** and **ORDERED** in Chambers, in Orlando, Florida on June 22, 2020.

ANNE C. CONWAY
United States District Judge

Copies furnished to:

Counsel of Record